J. GREENBERGER, PLLC
*Counsel for Plaintiffs*
Jordan Greenberger, Esq.
195 Montague Street, 14th Floor
Brooklyn, NY 11201
(718) 502-9555
jordan@jgreenbergerlaw.com

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MATTHEW LOMBARDO and WHO'S HOLIDAY LIMITED LIABILITY COMPANY,<br><br>                              Plaintiffs,<br><br>            -against-<br><br>DR. SEUSS ENTERPRISES, L.P.,<br><br>                              Defendant. | Index No. 16-cv- _____<br><br>**COMPLAINT** |

Plaintiffs Matthew Lombardo ("Mr. Lombardo") and Who's Holiday Limited Liability Company (the "LLC") (collectively, "Plaintiffs"), by their counsel J. Greenberger, PLLC, plead the following as their complaint against defendant Dr. Seuss Enterprises, L.P. ("Defendant"):

**NATURE OF THE CASE**

1. Plaintiffs bring this action for a judgment declaring that Mr. Lombardo's play, *Who's Holiday!* (the "Play"), does not infringe Defendant's copyright in Dr. Seuss's *How The Grinch Stole Christmas* ("*Grinch*") because the Play constitutes fair use under the Copyright Act of 1976 (17 U.S.C. 107). A true and correct copy of the Play is annexed hereto as <u>Exhibit 1</u>, and *Grinch* is incorporated by reference.

2. Additionally, Defendant's tortious conduct caused Plaintiffs to suffer monetary damages. Defendant recklessly sent multiple cease and desist letters that succeeded in halting performances of the Play scheduled for the 2016 holiday season.

1

**PARTIES**

3. Mr. Lombardo is the author and copyright owner of the Play.  He is also the managing member of the LLC, and resides in New York, New York.

4. The LLC is a New York domestic limited liability company with its principal place of business in New York, New York.  The LLC optioned and managed the initial production of the Play.

5. Defendant, on information and belief: (a) is a California limited partnership with its principal place of business in California; (b) does business in New York, though it is not registered with the New York Department of State to do so; and (c) owns, by assignment, the copyright in *Grinch* and other intellectual property rights in the works of Theodor S. Geisel, the author of well-known children's books written under the pseudonym "Dr. Seuss."

**JURISDICTION AND VENUE**

6. This is a declaratory judgment action involving a case of actual controversy under the Copyright Act of 1976 (17 U.S.C. 101 *et seq.*).  The basis of jurisdiction is 28 U.S.C. 1331, 1338(a), and 2201.

7. Additionally, the Court has jurisdiction over the New York State common-law tort claim: there is diversity jurisdiction pursuant to 28 U.S.C. 1332(a)(1); and even absent diversity jurisdiction there is supplemental jurisdiction pursuant to 28 U.S.C. 1367.

8. Venue is proper in this District under 28 U.S.C. 1391(b)(2) and 1400(a) because a substantial part of the events giving rise to the claims arose in this District and because Defendant or its agent may be found in this District.

## FACTS APPLICABLE TO ALL CAUSES

*Grinch*

9. *Grinch* is a famous children's book by the author known as Dr. Seuss. It was originally published in 1957, and is still published in the United States by Random House Children's Books, a division of Random House, Inc., New York.

10. *Grinch* was duly registered with the United States Copyright Office in 1957 (A312043), and the copyright registration was renewed in 1985 (RE238319).

11. *Grinch* tells the story of the Grinch, a grouchy, solitary green monster whose "heart was two sizes too small." He hates Christmas. The Grinch lives in a cave on snowy Mount Crumpit, just north of the town of *Who*-ville, which is the home of the merry and warm-hearted *Whos* who all "liked Christmas a lot." Annoyed by the cheerful and noisy holiday festivities taking place in *Who*-ville, the Grinch hatches a plot to put an end to Christmas. On Christmas eve, the Grinch crudely dresses as Santa Claus (with his dog, Max, also crudely dressed as a reindeer), sleds down to *Who*-ville while the whole town is asleep, slides down *Who*-ville's chimneys, and steals Christmas-themed items from the *Whos*. At one home, as he is shoving a Christmas tree up the chimney, the Grinch is interrupted by a little girl named Cindy-Lou *Who*:

> And the Grinch grabbed the tree, and he started to shove
> When he heard a small sound like the coo of a dove.
> He turned around fast, and he saw a small *Who!*
> Little Cindy-Lou *Who*, who was not more than two.
>
> The Grinch had been caught by this tiny *Who* daughter.
> Who'd got out of bed for a cup of cold water.
> She stared at the Grinch and said, "Santy Claus, why,
> *"Why* are you taking our Christmas tree? WHY?"
>
> But, you know, that old Grinch was so smart and so slick
> He thought up a lie, and he thought it up quick!
> "Why, my sweet little tot," the fake Santy Claus lied,
> "There's a light on this tree that won't light on one side.

