UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- X

MATTHEW LOMBARDO AND WHO'S
HOLIDAY LLC,

               Plaintiffs,

        -against-

DR. SEUSS ENTERPISES, L.P.,

             Defendant.

------------------------------------- X

:
:
:
:
:
:
:
:
:
:
:
:
:

**ECF CASE**

1:16-cv-09974 (AKH)

## DEFENDANT DR. SEUSS ENTERPRISES, L.P.'S MEMORANDUM OF LAW IN SUPPORT OF PARTIAL MOTION TO DISMISS THE COMPLAINT

Dated: New York, New York
      February 3, 2017

Of Counsel:

Tamar Y. Duvdevani
Ryan C. Compton (*pro hac vice* pending)

DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020
(212) 335-4500

*Attorneys for Defendant Dr. Seuss*
*Enterprises, L.P.*

## TABLE OF CONTENTS

**Page**

I.      PRELIMINARY STATEMENT ........................................................................ 1

II.     STATEMENT OF RELEVANT PLEADED FACTS AND DOCUMENTS ................... 4

III.    ARGUMENT ............................................................................................ 8

        A.    Legal Standard On A Motion to Dismiss .............................................. 8

        B.    Plaintiffs Fail To Plead The Elements Of A Tortious Interference Claim ........... 9

        C.    Even Had Plaintiffs Plead The Elements Of A Tortious Interference
              Claim, The Claim Fails As A Matter Of Law ...................................... 16

IV.     CONCLUSION ........................................................................................ 23

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ace Arts, LLC v. Sony-ATV Music Publ'g,*
56 F. Supp. 3d 436 (S.D.N.Y. 2014.)............................................................................... passim

*Agfa Corp. v. United Marketing Group, Inc.,*
No. 02 Civ. 8468 (LAP), 2003 WL 21555087 (S.D.N.Y. 2003)............................................21

*Altseekers, Inc. v. BrandForce SF, LLC,*
No. 12-cv-5392, 2015 WL 5719759 (E.D.N.Y. Sept. 29, 2015) .....................................10, 11

*Am. Bldg. Maint. Co. of New York v. Acme Prop. Servs.,*
515 F. Supp. 2d 298 (N.D.N.Y. 2007) ..................................................................................12

*Applera Corp. v. MJ Research Inc.,*
303 F. Supp. 2d 130 (D. Conn. 2004)....................................................................................20

*Ariel (UK) Ltd. v. Reuters Group PLC,*
05 Civ. 9646, 2006 WL 3161467 (S.D.N.Y. Oct. 31, 2006), *aff'd*, 277 F. App'x. 43
(2d Cir. 2008)............................................................................................................................9

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009).........................................................................................................8, 21

*AstraZeneca AB v. Mylan Labs., Inc.,*
No. 00 CIV. 6749, 2010 WL 2079722 (S.D.N.Y. May 19, 2010), *aff'd sub nom., In re
Omeprazole Patent Litig.*, 412 F. App'x 297 (Fed. Cir. 2011)...................................19, 20, 22

*Barbarian Rugby Wear, Inc. v. PRL USA Holdings, Inc.,*
Case No. 06 Civ. 2652, 2009 WL 884515 (S.D.N.Y. Mar. 31, 2009)....................................20

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007)........................................................................................................8, 21

*Bill Diodato Photography LLC v. Avon Products, Inc.,*
12 Civ. 847, 2012 WL 4335164 (S.D.N.Y. Sep. 21, 2012) ...................................................4, 9

*Bill Graham Archives v. Dorling Kindersley Ltd.,*
448 F.3d 605 (2d Cir. 2006)..................................................................................................22

*Boehner v. Heise,*
734 F. Supp. 2d 389 (S.D.N.Y. 2010).............................................................................11, 12

*Bruce Lee Enterprises, LLC v. A.V.E.L.A., Inc.,*
No. 10-cv-2333, 2013 WL 822173 (S.D.N.Y. Mar. 6, 2013).........................................15, 18

ii

*Cerveceria Modelo, S.A. De C.V. v. USPA Accessories LLC,*
   No. 07-cv-7998, 2008 WL 1710910 (S.D.N.Y. Apr. 10, 2008) ............................................12

*CHoldings B.V. v. Asiarim Corp.,*
   992 F. Supp. 2d 223 (S.D.N.Y. 2013)..................................................................................10

*CIBC Bank and Trust Co. (Cayman) Ltd. v. Banco Central do Brasil,*
   886 F. Supp. 1105 (S.D.N.Y. 1995).....................................................................................13

*Coleman v. ESPN, Inc.,*
   764 F. Supp. 290 (S.D.N.Y. 1991) ......................................................................................22

*D'Andrea v. Rafla–Demetrious,*
   3 F. Supp. 2d 239 (E.D.N.Y. 1996), *aff'd*, 146 F.3d 63 (2d Cir. 1998) ............................11, 13

*Dessert Beauty, Inc. v. Fox,*
   568 F. Supp. 2d 416 (S.D.N.Y. 2008)..................................................................................17

*DirecTV, Inc. v. Lewis,*
   No. 03-cv-6241, 2005 WL 1006030 (W.D.N.Y. Apr. 29, 2005).............................................19

*Excalibur Systems, Inc. v. Aerotech World Trade, Ltd.,*
   No. 98-cv-1931, 1999 WL 1281496 (E.D.N.Y. Dec. 30, 1999)...............................10, 13, 14

*G-I Holdings, Inc. v. Baron & Budd,*
   179 F. Supp. 2d 233 (S.D.N.Y. 2001)..................................................................................12

*Gortat v. Capala Bros., Inc.,*
   257 F.R.D. 353 (E.D.N.Y. 2009) ..........................................................................................2

*Guard–Life Corp. v. S. Parker Hardware Mfg.,*
   428 N.Y.S.2d 628 (1980)....................................................................................................10

*Highland Capital Mgmt. LP. v. Schneider,*
   198 F.. App'x. 41 (2d Cir. 2006) ...........................................................................................9

*Kirch v. Liberty Media Corp.,*
   449 F.3d 388 (2d Cir. 2006)...............................................................................................11

*Kirch v. Liberty Media Corp.,*
   449 F.3d 388 (2d Cir. 2006)...............................................................................................10

*Landscape Forms, Inc. v. Columbia Cascade Co.,*
   117 F. Supp. 2d 360, 56 U.S.P.Q.2d 1613 (S.D.N.Y. 2000) ..................................................18

*Leopold v. Henry I. Siegel Co.,*
   Case No. 86 Civ. 0063 (MGC), 1987 WL 5373 (S.D.N.Y. Jan. 5, 1987) ...............................17

*Lombard v. Booz-Allen & Hamilton, Inc.,*
    280 F.3d 209 (2d Cir. 2002).................................................................10, 13

*Marchon Eyewear, Inc. v. Clariti Eyewear, Inc.,*
    No. 04 CV 2103SJ, 2005 WL 820497 (E.D.N.Y. Apr. 6, 2005) ...........................................20