3

> "So I'm taking it home to my workshop, my dear.
> "I'll fix it up *there*.  Then I'll bring it back *here*."
>
> And his fib fooled the child.  Then he patted her head
> And he got her a drink and he sent her to bed.
> And when Cindy-Lou *Who* went to bed with her cup,
> HE went to the chimney and stuffed the tree up!

The Grinch escapes from Cindy-Lou's house, and continues his plot throughout all of *Who*-ville. He eventually returns home to Mount Crumpet, and as dawn breaks the Grinch expects to hear the *Whos* upset.  But despite his efforts, *Who*-ville's inhabitants still celebrate the holiday; his plot failed.  After some thought, the Grinch has a change of heart.  "Well … in *Who*-ville they say / That the Grinch's small heart / Grew three sizes that day!"  He returns everything that he stole, and joins the *Whos*' Christmas feast as the guest of honor.  "…HE HIMSELF…! *The Grinch carved the roast beast!*"

### *The Play*

12. Mr. Lombardo is a critically-acclaimed Broadway playwright.

13. In 2013, he wrote a gleefully imaginative ten-minute play, which was one of several playlets that made up a show called "Christmas on the Rocks," produced by TheaterWorks and performed in Hartford, Connecticut during the 2013 holiday season.

14. The setting for "Christmas on the Rocks" was Christmas Eve at a rundown local bar, with the bartender finding himself mixing drinks for a parade of surprising guests – children from popular Christmas tales, now all grown up.  The New York Times called the show a "shiny, new and dangerously irreverent holiday production," and stated, "This is in no way a holiday theater outing for the children. The characters use an impressive range of four-letter words."  Anita Gates, *Tiny Tim Cratchit, Older Now, Is a Bit of a Scrooge: A Review of 'Christmas on the Rocks' at TheaterWorks in Hartford*, N.Y. Times (December 12, 2013).

4

15. Mr. Lombardo's ten-minute playlet introduced the audience to a forty-five years old Cindy-Lou Who, the little girl who appears in *Grinch*. Life has dealt her a difficult hand and she has become embittered and jaded.

16. Due to the overwhelming audience reaction of Mr. Lombardo's playlet about Cindy-Lou Who, he decided to expand the playlet into an approximately 75-minute full length one-actress comedy: the Play.

17. In the Play, a grown up Cindy-Lou Who tells – in rhyme – the story of her life and its strange turn of events following her first fateful encounter with the Grinch in *Grinch*. As described in marketing materials for the Play: "You all know the story of Cindy Lou Who, Whom you last saw, when she was just two. But her life has taken quite a strange twirl So come see what's happened to that little girl!"

18. In the Play, Cindy-Lou Who is forty-five years old and living in a broken down trailer in the hills of Mount Crumpit. Having just been released from prison, she decides to throw a holiday party on Christmas Eve for her friends. As she waits for her guests to arrive, Cindy-Lou breaks the theatrical fourth wall and tells the audience how her life slowly fell apart since that fateful day when she first met the Grinch.

CINDY LOU WHO

> After dinner, that Grinch bravely told us the facts.
> How he lived by himself with just his dog Max.
> Such a sad little life, it brought a tear to my face
> How he could live all alone in that faraway place.
>
> Well. From that day forward, we became rather chummy
> That green thing and I. He was charming. And funny.
> He would drive into town in his little oxcart
> He was thoughtful and kind - for an ugly old fart.
>
> He taught me to skate, to ride my bike down the street.
> He took me for ice cream. Ohhh. That monster was sweet.