*McCarthy v. Dun & Bradstreet Corp.,*
    482 F.3d 184 (2d Cir. 2007)..........................................................................8

*Novo Nordisk of North America, Inc. v. Genentech, Inc.,*
    885 F. Supp. 522, 35 U.S.P.Q.2d 1058 (S.D.N.Y. 1995) ......................................20

*Orange Cnty. Choppers, Inc. v. Olaes Enterprises, Inc.,*
    497 F. Supp. 2d 541 (S.D.N.Y. 2007)................................................................12

*P. Kaufmann, Inc. v. Americraft Fabrics, Inc.,*
    232 F. Supp. 2d 220 (S.D.N.Y. 2002)...........................................................17, 18

*Perez v. MTA,*
    11 Civ. 8655 (RWS), 2012 WL 1943943 (S.D.N.Y. May 29, 2012) ......................................8

*Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.,*
    507 F.3d 117 (2d Cir. 2007)..........................................................................8

*Primetime 24 Joint Venture v. National Broadcasting Co., Inc.,*
    219 F.3d 92 (2d Cir. 2000)........................................................................3, 19

*Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.,*
    508 U.S. 49 (1993) ("*PRE*") ...................................................................18, 20

*Radiancy, Inc. v. Viatek Consumer Products Group, Inc.,*
    138 F. Supp. 3d 303 (S.D.N.Y. 2014).................................................................15

*Rapoport v. Asia Elec. Holding Co., Inc.,*
    88 F. Supp. 2d 179 (S.D.N.Y. 2000)..................................................................9

*RFP LLC v. SCVNGR, Inc.,*
    788 F. Supp. 2d 191 (S.D.N.Y. 2011)...............................................................14

*Ricciuti v. N.Y. City Transit Auth.,*
    90 Civ.2823, 1991 WL 221110 (S.D.N.Y. Oct. 3, 1991) .........................................2

*Riddle v. Citigroup,*
    13 Civ. 6833 (AKH), 2014 WL 2767180 (S.D.N.Y. May 29, 2014) ......................................8

*S&L Vitamins, Inc. v. Australian Gold, Inc.,*
    521 F. Supp. 2d 188 (E.D.N.Y. 2007) ...........................................................11, 14

*Shapiro & Son Bedspread Corp. v. Royal Mills Assocs.*,
   764 F.2d 69 (2d Cir. 1985)..................................................................18

*Swatch Group Mgmt. Services Ltd. v. Bloomberg L.P.*,
   808 F. Supp. 2d 634 (2011) (Hellerstein, J.)......................................22

*Tasso v. Platinum Guild Int'l.*,
   No.94-cv-8288, 1997 WL 16066 (S.D.N.Y. Jan. 16, 1997)....................10

*UMGRecordings, Inc. v. Global Eagle Entertainment, Inc.*,
   117 F. Supp. 3d 1092 (C.D. Cal. 2015) ................................................21

*Winter-Wolff Intern., Inc. v. Alcan Packaging Food and Tobacco Inc.*,
   499 F. Supp. 2d 233 (E.D.N.Y. 2007) ..................................................13

*Wolff v. Rare Medium, Inc.*,
   210 F. Supp. 2d 490 (S.D.N.Y. 2002).................................................13

STATUTES

17 U.S.C. § 107...................................................................................4, 5

OTHER AUTHORITIES

6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 31:104 (4th ed.) ...........................20

3 NIMMER ON COPYRIGHT § 8D.05 ................................................................21

Fed. R. Civ. P. 12(a)(4) ..........................................................................2

Fed. R. Civ. P. 12(b)(6).......................................................................1, 8

Defendant Dr. Seuss Enterprises, L.P. ("Dr. Seuss") respectfully submits this memorandum of law in support of its motion pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the Second Cause of Action against Dr. Seuss asserted in the Complaint of plaintiffs Matthew Lombardo and Who's Holiday LLC (collectively, "Plaintiffs").

## I.   PRELIMINARY STATEMENT

In July 2016, Dr. Seuss learned that Plaintiffs had created a play titled *Who's Holiday!* based on the iconic Dr. Seuss work *How The Grinch Stole Christmas!*  After reviewing the publicly available information about the play, including a flyer written in Dr. Seuss's well-recognized typeface that contained a copyrighted image of the Dr. Seuss character Cindy Lou Who, counsel for Dr. Seuss sent a cease and desist letter to the play's director (who was listed on the flyer).  The demand letter specifically noted Dr. Seuss's intellectual property rights and Dr. Seuss's concerns that the play and its marketing materials infringed the same, but welcomed the director to share a copy of the script to the extent he believed that the allegedly infringing use of Dr. Seuss intellectual property was protectable and/or non-infringing.  The director failed to respond to the letter, despite two additional attempts by Dr. Seuss in August and September 2016 to elicit a response to the same.  Dr. Seuss then contacted the relevant theater (the Shubert Organization) and the author of the play, plaintiff Matthew Lombardo, to reiterate its concerns and demands.  When Dr. Seuss was finally given a copy of the script, it did not change its view that the work infringed its intellectual property rights, and indicated as much to Plaintiffs in pre-litigation correspondence.  Dr. Seuss did not hear back, and the play was never performed.

Plaintiffs now seek a declaratory judgment of non-infringement of Dr. Seuss's copyright, premised on the argument that its appropriation of Dr. Seuss intellectual property amounts to Copyright Act fair use.  Dr. Seuss disagrees that this defense shields Plaintiffs from liability, and

will litigate this issue in the months to come.[1]  However, Plaintiffs have also advanced a second claim, with a corresponding demand for six figures of special and general monetary damages, exclusively premised on the demand letters described above.  This claim is ripe for dismissal.

The gravamen of Plaintiffs' Second Cause of Action is that Dr. Seuss "tortuously" sent cease and desist letters without reading the play or considering in "good faith" whether the play is non-infringing.  Plaintiffs assert in conclusory fashion that those letters "falsely cast doubt" on the lawfulness of the play, were "derogatory" to Plaintiffs, and "prevented or interfered with relationships between Plaintiffs" and unknown "others."  Plaintiffs do not make clear as to whether their Second Cause of Action asserts a claim for tortious interference with contract or tortuous interference with prospective contractual relations, but either way, the claim fails, and should be dismissed for three main reasons.