5

>Years flew by and we became rather close.
>My school chums didn't get it. They just thought he was gross.
>
>But every so often you befriend someone offbeat
>Who can teach you new lessons. Make you complete.
>I didn't care if he was different or not like the rest
>He treated me nicely. That's my only test.
>
>I'm not going to fib, I can't even pretend.
>That silly 'ol Grinch. He became my best friend.
>But things started to change when I turned eighteen.
>I was becoming a woman. And he? Was still green.
>
>The night of my birthday, he took me alone to the dock.
>Where he gave me my present. His big, thick, long –
>
>*The telephone rings.*
>
>Excuse me.

19. One by one her guests (including characters from other Dr. Seuss works) begin contacting her, making up a variety of excuses so they will not have to attend her party. An increasingly saddened Cindy-Lou admits that the cause of their reluctance is perhaps due to her scandalous reputation in town.

20. She confesses to having become pregnant with the Grinch's child. Cindy-Lou's parents, of course, were furious; they demanded that she not only never see that green monster again, but that she instead marry Morris McGurk (another Dr. Seuss character) in an effort to cover up her indiscretion and trick him into a shotgun wedding. Cindy-Lou agreed to their plan, but on the day of her wedding she ran away from her family and back into the arms of the Grinch, marrying him instead. Cindy-Lou moved into the Grinch's cave and slowly turned what was once a dark and dreary environment into a now functioning home for the newlyweds.

21. Cindy-Lou soon gave birth to a baby girl whom she named Patti. But family life was not what she had expected given that the Grinch had no way or means to support a wife and child.

Cindy-Lou even took a part time job to help with the cost of raising Patti, but that only lasted briefly, and no one else would hire her due to her reputation.

22. Years flew by for the struggling trio.  However, one Christmas Eve Cindy-Lou noticed that the Grinch mistakenly had left their dog, Max, outside all night, which led to an untimely death for the family hound.  Starving and desperate, Cindy-Lou rushed Max's corpse inside and put him into the oven, secretly serving the family pet for dinner so that they would all finally have something to eat.  When the Grinch discovered what she had done, he was livid and their dispute escalated:

### CINDY LOU WHO

> Then my husband came out with a rock in his mitt.
> It was him or me now. I don't put up with that shit.
> He lunged for me, soon moving in for the kill.
> I stepped quick to the left and he slipped down the hill.
>
> Thousands of feet my husband would fall.
> The saddest part was? I wasn't that sad at all.
> The police soon arrived when they found his dead carcass
> I didn't shed a tear. They all thought I was heartless.
>
> They dragged me downtown and began all their questions
> I couldn't afford counsel so I relied on suggestions.
> They charged me that night with a murder offense.
> I pleaded with them. "It was just self defense!"
>
> It was in all the papers and on TV shows
> All the whispers and gossip people chose to suppose
> They called me a killer. Some cold hearted wife
> Who had plotted and planned to take her own husband's life.
>
> But I didn't do anything 'cept protect myself and my child
> But the press had a field day. The rumors grew wild.
> No one believed sweet Cindy Lou Who
> They just painted me as some sick, psychopath shrew.
>
> I watched those twelve people the lawyers did choose
> a jury of my peers, all consisting of Whos.
> They found me guilty. And said that I lied.

7

> They charged me with murder and with yes, "canicide".

23. Cindy-Lou was convicted and served twenty years in jail. Her daughter Patti was put into a foster home and Patti refused to have anything more to do with her mother.

24. And so, having just been released from prison a few weeks ago, Cindy-Lou's party has turned out to be a failure. No one, including her own daughter, wants to spend the holiday with Cindy-Lou Who.

25. As a depressed and inconsolable Cindy-Lou turns out all the lights and gets ready for bed, she notices the audience still sitting there. They have not left her. They have been right there this entire time listening to her story. Feeling the spirit of joy and togetherness, Cindy-Lou invites the audience onstage to celebrate the holiday with her.

26. But wait. There is a knock at the front door. Cindy-Lou cannot imagine who it could be. As she looks out of the window to get a peek: it is Patti, who has come home for the holiday to be reunited with her mother as the curtain falls!

27. Dr. Seuss this is not. The Play is distinctive from, and departs markedly from, *Grinch*. Like *Grinch*, the Play is written in rhyming couplets. However, the Play does not copy *Grinch* verbatim, quote substantial (if any) portions of the text of *Grinch*, or copy the illustrations in *Grinch*. The highly transformative Play contains original dialogue, a newly devised plot, and the structure, tone and themes of the Play are materially different from that of *Grinch*.