First, Plaintiffs fail to plead the necessary elements for either type of tortuous interference claim.  For example, it is axiomatic that in order to state a claim for tortious interference with contract, there must be an allegation that a third party breached a specific provision of an agreement with the plaintiff, and that the defendant's intentional procurement of that third-party's breach of the contract was without justification.  Similarly, to state a claim for tortious interference with prospective contractual relations, the plaintiff must allege a defendant's interference with its business relations for a wrongful purpose or through wrongful means.  These allegations are absent from the Complaint: the only reference to any agreement in the

---

[1] As Dr. Seuss has timely moved to dismiss the Second Cause of Action, it has not yet served its answer to the Complaint or asserted its counterclaims.  *See, e.g.*, *Gortat v. Capala Bros., Inc.*, 257 F.R.D. 353, 366 (E.D.N.Y. 2009) ("[Fed. R. Civ. P. 12(a)(4)] provides that the service of a motion pursuant to Rule 12 suspends the movant's time to file a responsive pleading until 10 days following the disposition of the motion.  Interpreting that rule, courts have held that filing a partial motion to dismiss will suspend the time to answer those claims or counterclaims that are not subject to the motion."); *Ricciuti v. N.Y. City Transit Auth.,* 90 Civ.2823, 1991 WL 221110, at *2 (S.D.N.Y. Oct. 3, 1991) (same).

Complaint is the Shubert Theatre's "termination" – <u>not</u> breach – of the venue license agreement, and no "wrongful means," as that term has been defined by the relevant case law, is plead. Dr. Seuss had the absolute right to protect its valid intellectual property rights as a matter of law. Plaintiffs' conclusory allegations that Dr. Seuss's demand letters, which are referenced in the Complaint, relied upon by Plaintiff, and now before the Court, are somehow tortuous, cannot change this fact.

Second, even had Plaintiffs plead the necessary elements of their tortious interference cause of action, it is well-established that cease and desist letters cannot form the basis for tortious interference claims, particularly where, as here, there is no dispute that Dr. Seuss owns the intellectual property asserted in its letters, and where Plaintiffs merely assert that their appropriation of Dr. Seuss's copyright is shielded by a complex and fact-intensive affirmative defense. Dr. Seuss has discussed in this brief a number of cases from the Second Circuit dismissing similar tortious interference claims, and is not aware of any case that offers a contrary result under these circumstances. Indeed, the cases discussed herein that dismiss interference claims largely relate to claims that an intellectual property owner sent letters to completely unrelated third party retailers; here, the letters were sent to individuals actually involved in the play's production, and only after Dr. Seuss did not elicit a response from the play's director after three attempts to do so. Accordingly, Plaintiffs' entire premise for its Second Cause of Action is flawed.

Third, Dr. Seuss's legitimate efforts to protect its intellectual property are immunized by the *Noerr-Pennington* doctrine. The Second Circuit has noted that while the doctrine is borne out of antitrust law, "good faith litigation to protect a valid copyright . . . falls within the protection of the *Noerr-Pennington* doctrine." *Primetime 24 Joint Venture v. National*

*Broadcasting Co., Inc.*, 219 F.3d 92, 100 (2d Cir. 2000).  Such "litigation" includes pre-litigation demands, just like the ones at issue here.  As Plaintiffs did not, and cannot, allege that Dr. Seuss engaged in any "sham" litigation activity, the *Noerr-Pennington* doctrine provides a complete defense to Plaintiffs' tortuous interference claim.

For all of these reasons, Plaintiffs' Second Cause of Action and accompanying monetary damages demands should be dismissed, with prejudice.

## II.    STATEMENT OF RELEVANT PLEADED FACTS AND DOCUMENTS[2]

Defendant Dr. Seuss, the owner of the intellectual property rights in the works of Theodor S. Geisel, owns the copyright (A312043) in the renowned children's book, *How The Grinch Stole Christmas!* ("The Grinch"), which was originally published and registered with the United States Copyright Office in 1957.  (Compl. ¶¶ 5, 9-10.)  The copyright registration was renewed in 1985 (RE238319) and The Grinch is still published today. (*Id*. ¶¶ 9-10.)

Plaintiff Matthew Lombardo is the author of *Who's Holiday!* (the "Play"), and plaintiff Who's Holiday LLC "optioned and managed the initial production of the Play."  (*Id*. ¶¶ 3-4.) Plaintiffs allege in their Complaint that the Play does not infringe the copyright in The Grinch because the appropriation of Dr. Seuss's copyrighted material used in the Play amounts to fair use pursuant to 17 U.S.C. § 107.  (*Id*. ¶ 41.)  Plaintiffs also allege in their Second Cause of Action that Dr. Seuss engaged in "tortuous conduct" as a result of "cease and desist letters" that it sent to parties associated with the Play.  (*Id*. ¶¶ 59-65.)  Pursuant to the Second Cause of Action, Plaintiffs seek monetary damages from Dr. Seuss.  (*Id*. at p. 16.)

---

[2] For purposes of this motion only, the Court should assume the truth of the well-pleaded factual allegations of the Complaint.  However, where allegations of the Complaint are contradicted by the language of the documents referred to in the Complaint, it is the document's language, not the plaintiffs' allegations, that controls.  *Bill Diodato Photography LLC v. Avon Products, Inc*., 12 Civ. 847, 2012 WL 4335164, at *3 (S.D.N.Y. Sep. 21, 2012).

**The Cease and Desist Letters**

Beginning in July 2016, Dr. Seuss's lawyers sent correspondence regarding the Play to Plaintiffs and other parties involved in the Play's production.  (*Id*. ¶¶ 30-31).  These letters, discussed and relied upon in the Complaint, and thereby incorporated by reference,[3] are attached as Exhibits A-F to the February 3, 2017 Declaration of Tamar Y. Duvdevani ("Duvd. Decl.").

On July 26, 2016, Dr. Seuss sent a letter to an individual named Carl Andress, who was listed in Plaintiffs' advertising as the Play's director.  (Duvd. Decl. Ex. A.)  In this first letter, counsel for Dr. Seuss set forth in detail the ownership of its copyright in The Grinch, along with ownership of associated trademarks.  (*Id*. at 1.)  Counsel for Dr. Seuss further explained that it had recently come to their attention that Mr. Andress "appear[ed] to be directing a stage play based on or derived from the book *How The Grinch Stole Christmas!*" and pointed out that the flyer associated with the Play, reproduced in the letter and depicted below, makes prominent and unauthorized use of Dr. Seuss intellectual property:  (*Id*. at 1-2.)



---

[3] *See* Section III(A).

(Ex. A at 1.)

The letter required immediate action relating to removal and cessation of use of Dr. Seuss intellectual property, but also stated that "[i]f you believe that your use of the Dr. Seuss Intellectual Property is protected or otherwise non-infringing, please provide us with a copy of the script of the Infringing Work for our review." (*Id.* at 2.)

On August 22, 2016, counsel for Dr. Seuss followed up with Mr. Andress, enclosing a copy of the July 26, 2016 letter, pointing out that no response had been received, and demanding a response within five business days. (Ex. B. at 1.) After no response was received, Dr. Seuss made a third attempt to receive a response from Mr. Andress on September 21, 2016. (Ex. C.)

Failing to hear back from Mr. Andress for two months and after three letters, on September 27, 2016, Dr. Seuss sent additional correspondence to (1) Foresight Theatrical (Compl. ¶ 33; Ex. D); (2) plaintiff Matthew Lombardo (Compl. ¶ 31; Ex. E); and (3) the Shubert Organization. (Compl. ¶ 34; Ex. F.) On September 29, 2016, counsel for Dr. Seuss received a response from the Shubert Organization, directing counsel to plaintiff Who's Holiday LLC c/o Foresight Theatrical. (Ex. G.)