28. In July 2016, the LLC was formed and production of the Play began. Over the next few months the LLC, *inter alia*, raised funds, engaged and paid various service providers, hired a director (Carl Andress) and an actress (Tony nominee Jennifer Simard), purchased the trailer set-piece, and contracted with an off-Broadway theater, including paying a $44,000 deposit for the venue.

29. Performances were scheduled to begin on November 2, 2016 at New World Stages, a theater owned and operated by The Shubert Organization, Inc. (the "Shubert Organization").

*Defendant's Cease & Desist Letters*

30. Beginning in July 2016, Defendant's attorneys sent various cease & desist letters that claimed the Play infringed Defendant's rights in *Grinch* and demanded that performances of the Play be cancelled.  The letters were sent by lawyers from the global law firm DLA Piper LLP (US), which has offices in New York, New York.

31. Defendant's counsel sent a cease and desist letter to Mr. Lombardo.

32. Defendant's counsel sent a cease and desist letter to the director, Mr. Andress, dated July 26, 2016.  Defendant's counsel sent follow-up letters to Mr. Andress dated August 22 and September 21, 2016.  Each letter was sent to an email address that, on information and belief, Mr. Andress does not regularly check.

33. Defendant's counsel sent a cease and desist letter to the general manager of the Play's production, Foresight Theatrical, dated September 27, 2016.

34. And most significantly, Defendant's counsel sent a cease and desist letter to the Shubert Organization, dated September 27, 2016, claiming that the Shubert Organization was infringing Defendant's rights and demanding that production of the Play cease.  Due to Defendant's letter, the Shubert Organization gave notice that it was terminating the venue license agreement for the theater, and thereafter it returned 90% of the deposit for the theater.

35. Defendant's cease and desist letters halted the further production, and the future performances, of the Play.

36. In response to the cease and desist letters, Mr. Lombardo (through counsel) engaged in discussions with Defendant's counsel concerning the alleged infringement claim.  During those

9

discussions, Mr. Lombardo's counsel, *inter alia*, referred Defendant's counsel to the recent fair use case *Adjmi v. DLT Entm't Ltd.*, 97 F. Supp. 3d 512 (S.D.N.Y. 2015).

37. On October 25, 2016, Defendant's counsel responded to Mr. Lombardo's counsel:

> We have now reviewed the Who's Holiday script (the "work") **in detail**. This review did not assuage our concerns regarding the work, and, as such, our position that the work constitutes an unauthorized and infringing use of Dr. Seuss's intellectual property remains unchanged. Moreover, **we fail to see how** this work could be defensible as a parody of Dr. Seuss's works or that **the case you referenced telephonically provides any support** that the work does not constitute actionable infringement of Dr. Seuss's intellectual property. [Emphasis added].

38. In other words, before sending its cease and desist letters Defendant had not reviewed the Play "in detail" or analyzed recent instructive case-law in order for Defendant to form a subjective good faith belief that the Play was not permitted by law.

39. Nonetheless, Defendant successfully halted performances of the Play and caused Plaintiffs to suffer damages.

## FIRST CAUSE OF ACTION

40. Plaintiffs repeat and re-allege paragraphs 1 - 39 herein.

41. There is an actual case and controversy whether the Play is fair use such that it does not infringe Defendant's copyright in *Grinch*. 17 U.S.C. 107.

42. A judicial determination of the parties' rights and duties is necessary and appropriate at this time and under these circumstances to resolve the controversy between the parties.

43. Plaintiffs request that a judicial determination be made, pursuant to 28 U.S.C 2201, that the Play constitutes fair use and does not infringe Defendant's copyright in *Grinch*.

44. The Play is an original work of authorship by Mr. Lombardo, and any copyrightable elements of *Grinch* that are used in the Play are used in a highly transformative manner and/or for purposes of parody, and thus represent a non-infringing fair use.

45. The law has long recognized that some opportunity for fair use of copyrighted materials is necessary to promote progress in art. The doctrine of fair use, derived from common law, is now codified in the Copyright Act of 1976 (17 U.S.C. 107). That codification does not so much define "fair use" as provide a non-exhaustive list of factors to guide fair use determinations.