Following transmission of the September 27, 2016 letters, counsel for Plaintiffs and Dr. Seuss engaged in a telephonic discussion regarding the infringement claim, wherein counsel for Plaintiffs cited a fair use decision out of the Southern District of New York as a defense to Dr. Seuss's claim of copyright infringement. (*Id.* ¶ 36.) Following that discussion, on October 13, 2016, Plaintiffs' counsel forwarded a copy of the script sought by Dr. Seuss back in July 2016.[4] (Ex. H.) Dr. Seuss's counsel then responded to the e-mail:

_____

[4] Notably, the title page of the script received by Dr. Seuss on October 13, 2016, utilized the stylized lettering indicative of Dr. Seuss. The script submitted to the Court did not. (*compare* Ex. H at 2 with Compl. Ex. A at 1).

6

We have now reviewed the Who's Holiday script (the "work") in detail. This review did not assuage our concerns regarding the work, and, as such, our position that the work constitutes an unauthorized and infringing use of Dr. Seuss's intellectual property remains unchanged. Moreover, we fail to see how this work could be defensible as a parody of Dr. Seuss's works or that the case you referenced telephonically provides any support that the work does not constitute actionable infringement of Dr. Seuss's intellectual property.

Consequently, we reiterate our demands that your client agree to cease any and all use of the work, including any planning for performance of the same, or any other unauthorized use of the Dr. Seuss intellectual property. Please confirm in writing by October 31, 2016 that your client will comply with these demands.

Please note that this letter is made without prejudice to any other rights or remedies that may be available to Dr. Seuss. Nothing contained herein should be deemed a waiver, admission, or license by Dr. Seuss, and Dr. Seuss expressly reserves the right to assert any other factual or legal positions as additional facts come to light or as the circumstances warrant.

(Compl. ¶ 37; Ex. I.)  Dr. Seuss failed to hear back from Plaintiffs until this lawsuit was filed.

### **Plaintiffs' Second Cause of Action**

Plaintiffs seek recovery under a Second Cause of Action for "tortious conduct" arising exclusively from the cease and desist letters described above. (Compl. ¶¶ 59-65.)  In particular, Plaintiffs allege that due to Dr. Seuss's letter, the Shubert Organization "gave notice that it was terminating the venue license agreement for the theater . . . ." (*Id.* ¶ 34).  Plaintiffs allege that Dr. Seuss "recklessly sent multiple cease and desist letters that succeeded in halting performances of the Play scheduled for the 2016 holiday season." (*Id.* ¶ 2.)  Plaintiffs also allege that before sending the letters, Dr. Seuss had not reviewed the Play "in detail" or analyzed recent case law to form a subjective good faith belief that the Play was infringing of Dr. Seuss's rights. (*Id.* ¶¶ 38, 59.)  Plaintiffs further claim that Dr. Seuss's letters "falsely cast doubt on the lawfulness of the Play and were derogatory to Plaintiffs" and that Dr. Seuss's "tortious conduct

7

prevented or interfered with relationships between Plaintiffs and others."  (*Id.* ¶¶ 60, 62.)
Finally, Plaintiffs allege that due to Dr. Seuss's "tortious conduct" Plaintiffs were unable to raise
additional capital and generate revenues from "other exploitations of the Play."  (*Id.* ¶ 64.)
Plaintiffs consequently claim to have suffered special damages in the amount of $55,861.92, plus
general damages in excess of $75,000. (*Id.* ¶¶ 35, 39, 61-65, p. 16.)

## III.     ARGUMENT

### A.     Legal Standard On A Motion to Dismiss

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must contain
sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"
*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,
570 (2007)).  "Plaintiffs must allege sufficient facts to 'nudge[ ] their claims across the line from
conceivable to plausible.'"  *Perez v. MTA*, 11 Civ. 8655 (RWS), 2012 WL 1943943, at *3
(S.D.N.Y. May 29, 2012) (quoting *Twombly*, 550 U.S. at 570).  "Though the court must accept
the factual allegations of a complaint as true, it is 'not bound to accept as true a legal conclusion
couched as a factual allegation.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550
U.S. at 555)).  Moreover, a plaintiff must "allege facts that are not merely consistent with the
conclusion that the defendant violated the law, but which actively and plausibly suggest that
conclusion."  *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 121 (2d Cir.
2007).

In reviewing Dr. Seuss's motion to dismiss, "the Court 'is limited to the facts as asserted
within the four corners of the complaint, the documents attached to the complaint as exhibits,
and any documents incorporated in the complaint by reference.'"  *Riddle v. Citigroup*, 13 Civ.
6833 (AKH), 2014 WL 2767180, at *1 (S.D.N.Y. May 29, 2014) (quoting *McCarthy v. Dun &
Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007)).  Indeed, where a plaintiff bases its claim on

8

written documents or references those documents in its complaint, as Plaintiffs have done here, the Court may consider those documents on a motion to dismiss even though, as here, the plaintiffs have made a strategic decision not to attach the documents to their complaint. *Bill Diodato Photography LLC.,* 2012 WL 4335164, at *3 (quoting *Rapoport v. Asia Elec. Holding Co., Inc.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000)).  Moreover, "[i]f the documents contradict the allegations of a plaintiff's complaint, the documents control and the Court need not accept as true the allegations in the complaint." *Id.  See also Ariel (UK) Ltd. v. Reuters Group PLC*, 05 Civ. 9646, 2006 WL 3161467, at *5 (S.D.N.Y. Oct. 31, 2006), *aff'd*, 277 F. App'x. 43 (2d Cir. 2008).

Here, Plaintiffs incorporate by reference certain correspondence sent on behalf of Dr. Seuss by its intellectual property counsel, and rely upon that correspondence to set forth their tortious interference claim and corresponding demand for monetary damages.  (Compl. ¶¶ 59-61.)  The Court can accordingly consider that correspondence, which Plaintiffs elected not to attach to the Complaint, but which Dr. Seuss has placed before the Court, in connection with this motion.  (Duvd. Decl. Exs. A-F.)

**B.     Plaintiffs Fail To Plead The Elements Of A Tortious Interference Claim**

Under New York law, there are two categories of "tortious interference" causes of action:  (1) tortious interference with contractual relations; and (2) tortious interference with prospective economic advantage.  These causes of action are distinct.  *Highland Capital Mgmt. LP. v. Schneider*, 198 F.. App'x. 41, 46 (2d Cir. 2006) ("[T]he elements of tortious interference with contract are different from the elements of tortious interference with prospective economic relations.")