46. In the preamble to 17 U.S.C. 107, Congress states that, "the fair use of a copyrighted work ... for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research is not an infringement of copyright." As the words "such as" indicate, the listing is illustrative and not limitative.

47. Four non-exclusive factors are properly considered in "determining whether the use made of a work in any particular case is a fair use." 17 U.S.C. 107. These statutory factors are: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.

48. The Play is highly transformative of *Grinch*. The Play adds something new to *Grinch*, with a further purpose and different character that alters *Grinch* with new expression, meaning, and message. The Play imbues *Grinch* with a character different from that for which *Grinch* was created, and strives for new aesthetics with creative and communicative results distinct from *Grinch*.

49. The Play is a parody of *Grinch* and is protected by the First Amendment. The Play imitates the style of *Grinch* for comic effect or ridicule, and reasonably can be perceived as commenting on *Grinch* or criticizing it.

50. The Play humorously juxtaposes the rhyming innocence of *Grinch* with, among other things, profanity, bestiality, teen-age pregnancy, familial estrangement, ostracization and scandal, poverty, drug and alcohol abuse, the eating of a family pet, domestic violence and murder. The Play may reasonably be taken as a comment on the naiveté of *Grinch*.

51. To the extent that the Play mimics, draws upon, or copies *Grinch*, it does so to make its point and such use of *Grinch* is neither substantial nor excessive in relation to the parodic purpose. *Grinch* is an object of the parody, and the Play's humor, or its comment, necessarily springs from recognizable allusion to *Grinch* through distorted imitation. Using some characteristic features of *Grinch* cannot be avoided, as the Play must be able to refer to recognizable elements of *Grinch* and conjure up at least enough of *Grinch* to make the objects of its critical wit recognizable.

52. Mr. Lombardo did not merely use elements of *Grinch* to get attention or to avoid the drudgery in working up something fresh.

53. The Play is not a substitute for *Grinch*, does not merely supersede *Grinch*, and does not usurp the market for *Grinch*.

54. The Play is intended for adult audiences and contains adult themes and content. While both works rhyme, have happy-endings, and include the character Cindy-Lou Who, *Grinch* is a now-classic children's book intended for an all-ages audience. The Play, on the other hand, is a comedic work with explicit language geared towards only adult audiences. The language and tone of the Play is shockingly different from *Grinch*, and the Play's audience cannot mistake it for a theatrical version of *Grinch* given the Play's tone, plot, and other differences.

55. Defendant, as the owner of intellectual property rights in Dr. Seuss's works, is unlikely to develop a market for adaptations of *Grinch* similar in theme or tone to the Play. Indeed,

Defendant has exploited a derivative theatrical production of *Grinch*, "Dr. Seuss How The Grinch Stole Christmas! The Musical," and according to reviews posted on Defendant's website (www.grinchmusical.com), its show is "an awesome first Broadway musical for kids;" "a total delight for both kids and adults. For a family on a holiday-season outing, it's the right ticket;" and "A perfect holiday outing for the family."

56. The Play and *Grinch* serve different market functions.

57. Accordingly, Plaintiffs are entitled to a judgment declaring, in their favor and against Defendant, that the Play is fair use and/or does not infringe *Grinch*.

## SECOND CAUSE OF ACTION

58. Plaintiffs repeat and re-allege paragraphs 1 - 57 herein.

59. Defendant tortuously sent cease and desist letters without first reading the Play in detail and considering in good faith whether the Play is non-infringing. Defendant's conduct caused performances of the Play to be cancelled, and caused Plaintiffs to suffer monetary damages.

60. By claiming that the Play infringed Defendant's rights, Defendant's communications falsely cast doubt on the lawfulness of the Play and were derogatory to Plaintiffs.