"Under New York law, to state a claim for tortious interference with contract the plaintiff must allege '(1) the existence of a valid contract between the plaintiff and a third party; (2) the

defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom.'" *Altseekers, Inc. v. BrandForce SF, LLC*, No. 12-cv-5392, 2015 WL 5719759 at *8 (E.D.N.Y. Sept. 29, 2015) (quoting *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006)).  In addition, a plaintiff must allege that the defendant "used wrongful means" to induce the third party to breach the contract.  *Ace Arts, LLC v. Sony-ATV Music Publ'g*, 56 F. Supp. 3d 436, 450 (S.D.N.Y. 2014.)  "As the New York Court of Appeals has stated, examples of wrongful means in this context include: 'physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone.'" *Tasso v. Platinum Guild Int'l.*, No.94-cv-8288, 1997 WL 16066 at *5 (S.D.N.Y. Jan. 16, 1997) (citing *Guard–Life Corp. v. S. Parker Hardware Mfg.*, 428 N.Y.S.2d 628, 632 (1980)).

Alternatively, to state a claim for intentional "interference with prospective economic advantage, a party must allege that: (i) the plaintiff had business relations with a third party; (ii) the defendants interfered with those business relations; (iii) the defendants acted for a wrongful purpose or used dishonest, unfair, or improper means; and (iv) the defendants' acts injured the relationship." *Lombard v. Booz-Allen & Hamilton, Inc.,* 280 F.3d 209, 214 (2d Cir. 2002). "Further, the plaintiff must establish that it 'would have entered into the economic relationship [with the third party] but for the defendant's wrongful conduct." *CHoldings B.V. v. Asiarim Corp.*, 992 F. Supp. 2d 223, 246 (S.D.N.Y. 2013).  There also must be "a showing that 'the defendant interfered with business relations existing between a plaintiff and a third party, either with the sole purpose of harming the plaintiff or by means that are dishonest, unfair, or improper.'" *Excalibur Systems, Inc. v. Aerotech World Trade, Ltd*., No. 98-cv-1931, 1999 WL

10

1281496 at * 2 (E.D.N.Y. Dec. 30, 1999) (citing *D'Andrea v. Rafla–Demetrious*, 3 F. Supp. 2d 239, 250 (E.D.N.Y. 1996), *aff'd*, 146 F.3d 63 (2d Cir. 1998)).   In other words, "[o]ne of the key elements of this claim . . . is that a plaintiff must allege that a defendant's conduct was motivated solely by malice or to inflict injury by unlawful means, *beyond mere self-interest or other economic considerations*."   *S&L Vitamins, Inc. v. Australian Gold, Inc*., 521 F. Supp. 2d 188, 217 (E.D.N.Y. 2007) (emphasis added.).   While the elements of tortious interference with prospective economic relations are similar to those of tortious interference with contract, the defendants' conduct "must be more culpable" for the former, reflecting the greater protection accorded an interest in an existing contract (versus the speculative interest in a prospective relationship). *Ace Arts, LLC*, 56 F. Supp. 3d at 452-53.

Plaintiffs' Complaint is unclear as to which type of tortious interference Dr. Seuss is alleged to have engaged.   Regardless of this lack of clarity, the Second Cause of Action fails to state a claim for either types of tortious interference described above.

With regard to tortious interference with contract, Plaintiffs fail to allege any of the necessary elements – specifically that Dr. Seuss knew of a contract between Plaintiffs and a third-party, that Dr. Seuss intentionally procured a third-party's breach, and that a third-party in fact breached an agreement. *Altseekers, Inc.*, 2015 WL 5719759 at *8 (quoting *Kirch v. Liberty Media Corp.*, 449 F.3d 388 ,401(2d Cir. 2006)).   Plaintiff's only allegation concerning Dr. Seuss's knowledge or intent is that Dr. Seuss's "communications were reasonably calculated to halt production of the Play." (Compl. ¶ 61).   But this conclusory statement is insufficient to allege knowledge of a contract or intentional acts.   *Boehner v. Heise*, 734 F. Supp. 2d 389, 404–05 (S.D.N.Y. 2010) ("Because there is no evidence that Defendants[ ] knew of any specific contracts that Plaintiffs had with their customers, or directed any action at those customers in

order to secure a breach of their contracts with Plaintiffs, no reasonable jury could conclude that [through a letter,] Defendants tortiously interfered with Plaintiffs' economic relations with their customers."); *Am. Bldg. Maint. Co. of New York v. Acme Prop. Servs.,* 515 F. Supp. 2d 298, 315 (N.D.N.Y. 2007) (holding that plaintiff failed to state a claim for tortious interference with contract partly because the complaint never "single[d] out a particular contract that was known to [defendant]").

Most notably, Plaintiffs' only allegation regarding any agreement with a third party is that the Shubert Organization "gave notice that it was terminating the venue license agreement for the theatre, and thereafter returned 90% of the deposit for the theatre." (Compl. ¶ 34.)  A third party's termination of an agreement, however, is <u>not</u> a "breach." [5]  *Ace Arts, LLC*, 56 F. Supp. 3d at 451 ("[E]ven if it were true that Screenvision 'cancelled the Ziegfeld premiere' after Ace's failure to produce written confirmation of its rights to use the songs, this would 'leave open the possibility that [Screenvision] lawfully terminated the contract' without giving rise to any breach.") (quoting *Orange Cnty. Choppers, Inc. v. Olaes Enterprises, Inc*., 497 F. Supp. 2d 541, 562 (S.D.N.Y. 2007) (dismissing claims because allegations left open possibility that third party lawfully terminated contract or that contract was terminable at will); *Cerveceria Modelo, S.A. De C.V. v. USPA Accessories LLC,* No. 07-cv-7998, 2008 WL 1710910, at *3 (S.D.N.Y. Apr. 10, 2008) (dismissing counterclaim where party "never explicitly alleges that a third-party retailer 'breached' a contract with it, but asserts only that as a result of [other party's] interference retailers Wal-Mart Stores, Spencer's 'and others . . . canceled' their contracts, orders and commitments and did not enter into new ones with Defendant"); *G-I Holdings, Inc. v. Baron*

---

[5] Even a conclusory assertion that an agreement is breached would not be sufficient to survive a motion to dismiss. *See Ace Arts LLC,* 56 F. Supp. 3d 436, 450-51.  Nor would Plaintiffs be entitled to attempt to cure this defect by arguing that a breach occurred in any brief that opposes this motion, as legal memoranda cannot cure a pleading deficiency. *Id.* at 451.

& *Budd*, 179 F. Supp. 2d 233, 253 (S.D.N.Y. 2001) (dismissing claim where plaintiff argued "it is entitled to the inference that it can prove facts that demonstrate that its expulsion from [a cost-effective third-party settlement group] was a breach of the contract" because "no breach is alleged").[6]  As mentioned above, to state a claim for tortious interference with contract, the claimant must specifically allege that a third party breached its contract.  Plaintiffs have not done so here, and thus, to the extent their Second Cause of Action was meant to state a claim for tortious interference with contract, the claim fails and must be dismissed.