61. Defendant's communications were reasonably calculated to halt production of the Play, and resulted in special damages to Plaintiffs including $55,861.92 in special damages to the LLC as follows:

| *Payee* | *Description* | *Date Paid* | *Damages* |
|---|---|---|---|
| Matthew Lombardo | Author Fee & Advance | 9/19/16 | $10,000.00 |
| Andrew Farber, Esq. | Legal Counsel | 9/21/16 | $6,000.00 |
| Shane Marshall Brown | Press Agent | 9/22/16 | $2,000.00 |

13

| | | | |
|---|---|---|---|
| Sam Rudy Media Relations | Press Agent | 9/22/16 | $2,000.00 |
| Foresight Theatrical | General Manager | 9/22/16 | $5,000.00 |
| R. Eric Craig | Executive Producer | 9/23/16 | $1,250.00 |
| Red Rising Marketing, Inc. | Advertising | 9/23/16 | $3,100.00 |
| New World Stages Operating Company, Inc. | Theater/Venue (Shubert Organization) | 9/24/16 | $4,400.00[1] |
| Red Rising Marketing, Inc. | Advertising | 9/26/16 | $1,092.00 |
| Fraver Design LLC | Graphics | 9/26/16 | $2,000.00 |
| Red Rising Marketing, Inc. | Advertising | 10/5/16 | $575.00 |
| Doug Barron | Graphics | 10/5/16 | $500.00 |
| King Displays, Inc. | Posters/Marquee | 10/5/16 | $1,714.78 |
| Fraver Design LLC | Graphics | 10/5/16 | $2,000.00 |
| Milograph Ltd | Website | 10/5/16 | $225.00 |
| David Gallo Design Ltd. | Set Design | 10/6/16 | $868.04 |
| ICM Partners (as agent for David Gallo Design Ltd.) | Set Design | 10/6/16 | $1,666.67 |
| Jersey Carts | Set Piece (trailer) | 10/6/16 | $2,138.93 |
| Diagonal Media, LLC | Website | 10/8/16 | $2,850.00 |
| La Vie Productions LLC | Executive Producer | 10/18/16 | $1,250.00 |
| Jennifer J. Simard | Actress | 10/20/16 | $2,114.00 |

---

[1] The LLC paid a $44,000 deposit for the theater on September 24, 2016, of which 90% was returned after the license agreement was terminated; $4,400 is 10% of the deposit.

| | | | |
|---|---|---|---|
| Christine Catti | Stage Manager | 10/20/16 | $617.50 |
| Carl Andress | Director | 11/18/16 | $2,500.00 |
| ***Total*** | | | ***$55,861.92*** |

62. Additionally, Defendant's tortious conduct prevented or interfered with relationships between Plaintiffs and others.

63. Defendant caused Plaintiffs to suffer lost box-office receipts, such monetary damages to be determined but believed by Plaintiffs to exceed the $75,000 threshold for diversity jurisdiction. The theater at maximum capacity seats 499 people, the average ticket price would have been approximately $92.31 per ticket, and performances of the Play were scheduled to run for nine weeks during the 2016 holiday season.

64. Also due to Defendant's tortious conduct, the LLC was unable to raise additional capital from expectant and pledged investors, and Plaintiffs have been unable to generate revenues from any other exploitations of the Play.  For example, Plaintiffs received an offer to produce and perform the Play in the summer and autumn of 2017.

65. Accordingly, Plaintiffs are entitled to a monetary judgment in their favor and against Defendant.

WHEREFORE, Plaintiffs demand judgment:

(i)      On the first cause of action, (a) declaring that the Play constitutes fair use under 17 U.S.C. 107 and does not infringe Defendant's copyright in *Grinch*; and (b) awarding Plaintiffs attorney's fees pursuant to 17 U.S.C. 505;

(ii)     On the second cause of action, awarding monetary damages in Plaintiffs' favor, and against Defendant, in the amount of $55,861.92 in special damages, plus general damages in an amount to be determined but believed to exceed $75,000, plus interest;

(iii)    Awarding Plaintiff costs and disbursements in this action; and

(iv)    For such other and further relief as the Court deems just and proper.

## REQUEST FOR JURY TRIAL

Plaintiffs request a jury trial on all the issues so triable, pursuant to Fed. R. Civ. P. 38. This request is without prejudice to, or waiver of, Plaintiffs' right to move for judgment in their favor, pursuant to Fed. R. Civ. P. 12 and/or 56, on all issues that may be decided by the Court, including without limitation the issue of fair use.

Dated: December 27, 2016
       Brooklyn, New York

                                J. GREENBERGER, PLLC
                                *Counsel for Plaintiffs*

                                   /s/ Jordan Greenberger
                                Jordan Greenberger, Esq.
                                195 Montague Street, 14th Floor
                                Brooklyn, New York 11201
                                Tel: (718) 502-9555
                                jordan@jgreenbergerlaw.com