Plaintiffs' claim would fare no better if it were one for intentional interference with prospective economic advantage.  This is primarily because Plaintiffs have not alleged, nor can they allege, that Dr. Seuss acted for a wrongful purpose or used dishonest, unfair, or improper means.[7]  *Lombard*, 280 F.3d at 214; *Excalibur Systems, Inc.*, 1999 WL 1281496 at * 2 (citing *D'Andrea*, 3 F. Supp. 2d at 250).  Plaintiffs allege that Dr. Seuss "recklessly sent" cease and desist letters because before sending the letters, counsel for Dr. Seuss "had not reviewed the Play 'in detail' or analyzed recent instructive case-law in order for [Dr. Seuss] to form a subjective good faith belief that the Play was not permitted by law." (Compl. ¶¶ 2, 38, 59).  Plaintiffs further allege that Dr. Seuss's "communications falsely cast doubt on the lawfulness of the Play and were derogatory to Plaintiffs."  (*Id.* ¶ 60).  These conclusory allegations are belied by the

---

[6] *See also CIBC Bank and Trust Co. (Cayman) Ltd. v. Banco Central do Brasil*, 886 F. Supp. 1105, 1119 (S.D.N.Y. 1995) ("I am inclined, indeed I am bound, to follow the clear rule set out by the New York Court of Appeals and the Second Circuit—because no breach has been alleged as to the acceleration, no claim for tortious interference as to the acceleration can be sustained."); *Winter-Wolff Intern., Inc. v. Alcan Packaging Food and Tobacco Inc.*, 499 F. Supp. 2d 233, 241 (E.D.N.Y. 2007) ("Defendant is correct that the claim for tortious interference with contracts must be dismissed for failure to allege any breach of the contracts with the affiliates. . . . one of the necessary elements for a tortious interference with contract claim.").

[7] This also dooms any claim for intentional interference with contract, which also requires an allegation that a defendant used a wrongful means.  *Wolff v. Rare Medium, Inc.*, 210 F. Supp. 2d 490, 499 (S.D.N.Y. 2002).

letters themselves, which contain nothing "derogatory."  Nor do these allegations claim that Dr. Seuss was dishonest, unfair, improper, malicious, or unlawful in sending the letters.  *Excalibur Systems, Inc*., 1999 WL 1281496 at * 2;  *S&L Vitamins, Inc*., 521 F. Supp. 2d at 217; *RFP LLC v. SCVNGR, Inc*., 788 F. Supp. 2d 191 (S.D.N.Y. 2011) (dismissing tortious interference with business relationship claim where corporation did not allege that demand letters intended to harm corporation or otherwise constituted malice (i.e. no allegation that Plaintiff did not believe it had trademark rights); letter asserted trademark rights and was nearly identical to one owner had sent to corporation few weeks earlier.)

The actual letters, now properly before the Court, demonstrate that Dr. Seuss was merely self-interested in protecting its own copyright and trademarks against Plaintiffs, who Dr. Seuss believed were infringing those rights.  *Id.*  Indeed, the cease and desist letters to the "third parties", just like the one sent to the Play's director, set forth Dr. Seuss's ownership of its copyright and trademarks associated with The Grinch, rights that Plaintiff does not dispute. (Compl. ¶¶ 5, 9-10; Duvd. Decl. Exs. A-F.)  The letters addressed the Dr. Seuss intellectual property that appeared to be used in the Play, and the letters addressed the flyer and website associated with the Play that used "identical facsimiles of the Dr. Seuss Intellectual Property without the authorization of Dr. Seuss."  (Duvd. Decl. Ex. A, 1-2; Exs. A--F).

Further, before contacting any third parties, Dr. Seuss's counsel sought clarification as to whether the director, Mr. Andress, believed the Play was non-infringing and, if so, to provide a copy of the script for Dr. Seuss's counsel's review.  (Duvd. Decl. Ex. A. at 2).  Only after following up with Mr. Andress three times over the course of two months and receiving no response, did Dr. Seuss's counsel send letters to the Shubert Organization. (Ex. F.)  And, despite the fact that Dr. Seuss asked for the script in July 2016, it was only after contacting the Shubert

14

Organization that the script was received.  (Ex. H.)  These facts belie Plaintiffs' allegation that the letters addressed to third parties were sent "recklessly."  *See Bruce Lee Enterprises, LLC v. A.V.E.L.A., Inc*., No. 10-cv-2333, 2013 WL 822173, at *25 (S.D.N.Y. Mar. 6, 2013) (finding no wrongful conduct, such as when "'the actor has no belief in the merit of the litigation,'" or, even with such a belief, the actor threatens "'litigation in bad faith, intending only to harass the third parties and not to bring his claim to definitive adjudication,'" because Plaintiff sends "countless cease-and-desist letters as part of its routine enforcement operations, and does so in a good faith effort to stop unauthorized use of [its intellectual property].") (citation omitted).

Nothing in the letters is dishonest, unfair, improper, malicious, or unlawful or reflects that the letters were sent solely to harm Plaintiffs.  To the contrary, these letters were sent to right a wrong – to protect Dr. Seuss's intellectual property from infringement.  *See Radiancy, Inc. v. Viatek Consumer Products Group, Inc.,* 138 F. Supp. 3d 303, 328 (S.D.N.Y. 2014), as amended, (Apr. 1, 2014) (finding skincare products manufacturer's letter to a third party retailer, which stated that retailer was selling competitor's product and that the manufacturer believed infringed its intellectual property, did not demonstrate that the sole purpose behind manufacturer's letter was malicious or that it used dishonest, unfair, or improper means, thus precluding competitor's tortious interference claim against manufacturer under New York law); *see also* additional cases cited on pages 17-18 demonstrating that cease and desist letters cannot form the basis of a tortious interference claim.  In addition, while litigation activity may sometimes satisfy the "wrongful means" element, "this is true only when (1) 'the [defendant] has no belief in the merit of the litigation,' or (2) the defendant otherwise 'institutes or threatens to institute litigation in bad faith, intending only to harass the third parties and not to bring [its] claim to definitive adjudication.'"  *Ace Arts, LLC*, 56 F. Supp. 3d at 451 (*quoting RFP LLC*, 788 F. Supp. 2d at

197).  Plaintiffs have pleaded no facts plausibly showing that either circumstance exists.  *See Id*.  ("Other than the conclusory and therefore insufficient assertion that SATV's asserted copyright claims are 'false,' the Complaint is utterly devoid of allegations showing that SATV 'has no belief in the merit' of its copyright claims.")

Finally, it is of no import that Dr. Seuss's counsel sent the cease and desist letters before Plaintiffs responded to counsel with a copy of the script and their fair use position based on a district court case.  (Compl. ¶¶ 36-37, Exs. H, I.)  The letters demonstrate that Dr. Seuss tried for two months to get the Play's director to send the script over to the extent he believed the Play was non-infringing (despite the clearly infringing use of Dr. Seuss intellectual property on the flyer).  (Exs. A-F.)  It was only after this effort failed that Dr. Seuss reached out to the Shubert Theater.  And, regardless, Dr. Seuss's counsel was not convinced of Plaintiffs' position even *after* receiving the script as evidenced by its October 25, 2016 e-mail, or reviewing the non-binding authority Plaintiffs advanced.  (Compl. ¶¶ 36-37, Exs. H, I).

In light of all the above, to the extent Plaintiffs' claim is for tortious interference with prospective economic advantage, it fails and must be dismissed.  *See Ace Arts, LLC* , 56 F. Supp. 3d at 453 ("In the absence of any factual allegations plausibly showing that SATV asserted copyright claims with Screenvision solely out of malice, the Court concludes that this claim too must be dismissed.").

### C.    Even Had Plaintiffs Plead The Elements Of A Tortious Interference Claim, The Claim Fails As A Matter Of Law

Even had Plaintiffs properly plead the elements for tortious interference with contract or tortious interference with prospective economic advantage, Plaintiffs' second count must be dismissed with prejudice because: (1) a tortious interference claim cannot be based on Dr.

Seuss's cease and desist letters as a matter of law; and, relatedly (2) those communications are protected by the *Noerr-Pennington* doctrine.

In this District, the "case law is clear" that cease and desist letters cannot form the basis for tortious interference claims. *Dessert Beauty, Inc. v. Fox*, 568 F. Supp. 2d 416, 428-29 (S.D.N.Y. 2008) (citing *Leopold v. Henry I. Siegel Co*., Case No. 86 Civ. 0063 (MGC), 1987 WL 5373, at *4 (S.D.N.Y. Jan. 5, 1987)). In *Leopold v. Henry I. Siegel Co*., for example, a fashion designer sued a large manufacturer for tortious interference based on a cease and desist letter the manufacturer sent to a third-party retailer of the designer's products. *Leopold*, 1987 WL 5373, at *4. The manufacturer owned trademark rights in the mark "CHIC" for women's jeans and for women's clothing, and the manufacturer's letter objected to the retailer's use of the designer's "SHORT CHIC" mark for women's clothing. *Id.* at *3-4. In dismissing the designer's tortious interference claim based on the manufacturer's letter, the court found that "[i]f a letter such as [the manufacturer's] constitutes tortious interference, I am hard-pressed to think of a method by which a trademark owner, who genuinely believes that others may be infringing his trademark, can take initial, nonlitigious steps to protect his rights, without being subjected to a lawsuit for tortious interference with business relations." *Id*. at *4.

Similarly, in *P. Kaufmann, Inc. v. Americraft Fabrics, Inc*., 232 F. Supp. 2d 220 (S.D.N.Y. 2002), the court dismissed counterclaims for tortious interference based on cease and desist letters involving a copyright. Specifically, the fabric designer plaintiff claimed the defendant fabric manufacturer's fabric design infringed its copyright, and accordingly, the plaintiff sent cease and desist letters to third-party retailers of the defendant's design. *Id.* at 223. After receiving the letters, the third-party retailers terminated contracts with defendant that involved the disputed design. *Id.* Defendant claimed that but for the letters, its contracts with

17

these third-parties would have lasted for years.  *Id.* at 223-224.  In dismissing defendant's claims

for tortious interference with contract and with economic relations, the court noted that

"[s]eeking to protect a copyright by alerting a third party that the copyright is being infringed

constitutes a justification defense to" these claims.  *Id.* at 225 (citing *Shapiro & Son Bedspread*

*Corp. v. Royal Mills Assocs.*, 764 F.2d 69, 75 (2d Cir. 1985) (rejecting argument that notification

of customers of alleged infringement and potential legal consequents for selling infringing

products was unlawful interference with business because "[plaintiff's] actions were not

improper, since if in fact Shapiro has a valid copyright in the . . . design, as may prove to be the

case, sellers of infringing works may indeed be subject to certain sanctions.") (distinguished on

other grounds)).  *See also, e.g., Bruce Lee Enterprises, LLC*, 2013 WL 822173, at \*24-25

(dismissing counterclaims for tortious interference with contract and with prospective economic

advantage because "sending a cease-and-desist letter to an alleged infringer cannot support a

tortious interference claim"); *Landscape Forms, Inc. v. Columbia Cascade Co.*, 117 F. Supp. 2d

360, 371, 56 U.S.P.Q.2d 1613, 1621 (S.D.N.Y. 2000) ("It is hornbook law that commencement

of a law suit in a good faith effort to enforce alleged intellectual property rights—or any legal

rights for that matter—is not unfair competition, even if it is later proven that the party bringing

suit was not entitled to such protection.")  Accordingly, Plaintiff's Second Cause of Action,

which relies exclusively on the cease and desist letters, fails as a matter of law and must be

dismissed.

   Moreover, Plaintiffs' claims regarding the cease and desist letters are barred by the

*Noerr-Pennington* doctrine.  While the *Noerr-Pennington* doctrine initially related to immunity

from antitrust liability for "[t]hose who petition government for redress," *Prof'l Real Estate*

*Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56, (1993) ("*PRE*"), it now also

18

includes the filing of infringement claims to vindicate intellectual property rights.  *See, e.g., AstraZeneca AB v. Mylan Labs., Inc.*, No. 00 CIV. 6749, 2010 WL 2079722, at *3 (S.D.N.Y. May 19, 2010), *aff'd sub nom., In re Omeprazole Patent Litig.*, 412 F. App'x 297 (Fed. Cir. 2011).

The Second Circuit has explained that the *Noerr-Pennington* doctrine applies not just to filed infringement claims, but to pre-litigation cease and desist letters, just like the ones at issue here.  In *Primetime 24 Joint Venture,* 219 F.3d at 100*, a satellite operator sued broadcast television networks, their affiliates, and television trade organizations for intentionally engaging in a concerted action to monopolize the relevant market by restricting the availability of network programming to direct-to-home satellite subscribers via the "filing [of] baseless challenges for the purpose of raising PrimeTime's cost structure and thereby reducing competition from it."  *Id.* at 96*.*  While the Court reversed the district court's decision on the Sherman Act claims, the Court explained in dicta that "Courts have extended *Noerr-Pennington* to encompass concerted efforts incident to litigation, such as prelitigation 'threat letters,'" and that "[l]itigation, including good faith litigation to protect a valid copyright, therefore falls within the protection of the *Noerr-Pennington* doctrine."  *Id.* (collecting cases).  Other New York district courts have relied on *PrimeTime's* ruling to dismiss non-antitrust claims based on cease and desist letters, *see, e.g., DirecTV, Inc. v. Lewis*, No. 03-cv-6241, 2005 WL 1006030, at *5 (W.D.N.Y. Apr. 29, 2005) (granting Rule 12 motion to dismiss where "[t]he Court finds that prelitigation activities, such as those engaged in here, are protected by the *Noerr-Pennington* doctrine, a judicially created doctrine that protects a party's entitlement to act in furtherance of the First Amendment right to petition governmental authorities for redress."), and have recognized that the doctrine can bar claims related to pre-litigation demand letters for intellectual property and other violations. *See*

19

*Barbarian Rugby Wear, Inc. v. PRL USA Holdings, Inc.,* Case No. 06 Civ. 2652, 2009 WL 884515, at \*6 (S.D.N.Y. Mar. 31, 2009) (recognizing that *Noerr-Pennington* doctrine has "specifically been held to immunize trademark holders from liability for, *inter alia*, sending pre-litigation demand letters and filing lawsuits"); *Applera Corp. v. MJ Research Inc*., 303 F. Supp. 2d 130, 133 (D. Conn. 2004) (collecting cases extending *Noerr- Pennington* to "prelitigation threats"); 6 McCarthy on Trademarks and Unfair Competition § 31:104 (4th ed.)("The majority of courts hold that the sending of cease and desist letters is activity immune under the *Noerr-Pennington* Defense.")

While *Noerr-Pennington* immunity does not extend, to "sham" litigation, *PRE,* 508 U.S. at 56, Dr. Seuss's enforcement efforts cannot be said to be a sham. The test for "sham" litigation exception has two parts. "First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr* . . . ." *Id.* at 60. "Only if [the] challenged litigation is objectively meritless may a court examine the litigant's subjective motivation" under the second part of the "sham" litigation definition. *Id.; see AstraZeneca AB*, 2010 WL 2079722, at \*6; *Marchon Eyewear, Inc. v. Clariti Eyewear, Inc.*, No. 04 CV 2103SJ, 2005 WL 820497, at \*3 (E.D.N.Y. Apr. 6, 2005). Under the second, subjective prong of the sham litigation exception, "the court should focus on whether the baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor . . . through the use [of] the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon." (quotations and citations omitted) (emphasis in original). *PRE*, 508 U.S. at 60-61. A determination as to whether a litigation is a "sham" can be made on a motion to dismiss. *Novo Nordisk of North America,*

*Inc. v. Genentech, Inc.*, 885 F. Supp. 522, 526, 35 U.S.P.Q.2d 1058 (S.D.N.Y. 1995) (determining Plaintiff's antitrust claim is not "sham litigation" on a motion to dismiss); *Agfa Corp. v. United Marketing Group, Inc.*, No. 02 Civ. 8468 (LAP), 2003 WL 21555087, at *3-4 (S.D.N.Y. 2003) (allowing plaintiff's claim to proceed as allegations of sham litigation were not contained in the defendants' pleadings); *see also UMGRecordings, Inc. v. Global Eagle Entertainment, Inc.,* 117 F. Supp. 3d 1092, 1113 (C.D. Cal. 2015) ("To the extent counterclaimants' interference claim is based on the cease-and-desist letter, they fail plausibly to allege that the letter falls outside the ambit of the *Noerr–Pennington* doctrine because it threatened sham litigation.  As alleged, any claim based on the cease-and-desist letter lacks facial plausibility, and must be dismissed under Rule 8 and the Supreme Court's decisions in *Twombly* and *Iqbal*.")

Dr. Seuss's letters seeking to protect its copyright and trademarks in The Grinch do not amount to sham litigation, nor have Plaintiffs alleged as such.  It is undisputed by Plaintiffs that Dr. Seuss owns a valid copyright to The Grinch.  (Compl. ¶¶ 5, 9-10.)  It is also undisputed that Plaintiffs used elements of The Grinch without Dr. Seuss's authorization to create The Play and its associated marketing.  (*Id.* ¶ 41; Duvd. Decl. Exs. A-F.)  At the very least, these facts provide a "plausible claim" for infringement, defeating any claim of sham.  3 NIMMER ON COPYRIGHT § 8D.05, n.24 ("The *Noerr-Pennington* doctrine affords a complete defense to filing reasonable copyright claims.")  Nor do Plaintiffs make any allegations that support a plausible inference that the alleged threats in the cease and desist letters were objectively baseless, and under these circumstances, Plaintiffs would be hard-pressed to do so.  Indeed, even if Dr. Seuss were to have brought suit first for copyright infringement and that suit were not successful, Dr. Seuss would

still be protected by *Noerr-Pennington* as "an unsuccessful lawsuit, without more, is not a sham." *AstraZeneca AB*, 2010 WL 2079722, at *4.

Additionally, while Plaintiffs' damages prayer relates only to its tortious interference claim, the crux of Plaintiffs' lawsuit is a declaratory judgment that its usurpation of Dr. Seuss intellectual property amounts to copyright fair use.  (Compl. ¶¶ 1-29; 41-57.)  As this Court has recognized, copyright fair use is a complex "fact-intensive" inquiry, and whether such fair use exists "'involves a case-by-case determination using four non-exclusive, statutorily provided factors in light of the purposes of copyright.'"  *Swatch Group Mgmt. Services Ltd. v. Bloomberg L.P.*, 808 F. Supp. 2d 634, 640-41 (2011) (Hellerstein, J.) (denying motion to dismiss copyright infringement on fair use grounds) (quoting *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608 (2d Cir. 2006)).  "[W]hether a particular use of a copyrighted work constitutes fair use depends on whether the copyright law's goal of promoting the Progress of Science and useful Arts would be better served by allowing the use than by preventing it."  *Id.* (internal quotation marks omitted.)  Given that fair use is such a complex, fact-intensive, inquiry, it is not plausible to allege that Dr. Seuss's claim, which Plaintiffs deny based on fair use grounds, amounts to a sham.  *Coleman v. ESPN, Inc.*, 764 F. Supp. 290, 294-95 (S.D.N.Y. 1991) ("Fair use is a mixed question of law and fact . . . which requires a fact-intensive inquiry ill-suited [even] for summary judgment.")(citations omitted).

Because Plaintiffs' tortious interference claims cannot satisfy the first, objective prong of the "sham" litigation exception to *Noerr-Pennington* immunity, the Court need not reach the second, subjective prong.  But even if it did, the fact that Dr. Seuss raised its legitimate intellectual property rights in letters to Plaintiffs and others allegedly infringing those rights undermines Plaintiffs' position.  In any event, as Plaintiffs do not allege facts to support a conclusion that Dr.

Seuss's intellectual property claims in this case are objectively baseless, Plaintiffs' tortious interference claims must be dismissed.

## IV.    CONCLUSION

For the reasons stated above, the Court should dismiss the Second Cause of Action and related prayer for relief, with prejudice.

Dated: New York, New York
       February 3, 2017

                                                       **DLA PIPER LLP (US)**

                                             By: /s/ *Tamar Duvdevani*
                                                Tamar Y. Duvdevani
                                                  1251 Avenue of the Americas
       New York, New York 10020
       Tel: (212) 335-4500
       Fax: (212) 884-8580

       Ryan C. Compton (*pro hac vice* pending)
       DLA PIPER LLP (US)
       500 Eighth Street, NW
       Washington, D.C. 20004
       Tel:  202.799.4000
       Fax: 202.799.5000

       *Attorneys for Defendant*
       *Dr. Seuss Enterprises, L.P.*