J. GREENBERGER, PLLC
*Counsel for Plaintiffs*
Jordan Greenberger, Esq.
195 Montague Street, 14th Floor
Brooklyn, NY 11201
(718) 502-9555
jordan@jgreenbergerlaw.com

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MATTHEW LOMBARDO and WHO'S HOLIDAY LIMITED LIABILITY COMPANY,<br><br>            Plaintiffs,<br><br>    -against-<br><br>DR. SEUSS ENTERPRISES, L.P.,<br><br>            Defendant. | Index No. 16-cv-9974-AKH |

# PLAINTIFFS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR
## FED. R. CIV. P. 12(c) MOTION FOR
## JUDGMENT ON THE PLEADINGS

On the brief:   Jordan Greenberger, Esq.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ii

I. PRELIMINARY STATEMENT .......................................................................... 1

II. STANDARD ON A RULE 12(C) MOTION.................................................... 3

III. DISCOVERY IS UNNECESSARY.................................................................. 4

IV. THE PLAY CONSTITUTES FAIR USE UNDER COPYRIGHT LAW.................... 6

    A. First Factor: Purpose and Character of the Use ................................... 9

        1. Parody .......................................................................... 9

        2. Highly Transformative........................................................ 12

        3. Commercial Use ................................................................ 15

    B. Second Factor: Nature of the Copyrighted Work............................... 15

    C. Third Factor: Amount and Substantiality of Use ............................... 16

    D. Fourth Factor: Effect on Potential Market for Copyrighted Work 19

V. THE TRADEMARK COUNTERCLAIMS ALSO FAIL TO STATE A CLAIM ....... 22

VI. CONCLUSION .......................................................................... 26

## TABLE OF AUTHORITIES

CASES

*Abilene Music, Inc. v. Sony Music Entm't., Inc.*, 320 F. Supp.2d 84 (S.D.N.Y. 2003) .... 10, 15, 16

*Adjmi v. DLT Entm't Ltd.*, 97 F. Supp. 3d 512 (S.D.N.Y. 2015)........................................... passim

*Agence France Presse v. Morel*, 769 F. Supp.2d 295 (S.D.N.Y. 2011) ...................................... 26

*Am. Geophysical Union v. Texact Inc.*, 60 F.3d 913 (2d Cir. 1994)............................................ 20

*Arrow Productions Ltd. v. Weinstein Co. LLC*, 44 F. Supp. 3d 359 (S.D.N.Y. 2014) .............. 4, 5

*Atrium Group De Dediciones Y Publicaciones, S.L. v. Harry N. Abrams, Inc.*, 565 F. Supp.2d 505 (S.D.N.Y. 2008) ................................................................................................................ 26

*Berlin v. E.C. Publications, Inc.*, 329 F.2d 541 (2nd Cir. 1964)................................................. 10

*Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006) ........................ 15

*Blanch v. Koons*, 467 F.3d 244 (2d Cir. 2006) ....................................................................... 7, 15

*Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296 (2d Cir. 2004)............................ 26

*Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687 (7th Cir. 2012) ................................ 1

*Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569 (1994) .................................................. passim

*Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013)..................................................................... passim

*CCA & B, LLC v. F+W Media Inc.*, 819 F. Supp. 2d 1310 (N.D. Ga. 2011) ........................ 11, 20

*Charles Atlas, Ltd. v. DC Comics, Inc.*, 112 F. Supp. 2d 330 (S.D.N.Y. 2000).......................... 23

*Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Group., Inc.*, 886 F.2d 490 (2d Cir. 1989)....23, 24, 25

*Conan Properties, Inc. v. Mattel, Inc.*, 712 F. Supp. 353 (S.D.N.Y. 1989)................................. 17

*Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003) ................................... 26

*DC Comics v. Towle*, 802 F.3d 1012 (9th Cir. 2015) ................................................................. 17

*Dr. Seuss Enterprises, L.P. v. Penguin Book USA, Inc.*, 109 F.3d 1394 (9th Cir. 1997) ............. 11

*Dr. Seuss Enters., L.P. v. ComicMix LLC*, No. 3:16-cv-02779 at Doc. 38, 2017 U.S. Dist. LEXIS 89205, 2017 WL 2505007 (S.D. Cal. June 9, 2017)......................................................... passim

*Durham Industries v. Tomy Corp.*, 630 F.2d 905 (2nd Cir. 1980)............................................... 22

*Effie Film, LLC v. Murphy*, 932 F. Supp. 2d 538 (S.D.N.Y. 2013), *aff'd* 564 Fed. Appx. 631 (2nd Cir. 2014) ................................................................................................................................... 4

*Elsmere Music, Inc. v. NBC*, 482 F. Supp. 741 (S.D.N.Y. 1980), *aff'd* 623 F.2d 252 (2d Cir. 1980) .................................................................................................................................... 19

*Fioranelli v. CBS Broadcasting Inc.*, 2017 WL 1400119 (S.D.N.Y. Jan. 19, 2017)................... 22

*Fox News Network, LLC v. TVEyes, Inc.*, 43 F. Supp.3d 379 (S.D.N.Y. 2014) (Hellerstein, J.) ... 8

*Galvin v. Illinois Republican Party*, 130 F. Supp. 3d 1187 (N.D. Ill. 2015) ................................ 5

*Keeling v. Hars*, 809 F.3d 43 (2d Cir. 2015) ........................................................... 3, 10

*Kienitz v. Sconnie Nation LLC*, 965 F. Supp. 2d 1042 (W.D. Wis. 2013) .................................. 12

*Kouf v. Walt Disney Pictures & TV*, 16 F.3d 1042 (9th Cir. 1994) ................................. 17

*Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109 (2d Cir. 1998) ..................................... 9, 14

*Louis Vuitton Malletier S.A. v. Warner Bros. Entm't Inc.*, 868 F. Supp. 2d 172 (S.D.N.Y. 2012) 6

*Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*, 156 F. Supp. 3d 425 (S.D.N.Y. 2016), *aff'd*
2016 WL 7436489 (2nd Cir. Dec. 22, 2016) ................................................... 24, 25

*Mattel Inc. v. Walking Mountain Productions*, 353 F.3d 792 (9th Cir. 2003) ........................ 21, 22

*Mattel, Inc. v. Pitt*, 229 F. Supp. 2d 315 (S.D.N.Y. 2002) ................................ 5, 16, 21

*Medina v. Dash Films, Inc.*, 2016 WL 3906714 (S.D.N.Y. July 14, 2016) ................................... 6

*Northland Family Planning Clinic, Inc. v. Ctr. for Bio-Ethical Reform*, 868 F. Supp. 2d 962
(C.D. Cal. 2012) .................................................................................... 22

*Polaroid v. Polared Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961) ...................................... 24

*Roberts v. Bliss*, 2017 WL 354186 (S.D.N.Y. Jan. 24, 2017) ...................................... 6

*Rogers v. Grimaldi*, 875 F.2d 994 (2nd Cir. 1989) .................................................. 3, 23

*Salinger v. Colting*, 607 F.3d 68 (2d Cir.2010) .................................................... 21

*Silas v. Home Box Office, Inc.*, 201 F. Supp. 3d 1158 (C.D. Cal. 2016) ..................................... 18

*SunTrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257 (11th Cir. 2001) ................................. 9, 16

*Swatch Group Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73 (2d Cir. 2014) ....................... 21

*TCA Television Corp. v. McCollum*, 839 F.3d 168 (2d Cir. 2016) ....................................... passim

*Tetley, Inc. v. Topps Chewing Gum, Inc.*, 556 F. Supp. 785 (E.D.N.Y. 1983) ........................... 23

*Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F. Supp. 2d 410 (S.D.N.Y. 2002) ..... 23

*Urbont v. Sony Music Entertainment*, 831 F. 3d 80 (2d Cir. 2016) ...................................... 25

*Walt Distney Prods. v. Air Pirates*, 581 F.2d 751 (9th Cir. 1978) ................................ 18

*Warner Bros. Inc. v. Am. Broadcasting Cos., Inc.*, 720 F.2d 231 (2nd Cir. 1983) ................. 17, 22

*Yankee Pub. Inc. v. News Am. Pub. Inc.*, 809 F. Supp. 267 (S.D.N.Y. 1992) ....................... 23, 24

DOCKETED CASES

*Adjmi*, No. 1:14-cv-00568-LAP (S.D.N.Y.), at Doc. 47 filed Oct. 2, 2014 .................................. 4

*ComicMix*, No. 3:16-cv-02779 (S.D. Cal.), at Doc. 22, p. 17 ..................................... 6

*Estate of James Oscar Smith v. Cash Money Records, Inc.*, No. 14-cv-2703 (S.D.N.Y. Opinion &
Order dated May 30, 2017) .................................................................... 6

Sᴛᴀᴛᴜᴛᴇs

15 U.S.C. § 1117 ........................................................................................... 26

15 U.S.C. § 1125(a) ......................................................................................... 2

17 U.S.C. § 101 ............................................................................................... 8

17 U.S.C. § 107 ....................................................................................... passim

Fed. R. Civ. P. 12(b)(6) ............................................................................ 2, 5, 6

Fed. R. Civ. P. 12(c) ....................................................................... 1, 3, 4, 5, 6

New York General Business Law § 360-l ................................................ 3, 22

Tʀᴇᴀᴛɪsᴇs

4 Patry on Copyright § 10:91 ........................................................................ 12

4 Patry on Copyright § 10:159 ........................................................................ 5

Patry on Fair Use § 3:94 ............................................................................... 10

Oᴛʜᴇʀ Aᴜᴛʜᴏʀɪᴛɪᴇs

Roger L. Zissu, *Expanding Fair Use: The Trouble With Parody, The Case For Satire*, 64 J. Cᴏᴘʏʀɪɢʜᴛ Sᴏᴄ'ʏ, page no. 165 (2016) ................................................ 11

Plaintiffs respectfully submit this memorandum of law in support of their Fed. R. Civ. P. 12(c) motion for judgment on the pleadings.  In short, Mr. Lombardo's play, *Who's Holiday!* (the "Play"), does not infringe the intellectual property rights of Dr. Seuss Enterprises, L.P. ("Defendant") in Dr. Seuss's *How The Grinch Stole Christmas* ("*Grinch*").

## I. <u>PRELIMINARY STATEMENT</u>

Eight months ago and without even having a copy of the Play to analyze whether it constituted fair use, Defendant successfully halted performances of the Play (scheduled for the Holiday 2016 season) by sending a series of cease and desist letters to the theater owner and general managers that threatened secondary liability for copyright and trademark infringement. Six months ago, Plaintiffs – the author and manager of the Play – commenced this action seeking a declaratory judgment that the Play constitutes fair use under section 107 of the Copyright Act (17 U.S.C. § 107).  After initial motion practice that skirted the fair use issue, the pleadings finally closed at the end of May 2017.  Plaintiffs are now respectfully asking the Court to decide the very same question that the parties could not resolve last year without judicial intervention: does the Play infringe Defendant's rights in *Grinch* or does it constitute fair use, like the play at issue in *Adjmi v. DLT Entm't Ltd.*, 97 F. Supp. 3d 512 (S.D.N.Y. 2015) (Preska, C.J.)?

Plaintiffs' position is straightforward: the Court may determine that the Play is fair use simply by comparing the two works and reviewing relevant case law.  The Play is, on its face, a parody or it is not; highly transformative, or not.

Defendant has asserted that discovery is necessary in order to decide fair use in this case. While some courts have decided fair use at summary judgment or trial, there is no per se rule that discovery is required.  This is confirmed by *Adjmi* and *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687 (7th Cir. 2012), which was cited with approval by the Second Circuit in *Cariou v. Prince*, 714 F.3d 694, 707 (2d Cir. 2013).  Both *Adjmi* and *Brownmark* rejected the

need for discovery in analogous circumstances, and Defendant is hard-pressed to distinguish those cases.  If there is any difference between *Adjmi* and this case, it actually favors Plaintiffs: in *Adjmi*, Chief Judge Preska compared the subject play with multiple episodes of the 1970s television sitcom *Three's Company*; here, the Court need only compare the Play with a relatively brief children's book.

Moreover, a recent decision in an unrelated case in which Defendant is the plaintiff alleging copyright infringement of the Dr. Seuss work "Oh The Places You'll Go!", *Dr. Seuss Enters., L.P. v. ComicMix LLC*, No. 3:16-cv-02779 at Doc. 38, 2017 U.S. Dist. LEXIS 89205, 2017 WL 2505007 (S.D. Cal. June 9, 2017), supports Plaintiffs' position that fair use may be decided at this juncture.  In *ComicMix*, the Court rejected Defendant's argument (made as the plaintiff in opposition to a Rule 12(b)(6) motion to dismiss) that it was inappropriate to decide fair use at the pleading stage, and concluded that fair use analysis was appropriate on a Rule 12(b)(6) motion.[1]  *Id.*, at *8-9.

In addition to counterclaiming for copyright infringement of *Grinch*, Defendant has attempted to complicate this case by asserting counterclaims for infringement of Defendant's alleged copyright in *Grinch's* Grinch and Cindy-Lou Who characters (the "Characters"), for false association and unfair competition under the Lanham Act [15 U.S.C. § 1125(a)(1)(a)]; for

---

[1] Although it decided that fair use analysis was appropriate at the Rule 12(b)(6) stage and dismissed the trademark-related claims, the *ComicMix* court did not dismiss the copyright infringement claim because it accepted as true (at the posture of that case) the allegation of market harm caused by usurped licensing opportunities.  In this regard, *ComicMix* is distinguishable because the work at issue was not a parody; it was a literary and pictorial "mash-up" of *Star Trek* and Dr. Seuss's *Oh, The Places You'll Go!* that was transformative but did not juxtapose the underlying works to create comic effect or ridicule.  2017 U.S. Dist. LEX 89205 at *11-12 (quoting *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 580 (1994)).

unfair competition under New York common law; and for dilution under New York General Business Law § 360-l.  But, Defendant's counterclaims fail for similar reasons.

The Character-copyright claims are entwined with the *Grinch*-copyright claim, and Defendant cannot use trademark law to restrict Plaintiffs' First Amendment rights of free-expression or to obtain through trademark law what Defendant cannot obtain through copyright law.  As to the latter, the *ComicMix* court recently dismissed similar claims relying on the Second Circuit's decision in *Rogers v. Grimaldi*, 875 F.2d 994 (2nd Cir. 1989).

There is no question that Plaintiffs' invocation of Defendant's alleged trademarks is relevant to the Play's artistic purpose.  Nor does the Play explicitly mislead as to its source or content; the website for the Play explicitly announces that it was written by Mr. Lombardo and that it is a parody, and the imagery is vastly different than that used in *Grinch*.  Plaintiffs do not purport that Defendant is the source of the Play or authorized it: the Play is a parody!  Whatever rights that Defendant may have in the marks GRINCH, CINDY-LOU WHO and the stylized lettering on the cover of *Grinch*, they do not trump Plaintiffs' right of artistic expression.

A ruling that precludes Plaintiffs from exploiting the Play is contrary to the fundamental purpose of copyright law: to promote the arts and sciences.  *Cariou*, 714 F.3d at 705; *Keeling v. Hars*, 809 F.3d 43, 50 (2d Cir. 2015).  Defendant's copyright in *Grinch* is not an inevitable, divine, or natural right that confers upon Defendant the absolute ownership of Dr. Seuss's creation.  *Cariou*, 714 F.3d at 705.  Thus, the Court should grant Plaintiffs judgment on the pleadings.  "[A]ny further delay will adversely affect the plaintiffs' rights."  June 7, 2017 Order [Doc. 40].

## II.  <u>STANDARD ON A RULE 12(C) MOTION</u>

"Courts in this Circuit have resolved motions to dismiss on fair use grounds in this way: comparing the original work to an alleged parody, in light of applicable law."  *Adjmi*, 97 F. Supp.

3d at 526-27 (citing cases, including *Effie Film, LLC v. Murphy*, 932 F. Supp. 2d 538, 552-53 (S.D.N.Y. 2013), *aff'd* 564 Fed. Appx. 631 (2nd Cir. 2014)).

In *Adjmi*, a playwright authored an off-Broadway play entitled *3C* based on the 1970's television comedy series *Three's Company*, and he brought declaratory judgment action for non-infringement after the copyright holder sought to halt all performances of the play. The playwright moved for judgment on the pleadings and Chief Judge Preska granted the motion upon reviewing the pleadings and the underlying source material. Going through section 107's rubric, the *Adjmi* Court found that *3C* was a parody and a fair use of *Three's Company*. Like *Adjmi*, there can be no set of facts to support an action for copyright infringement by Defendant against Plaintiffs. *Id.*, at 528. No discovery is necessary: the only two pieces of evidence needed to decide the question of fair use are the Play and *Grinch*.

### III.   DISCOVERY IS UNNECESSARY

Discovery is unnecessary because "[w]hat is critical is how the work in question appears to the reasonable observer, not simply what an artist might say about a particular piece or body of work." *Cariou*, 714 F.3d at 707. For example, discovery was stayed in *Adjmi* (No. 1:14-cv-00568, at Doc. 47 filed Oct. 2, 2014)), and the Court came to its fair use conclusion on a Rule 12(c) motion by comparing seven episodes of the 1970s television sitcom *Three's Company* with the subject play. Here, the Court need only compare the Play with a relatively short children's book. Similarly, the Seventh Circuit rejected the argument that discovery was required in *Brownmark*, where the Court compared the defendant's episode of the television show *South Park* with the plaintiff's viral internet video. The Second Circuit has characterized *Brownmark* as "instructive." *Carou*, 714 F.3d at 707.

Likewise, in *Arrow Productions Ltd. v. Weinstein Co. LLC*, 44 F. Supp. 3d 359 (S.D.N.Y. 2014), the Court came to a fair use conclusion on a Rule 12(c) motion. That case involved the

transformative fair use of a pornographic film in a Hollywood film, and Judge Griesa rejected the

plaintiff's argument that the Court should not make a fair use determination at that juncture.  44

F. Supp. 3d at 367-68 ("there is a complete factual record before the court and discovery would

not provide any additional relevant information in this inquiry. All that is necessary for the court

to make a determination as to fair use are the two films at issue").[2]

Accordingly, to the extent that Defendant relies upon *ComicMix* to argue that discovery

about market harm is required where the work at issue is transformative, *Arrow Productions* is

precedent in this Circuit that the issue may be decided on a Rule 12 motion even where the fair

use is transformative.  44 F. Supp. 3d at 372.  *See also Galvin*, fn. 2.  In *Arrow Productions*, the

two films at issue had entirely different subjects (one was a pornography and the other a critical

biography), and Judge Griesa was clear that the plaintiff could not prevent the defendants from

entering the fair use market.  *Id.*, at 372.  As further discussed below, it is also fair to assume that

an adult-oriented derivative of *Grinch* in the nature of the Play is not a use that Defendant, as

owner of the rights in Dr. Seuss's works, would likely develop or license others to develop.

*Mattel, Inc. v. Pitt*, 229 F. Supp. 2d 315, 324 (S.D.N.Y. 2002) (erotic/sexualized Barbie dolls).

Depositions are unnecessary to determine whether the Play, on its face, is a parody and/or

transformative.  Mr. Lombardo's intent in writing the Play is not dispositive.  *Cariou*, 714 F.3d

at 707; *Adjmi*, 97 F.Supp. 3d at 532, fn. 13 ("the Court does not require 'intent' evidence,

purporting to explain the aims and goals animating [the two works]…").  Nor is there a need to

---

[2] *See also Galvin v. Illinois Republican Party*, 130 F. Supp. 3d 1187 (N.D. Ill. 2015) (granting the defendants' Rule 12(b)(6) motion to dismiss on fair use grounds; at p. 1192: "Given the limited nature of the present claim and the sufficiency of the allegations in and attachments to the complaint, the Court can evaluate each of the fair use factors at this juncture"); 4 Patry on Copyright § 10:159 (observing that "courts now regularly make fair use determinations on a rule 12(b)(6) motion to dismiss for failure to state a claim," and collecting cases).

depose (or obtain documents from) non-parties, like the set designer or director, concerning stylistic factors like setting, costume, style, place, and tone because the Play's substance is overwhelmingly transformative of *Grinch*.  *Adjmi*, 97 F. Supp. 3d. at 531.

Additionally, the First Amendment issues raised by Defendant's trademark counterclaims may be decided on a Rule 12 motion, as was recently done by the *ComicMix* court when it dismissed Defendant's trademark claims.  *See also Roberts v. Bliss*, 2017 WL 354186, at *7 (S.D.N.Y. Jan. 24, 2017); *Louis Vuitton Malletier S.A. v. Warner Bros. Entm't Inc.*, 868 F. Supp. 2d 172, 183 (S.D.N.Y. 2012); *Medina v. Dash Films, Inc.*, 2016 WL 3906714, at *1 (S.D.N.Y. July 14, 2016).

A post-discovery summary judgment motion would be virtually identical to this motion: the Court would review the Play and *Grinch*, and relevant case law.  As Defendant admitted in *ComicMix*, there is no per se rule against deciding fair use on the pleadings.  *ComicMix*, No. 3:16-cv-02779, at Doc. 22, p. 17 (S.D. Cal.).  The only thing discovery will do is needlessly delay resolution of this case, increase Plaintiffs' litigation costs and expenses, and prejudice Plaintiffs because theaters are unwilling to provide a venue for performances of the Play until the cloud of secondary liability for copyright infringement has been cleared.

## IV.  <u>THE PLAY CONSTITUTES FAIR USE UNDER COPYRIGHT LAW</u>

Any copyrightable elements of *Grinch* that are used in the Play are used for purposes of parody and/or in an otherwise highly transformative manner, and thus represent a non-infringing fair use pursuant to section 107 of the Copyright Act of 1976.  17 U.S.C. § 107.  The essential goal of copyright law is furthered by excusing Plaintiffs from liability.  *Estate of James Oscar Smith v. Cash Money Records, Inc.*, No. 14-cv-2703 (S.D.N.Y. Opinion & Order dated May 30, 2017, at pp. 12-13) (Pauley, J.) (the allegedly infringing material, a sample of a spoken-word jazz track used in a hip-hop song, was transformative and therefore fair use).

The Play is an original work of authorship by Mr. Lombardo that humorously juxtaposes the rhyming innocence of *Grinch* and its Cindy-Lou Who character with, among other things, profanity, bestiality, teen-age pregnancy, familial estrangement, ostracization and scandal, poverty, drug and alcohol abuse, the eating of a family pet, domestic violence and murder. The Play is distinctive from, and departs markedly from, *Grinch*. Like *Grinch* (and other popular works by Dr. Seuss), the Play is written in rhyming couplets. However, the Play is not a retelling of *Grinch*, does not copy *Grinch* verbatim, quote substantial (if any) portions of the text of *Grinch*, or copy the illustrations in *Grinch*. The highly transformative Play contains original dialogue, a newly devised plot referencing original characters created by Mr. Lombardo, and the structure, tone and themes of the Play are materially different from that of *Grinch*.

The determination of copyright fair use "is an open-ended and context-sensitive inquiry." *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006). There are no "bright-line rules" and fair use requires a "case-by-case analysis." *Campbell*, 510 U.S. at 577. "[F]air use may be governed by statute, but it is still very much judge-made common law." *Adjmi*, 97 F. Supp. 3d at 529.

The Second Circuit most recently addressed fair use in *TCA Television Corp. v. McCollum*, 839 F.3d 168 (2d Cir. 2016). Notwithstanding the Second Circuit's conclusion in that case that the defendant's use of Abbott & Costello's *Who's On First?* routine in the Broadway show *Hand to God* did not constitute fair use, the Court's analysis of the fair use doctrine and basic copyright principles supports Plaintiffs in this case.

> First, the law affords copyright protection to promote not simply individual interests, but—in the words of the Constitution—"the progress of science and useful arts" for the benefit of society as a whole. As the Supreme Court has explained, copyright protection is based on the "economic philosophy ... that encouragement of individual effort by personal gain is the best way to advance public welfare.". In short, the "monopoly created by copyright ... rewards the individual author," but only "in order to benefit the public."

> Second, and consistent with this public purpose, the law has long
> recognized that "some opportunity for fair use of copyrighted materials" is
> necessary to promote progress in science and art.  The doctrine of fair use,
> derived from common law, is now codified in the Copyright Act of 1976,
> Pub. L. No. 94–553, 90 Stat. 2541.  See 17 U.S.C. § 107.  That codification
> does not so much define "fair use" as provide a non-exhaustive list of factors
> to guide courts' fair use determinations. This affords the doctrine a certain
> "malleability" that can challenge judicial application.  [*TCA Television*, 839
> F.3d at 177-78 (internal citations and parentheticals omitted)].

In the preamble to 17 U.S.C. § 107, Congress states that "the fair use of a copyrighted work ... for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research is not an infringement of copyright."  As the words "such as" indicate, the listing is "illustrative and not limitative."  17 U.S.C. § 101.  Four nonexclusive factors – incorporating common law traditions – are properly considered in "determining whether the use made of a work in any particular case is a fair use."  17 U.S.C. § 107; *TCA Television*, 839 F.3d at 178.  These statutory factors are as follows:

> (1) the purpose and character of the use, including whether such use is of
> a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the
> copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the
> copyrighted work.  [17 U.S.C. § 107].

"[T]he factors must be viewed collectively, with their results 'weighed together, in light of the purposes of copyright.'"  *TCA Television*, 839 F.3d at 179 (quoting *Campbell*, 510 U.S. at 578).  "A proponent of the fair use doctrine need not establish that each factor weighs in its favor to prevail."  *Fox News Network, LLC v. TVEyes, Inc.*, 43 F. Supp.3d 379, 389 (S.D.N.Y. 2014).

A.  **FIRST FACTOR: PURPOSE AND CHARACTER OF THE USE**

"The first statutory fair use factor considers the purpose and character of the secondary use.  In this regard, the uses identified by Congress in the preamble to § 107 – criticism, comment, news reporting, teaching, scholarship, and research – might be deemed most appropriate for a purpose or character finding indicative of fair use."  *TCA Television*, 839 F.3d at 179 (cit. om.).  But, "[t]he law imposes no requirement that a work comment on the original or its author in order to be considered transformative, and a secondary work may constitute a fair use even if it serves some purpose other than those … identified in the preamble to the statute." *Cariou*, 714 F.3d at 706.

Here, any copyrightable elements of *Grinch* that are used in the Play are used (1) for purposes of parody and/or (2) in a highly transformative manner.  Thus, the first statutory factor – which is "the heart of the fair use inquiry" – favors Plaintiffs.  *Cariou*, 714. F.3d at 705.

1. **Parody**

"One type of protected creativity is parody, a recognized category of criticism or comment authorized by Section 107."  *Adjmi*, 97. Fupp. 3d at 530 (citing *Campbell*, 510 U.S. at 579).  Parody "invariably comment[s] on an original work and/or on popular culture."  *Cariou*, 714 F.3d at 706 (discussing the rap group 2 Live Crew's parody of Roy Orbison's "O, Pretty Woman" that was at issue in *Campbell*, and how that parody "was clearly intended to ridicule the white-bread original"; quoting 510 U.S. at 582).  *See also SunTrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257 (11th Cir. 2001) (the *Gone With The Wind / The Wind Done Gone* case); *Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109 (2d Cir. 1998) (the Demi Moore photograph / *Naked Gun* movie poster case); and the Oxford Dictionary definition of "parody."[3]

---

[3] https://en.oxforddictionaries.com/definition/parody

9

"[P]arody, like any other use, has to work its way through the relevant factors, and be judged case by case, in light of the ends of copyright law." *Campbell*, 510 U.S. at 580. However, "once a work is determined to be a parody, the second, third, and fourth factors are unlikely to militate against a finding of fair use." *Abilene Music, Inc. v. Sony Music Entm't, Inc.*, 320 F. Supp. 2d 84, 89 (S.D.N.Y. 2003); *Keeling*, 809 F.3d at 53 ("the first factor … lies at the 'heart of the inquiry' for parody, while the other three factors are much less important").

The parodic character of the Play is clear. *Campbell*, 510 U.S. at 580.[4]  The Play imitates the style of *Grinch* for comic effect or ridicule, and reasonably may be perceived as commenting on *Grinch* or criticizing it.  The Play humorously juxtaposes the rhyming innocence of *Grinch* with, among other things, profanity, bestiality, teen-age pregnancy, familial estrangement, ostracization and scandal, poverty, drug and alcohol abuse, the eating of a family pet, domestic violence and murder.  *See* Patry on Fair Use § 3:94 ("Even vulgar caricature or a simplistic poking of fun may merit treatment as parody; it is not for judges to impose on the public their own views of what constitutes good humor"); *Berlin v. E.C. Publications, Inc.*, 329 F.2d 541, 545 (2nd Cir. 1964) ("While the social interest in encouraging the broad-gauged burlesques of Mad Magazine is admittedly not readily apparent, and our individual tastes may prefer a more subtle brand of humor, this can hard by dispositive here.").  The Play may reasonably be taken as a comment on the naiveté of *Grinch*, expressing that not everyone who grew up in Who-ville has had the uber-cheery, terminally smiling lifestyle of their ancestors and neighbors.

---

[4] The Play did not need to be labeled as a parody for it to be a parody.  *Campbell* 510 U.S. at 583, n. 17.  However, Plaintiffs' website expressly referred to the Play as a parody.

Mr. Lombardo did not merely use elements of *Grinch* to get attention or to avoid the drudgery in working up something fresh.[5]  *Campbell*, 510 U.S. at 580.  Therefore, the case that Plaintiffs anticipate that Defendant will rely upon, *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1396 (9th Cir. 1997), is distinguishable.  That widely criticized[6] decision, which affirmed a preliminary injunction in favor of Defendant (the plaintiff in that case), concerned a poetic account of the O.J. Simpson double murder trial entitled *The Cat NOT in the Hat! A Parody by Dr. Juice*, which the defendant alleged was a fair use of the well-known *The Cat in the Hat* by Dr. Seuss.  *Id.*, at 1396.  The Ninth Circuit rejected the defendant's argument that the work at issue was a parody, finding that "the substance and content of *The Cat in the Hat* is not conjured up by the focus on the Brown-Goldman murders or the O.J. Simpson trial."  109 F.3d at 1401.  Here, in contrast, Mr. Lombardo's writing not only mimics *Grinch's* rhyming style, but the text has a critical bearing on the substance and style of *Grinch*.  Mr. Lombardo did not randomly select any-old popular work to tell a story about a topical news event, like the OJ Simpson trial.  The Play is a Christmas-themed work that conjures up *Grinch* and comments on *Grinch* as part of a newly created original work of authorship.

Analogous, because it also dealt with Christmas-related works, is *CCA & B, LLC v. F+W Media Inc.*, 819 F. Supp. 2d 1310 (N.D. Ga. 2011).  There, the plaintiff published a popular children's Christmas book called *The Elf on the Shelf*, and alleged that the defendant's book, *The*

---

[5] The Court may take judicial notice of the theater's rich history of parody, from the off-Broadway production of *Spamilton* (a parody of *Hamilton*) to *Dog Sees God* (a parody of *Peanuts* and Charlie Brown).

[6] *See* Roger L. Zissu, *Expanding Fair Use: The Trouble With Parody, The Case For Satire*, 64 J. COPYRIGHT SOC'Y, page no. 165 (2016) (at page 176, describing *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*, as "[t]he most disappointing and widely criticized decision in its copyright fair use analysis with regard to a satirical use after *Campbell*…").

*Elf* <u>off</u> *the Shelf*, constituted copyright and trademark infringement.  The plaintiff's book

explained how Santa employed millions of "scout" elves around the world to keep track of who

is naughty and nice each year and of their holiday wishes; the defendant's book told "a very

different but related story."[7]  819 F. Supp. 2d at 1316.   Plaintiff moved for a preliminary

injunction, and in addressing the likelihood of plaintiff's success on the merits the Court found

that defendant's book "clearly constitute[d]" parody.  *Id.*, at 1318-19; *also* at 1321-24.  Like the

Elf-case, the Play tells a related but very different story from *Grinch*.

Lastly, it does not matter whether the Play "is hardly novel or original" or whether "many

Dr. Seuss works explore" themes "such as life is not easy, perfect, and often does not work out

the way we hoped as children."  Counterclaims, ¶¶ 12-14, 22.  "A parody can legitimately

comment on general aspects of society, especially if plaintiff's work is associated in the public

mind with the aspect of society commented on."   4 Patry on Copyright § 10:91.  *Grinch* is a

famous Dr. Seuss work that, in Defendant's words, "teaches the true meaning of Christmas."

### 2.  <u>Highly Transformative</u>

Even if the Court were to find that the Play is not a parody, the Court still should find that

the Play is a fair use because it is highly transformative of *Grinch*.  There is no need to target the

original work, *Grinch*, in order for the Play to be a fair use.  *Cariou*, 714 F.3d at 706; *Kienitz v.*

*Sconnie Nation LLC*, 965 F. Supp. 2d 1042, 1050-51 (W.D. Wis. 2013) (defendants use of a

---

[7] As described in the decision: "The elf narrator describes himself as a discount elf (sprung from a marked-down copy of *Elf On*) who is supposed to help Santa decide who's been naughty and nice.  But the stories quickly diverge from this common ground.  In *Elf Off*, the elf warns that he'll be 'pissed' if children give him a name he dislikes.  Once he's given a lousy first name, Horace the Elf decides he's not going to be a good elf.  Rather, he's going to drink spiked eggnog, try to make his 'move' on Barbie while Ken's away at the Malibu dream house, watch pornography in the middle of the night, change the children's gift list so there's 'something in it for me,' and finally, run away to the tropics rather than return to the North Pole."  819 F. Supp. 2d at 1316 (internal cit. om.).

copyrighted photograph of a mayor on t-shirts and tank tops manufactured, promoted, and sold in connection with a street fair, was fair use because of the transformative nature of the shirts).

"The Supreme Court has stated that 'the goal of copyright … is generally furthered by the creation of transformative works.'" *TCA Television*, 839 F.3d at 179 (quoting *Campbell*, 510 U.S. at 579).  "Transformative use is neither a sufficient nor exclusive means to establish fair use, but such works lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright and the more transformative the new work, the greater the likelihood of a finding of fair use.  This is in keeping with the general calculus of copyright law: promoting the arts and sciences by rewarding ingenuity, without stifling creativity."  *Adjmi*, 97 F. Supp. 3d at 530 (internal cit. and quot. om).

In deciding whether and to what extent the new work is transformative, "*Campbell* instructs that a court properly considers 'whether the new work merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message.'" *TCA Television*, 839 F.3d at 179 (quoting *Campbell*, 510 U.S. at 579; emphasis in original).  "[T]he critical inquiry is whether the new work uses the copyrighted material itself for a purpose, or imbues it with a character, different from that for which it was created." *Id.*; *see also Cariou*, 714 F.3d at 706.

The Second Circuit made this point in *Cariou*, which the *TCA Television* court later referred to as "the high-water mark" for the Second Circuit's recognition of transformative works (830 F.3d at 181).  In *Cariou*, the defendant "appropriation artist" had taken the plaintiff's copyrighted photographic portraits of Rastafarian men (described as serene and deliberately composed), and altered them to create crude and jarring collages. *Id.*, at 706.  Reversing a district court award of summary judgment in favor of the plaintiff, the Second Circuit ruled that

it is not essential that a new creative work comment on an incorporated copyrighted work to be transformative.  *Cariou*, 714 F.3d at 706.  "Rather, 'to qualify as a fair use' in the absence of such a different purpose, the new work 'generally must alter the original with 'new expression, meaning, or message.'"  *TCA Television*, 830 F.3d at 180 (citing *Cariou*, 714 F.3d at 706 (quoting *Campbell*, 510 U.S. at 579)).  As described in *TCA Television*, 839 F.3d at 181:

> *Cariou* concluded that the challenged artworks there satisfied this standard because they not only strove for "new aesthetics with creative and communicative results distinct from" that of the copyrighted material, but also gave the incorporated photographs "new expression," thereby admitting a transformative purpose.  *Id.* at 708.  Indeed, where the defendant's use so "heavily obscured and altered" the original photographs as to make them "barely recognizable" within the new work, the court ruled that transformative purpose (and ultimately fair use) was established as a matter of law.  *Id.* at 710.

In *TCA Television*, on the other hand, the defendants' use of the Abbot & Costello *Who's On First* routine in the Broadway play *Hand to God* "appeared not to have altered the Routine at all."  830 F.3d at 181.  The routine was used in the defendant's play almost verbatim, and the unaltered use had no bearing on the original work.

Here, Defendant alleges the Play "takes substantially from the original, and merely works a perverted twist on the [Characters], with no change to the original story of these characters or their names, or to the rhyming couplets, tone, pace, story, arc, setting of Who-ville or the themes of [*Grinch*]."  Counterclaim, ¶ 22.

It is as though Defendant, all these months later, still has not read the Play.  Simply compare *Grinch* and the Play.  The Play may "reasonably be perceived" as highly transformative of *Grinch*.  *Cariou*, 714 F.3d at 707 (quoting *Campbell*, 510 U.S. at 582, and *Leibovitz*, 137 F.3d at 113-14).  The Play does not copy *Grinch* verbatim, quote substantial (if any) portions of the text of *Grinch*, or copy the illustrations in *Grinch*.  The highly transformative Play contains

14

original dialogue, a newly devised plot, and the structure, tone and themes of the Play are materially different from that of *Grinch*.   Like the photographs at issue in *Cariou*, the Play manifests "an entirely different aesthetic from" *Grinch*.  714 F.3d at 706.  The Play adds something new to *Grinch*, with a further purpose and different character that alters *Grinch* with new expression, meaning, and message.  *Campbell*, 510 U.S. at 579.  The Play does not merely repackage *Grinch* to entertain fans of *Grinch*; it "is hardly a repeat" of *Grinch*.  *Adjmi*, 97 F. Supp. 3d at 531.

### 3.  Commercial Use

The first fair use factor also requires that the Court consider whether the Play has a commercial or nonprofit educational purposes.  *Cariou*, 714 F.3d at 708.  However, the Court may discount the Play's commercial character because it is a parody of, and highly transformative of, *Grinch*.  *Campbell*, 510 U.S. at 579-81; *Cariou*, 714 F.3d at 708; *Blanch*, 467 F.3d at 254.

### B.  SECOND FACTOR: NATURE OF THE COPYRIGHTED WORK

Plaintiffs do not dispute that *Grinch* is entitled to protection.  But, the second factor is of limited usefulness in cases of parody and transformative use.  *Adjmi*, 97 F. Supp. 3d at 53 ("the second factor is not 'ever likely to help much in separating the fair use sheep from the infringing goats in a parody case, since parodies almost invariably copy publicly known, expressive works'") (quoting *Campbell*, 510 U.S. at 586); *Abilene Music*, 320 F. Supp.2d at 89 (S.D.N.Y. 2003)  ("the second factor … is not heavily weighted in cases involving parodies, since any work meriting parody is likely to be both well-known and creative enough to be close to the core of intended copyright protection."); *see also Blanch*, 467 F.3d at 257; *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 612 (2d Cir. 2006) (defendant's use of plaintiff's images,

concert posters for the musical group the Grateful Dead, in a biography of the Grateful Dead constituted fair use).

### C.  THIRD FACTOR: AMOUNT AND SUBSTANTIALITY OF USE

The third statutory factor asks whether "'the amount and substantiality of the portion used in relation to the copyrighted work as a whole' ... are reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586 (quoting 17 U.S.C. 107(3)).  "The third fair use factor acts as a link between the first and fourth factors to screen out works that lack transformative character or threaten to serve as a market substitute for the original work." *Mattel, Inc. v. Pitt*, 229 F. Supp. 2d at 323–24 (finding "slim to no likelihood" that defendant's sexualized Barbie dolls would serve as a market substitute for plaintiff's real Barbie dolls).

In assessing this factor, the Court considers not only "the quantity of the materials used" but also "their quality and importance." *Campbell*, at 587.  "Even a substantial taking…can constitute fair use if justified." *TCA Television*, 830 F.3d at 185.

"Because a parody must take recognizable material from the original in order to convey its message, it is more likely to copy the 'heart' of the original, and the court must take this into account in its consideration of the third factor, the amount and substantiality of the material used." *Abilene Music*, 320 F. Supp. 2d at 89 (citing *Campbell*, 510 U.S. at 588-89).  A parodist need not take the bare minimum amount of material necessary to conjure up the original. *Campbell*, 510 U.S. at 588; *also SunTrust* , 268 F.3d at 1273 ("A use does not necessarily become infringing the moment it does more than simply conjure up another work."); *Adjmi*, 97 F. Supp.3d at 533 ("the Court of Appeals has consistently held that a parody under the fair use doctrine is entitled to more extensive use of the original work than is ordinarily allowed under the substantial similarity test.").

To the extent that the Play mimics, draws upon, or copies *Grinch*, it does so to make its point and such use of *Grinch* is neither substantial nor excessive in relation to the parodic purpose. *Grinch* is an object of the parody, and the Play's humor, or its comment, necessarily springs from recognizable allusion to *Grinch* through distorted imitation. Using some characteristic features of *Grinch* cannot be avoided, as the Play must be able to refer to recognizable elements of *Grinch* and conjure up at least enough of *Grinch* to make the objects of its critical wit recognizable to the audience.

This includes the Characters, who Defendant describes as essential to *Grinch*. Counterclaims, ¶ 16. Even assuming, *arguendo*, that those characters are entitled to copyright protection,[8] Plaintiffs have not copied those characters. *Warner Bros. Inc. v. American Broadcasting Companies, Inc.*, 720 F.2d 231, 239-45 (2nd Cir. 1983) (superhero character was sufficiently dissimilar to Superman); *Conan Properties, Inc. v. Mattel, Inc.*, 712 F. Supp. 353, 361 (S.D.N.Y. 1989) ("This Court has read the Conan comic books and examined the He-Man doll. The protected elements of Conan and He-Man are not substantially similar, and no reasonable trier of fact could conclude otherwise."); *Kouf v. Walt Disney Pictures & TV*, 16 F.3d 1042, 1046 (9th Cir. 1994) ("the district court correctly concluded that the characters and dialogue in the two works are dissimilar as a matter of law: (1) the 'Thompson' in 'Honey, I Shrunk the Kids' is a concerned father and neighbor, and he is a gangster in 'The Formula'…").

---

[8] *See generally DC Comics v. Towle*, 802 F.3d 1012, 1021 (9th Cir. 2015) (three-part test determines whether a character in a comic book, television program, or motion picture is entitled to copyright protection: (1) the character must generally have physical as well as conceptual qualities; (2) the character must be sufficiently delineated to be recognizable as the same character whenever it appears; and (3) the character must be especially distinctive and contain some unique elements of expression).

17

The Play is a one-woman show; there is no actor playing the Grinch character, who "appears" in the Play only through the recollection and dialogue of Cindy-Lou Who. Additionally, Dr. Seuss's Cindy-Lou Who is a young child that does not look like a human-being (she looks like a "Who").  In the Play, Cindy-Lou Who is an adult woman who looks very much like a human-being (because she is one).  *Compare Walt Disney Prods. v. Air Pirates*, 581 F.2d 751, 757-58 (9th Cir. 1978) (close copying of Disney characters impermissible), *cert. den*. 439 U.S. 1132 (1979), and *United Feature Syndicate, Inc. v. Koons*, 817 F. Supp. 370, 381 (S.D.N.Y. 1993) (sculpture copied cartoon character "virtually in its entirety"); *with Silas v. Home Box Office, Inc.*, 201 F. Supp. 3d 1158, 1177-80 (C.D. Cal. 2016) (dismissing, on the pleadings, claims for copyright infringement of characters because the characters were not sufficiently similar).  The cartoon image of an adult Cindy-Lou Who on Plaintiffs' website is holding a martini glass and smoking a cigarette, and she does not look anything like the image of Cindy-Lou Who in *Grinch*.  The cartoon image of a young girl appearing on Plaintiffs' allegedly infringing advertisement (which merely was an invitation to a handful of potential investors to a closed-reading of the Play) does not appear anywhere in *Grinch*.

In addition to their appearances, the personalities of the Characters are drastically different in the two works.  While the Play's Grinch is also a "Grinch," he is a much different "Grinch" than in *Grinch*.  *Grinch*'s Grinch steals Christmas toys, then returns them, and then carves roast beef.  The Play's Grinch character, as told by Cindy-Lou, impregnates Cindy-Lou (once she is of legal age), marries her and takes her away from her family, perpetrates domestic violence, and is ultimately killed.  Similarly, the Play's Cindy-Lou Who character differs greatly from the young child who appears in only four pages of *Grinch*.  *Grinch*'s Cindy-Lou Who is an innocent young "Who" child.  In the Play, Cindy-Lou Who is an embittered middle-aged woman

who has an estranged daughter and was just released from prison for killing her husband.  The Characters' attributes and traits are completely different in the two works.

### D.   Fourth Factor: Effect on Potential Market for Copyrighted Work

The final statutory factor considers "the effect of the use upon the potential market for or value of the copyrighted work," 17 U.S.C. § 107(4), focusing on whether the secondary use usurps demand for the protected work by serving as a market substitute.  *Campbell*, 510 U.S. at 592; *TCA Television*, 839 F.3d at 186.  The more transformative the secondary use, the less likelihood that the secondary use substitutes for the original, even though the fair use, being transformative, might well harm, or even destroy, the market for the original.  *Cariou*, 714 F.3d at 709.

The Play plainly does not "usurp" the market for *Grinch*.  *Cariou*, 714 F.3d at 708-09; *Elsmere Music, Inc. v. NBC*, 482 F. Supp. 741, 747 (S.D.N.Y. 1980), *aff'd* 623 F.2d 252 (2d Cir. 1980) (Saturday Night Live song "I Love Sodom" was a parody and did not interfere with the marketability of the plaintiff's advertising jingle "I Love New York").  The Court need only compare the two works to determine that the Play is not a substitute for *Grinch*.  *Adjmi*, 97 F. Supp. 3d at 535.

The Play is intended for adult audiences and contains adult themes and content.  While both works rhyme, have happy-endings, and include the character Cindy-Lou Who, *Grinch* is a now-classic children's book intended for an all-ages audience.  The Play, on the other hand, is a dark comedic work with explicit language geared towards only adult audiences (as indicated on the website for ticket-sales).  The language and tone of the Play is shockingly different from *Grinch*, and no reasonable audience member of the Play could mistake it for a theatrical version of *Grinch* given the Play's tone, plot, and other differences.

The Play will not replace sales of *Grinch* because the Play and *Grinch* serve different market functions.  *E.g.*, *CCA & B*, 819 F. Supp. 2d at 1323 ("it is highly unlikely that consumers will choose an inappropriate-for-children parody in lieu of the wholesome [original].  Although Plaintiff cites as evidence Defendant's stated goal of knocking a holiday favorite off its perch, such evidence does not indicate that Defendant's book will *replace* sales of Plaintiff's product.") (Emphasis in original).

Even though there may be a derivative market for *Grinch* (e.g., Defendant licenses theatrical adaptations of *Grinch*), "a court properly considers the challenged use's 'impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets."  *TCA Television*, 839 F.3d at 186 (quoting *Am. Geophysical Union v. Texact Inc.*, 60 F.3d 913, 930 (2d Cir. 1994)).  Defendant cannot prevent others from entering fair use markets merely be developing or licensing a market for other uses of *Grinch* beyond the original book.  *Bill Graham*, 448 F.3d at 614-15.

Defendant is the owner of the valuable Dr. Seuss intellectual property, and would never develop a market for adaptations of *Grinch* similar in theme or tone to the Play.  Defendant's theatrical production of *Grinch*, "Dr. Seuss How The Grinch Stole Christmas! The Musical," received reviews describing the show as "an awesome first Broadway musical for kids," "a total delight for both kids and adults," and "A perfect holiday outing for the family."  The same could not be said for the Play; the Telecharge page for purchasing tickets online stated that the Play "May be inappropriate for 15 and under.  (*Strong language and subject matter.*)  *Children under the age of 4 are not permitted in the theatre.*"  Answer to Counterclaims, Ex. A at p. 15.

Defendant, as successor-in-interest to the author of well-known children's books, is as likely to develop a work like the Play as the plaintiff toy-maker in the Barbie doll cases was to

20

developing sexualized versions of the doll.  The allegedly infringing articles in *Mattel, Inc. v. Pitt* were erotic/sexualized Barbie dolls.  The Court found in denying the plaintiff's motion for summary judgment that, "Even if the Court were to find the element of parody less significant than either the commercial or the erotic element of Defendant's dolls, the dolls do not appear to pose any danger of usurping demand for Barbie dolls in the children's toys market.  The sale or display of 'adult' dolls does not appear to be a use Mattel would likely develop or license others to develop."  *Id.*, 229 F. Supp. 2d at 324.  In *Mattel Inc. v. Walking Mountain Productions*, 353 F.3d 792, 806 (9th Cir. 2003), the Ninth Circuit thought it "safe to assume" that the plaintiff toy-maker would not enter a market for "adult-oriented artistic photographs of Barbie."

Now, compare *Grinch* with the Play, which includes these quotes: (a) "The night of my birthday, he took me alone to the dock.  Where he gave me my present.  His big, thick, long – *The telephone rings*.  Excuse me;" and (b) "Then my husband came out with a rock in his mitt.  It was him or me now.  I don't put up with that shit."  Even if Dr. Seuss's books "entertain children and adults alike … are fit for children and adults[,] and their teachings often grapple with the realities of life" (Counterclaims, ¶ 14), *Grinch* and other Dr. Seuss books do not include sexual jokes, profanities, or characters who kill their spouse.  That is not Defendant's normal market.  The only possible adverse effect occasioned by the Play would be to a potential market or value the Defendant has not typically sought to capture.  *Swatch Group Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 90-91 (2d Cir. 2014).

Any argument by Defendant that the Play undermines the potential market for an authorized "sequel" of *Grinch* (e.g., *Salinger v. Colting*, 607 F.3d 68, 74 (2d Cir.2010)), is misplaced.  The Play is not a true sequel because it is a parody, and "the law recognizes no derivative market for critical works."  *Campbell*, 510 U.S. at 592.  If the Play's parodic character

21

produces a harm to *Grinch*'s value, such harm is not cognizable under the Copyright Act. *Campbell*, 510 U.S. at 591-92 ("when a lethal parody, like a scathing theater review, kills the demand for the original, it does not produce a harm cognizable under the Copyright Act."); *see also Northland Family Planning Clinic, Inc. v. Ctr. for Bio-Ethical Reform*, 868 F. Supp. 2d 962, 982 (C.D. Cal. 2012) (granting abortion opponents summary judgment on a family planning clinic's copyright infringement claim where the accused videos did not create a cognizable market injury to the clinic's video).

## V. THE TRADEMARK COUNTERCLAIMS ALSO FAIL TO STATE A CLAIM

In addition to copyright infringement, Defendant has asserted counterclaims alleging false association and unfair competition under Section 43(a) of the Lanham Act, unfair competition under New York common law, and dilution under N.Y. Gen. Bus. Law § 360-l.  The marks at issue are GRINCH and CINDY LOU WHO, stylized hand-lettering that appears on the cover of *Grinch*,[9] and drawn-images of Cindy-Lou Who.  Counterclaims, ¶ 20.

Defendant's trademark related claims should be dismissed for the same reason they were recently dismissed by the *ComicMix* court.  Trademark law does not provide Defendant with a backdoor around copyright fair use.  *ComicMix*, *supra*; *Mattel*, 353 F.3d at 806-08; *also*, *Warner Bros.*, 720 F.2d at 246 ("the absence of substantial similarity [for the purposes of a copyright action] leaves little basis for asserting a likelihood of confusion"); *Durham Industries v. Tomy Corp.*, 630 F.2d 905, 918 (2nd Cir. 1980) ("In regard to the three Disney characters, Tomy cannot achieve by an unfair competition claim what it failed to achieve under its copyright claim"); *Fioranelli v. CBS Broadcasting Inc.*, 2017 WL 1400119, *5-7 (S.D.N.Y. Jan. 19, 2017) ("Plaintiff's Lanham Act claim amounts to nothing more than a copyrighted infringement claim

---

[9] A simple Google search for "Dr. Seuss fonts" reveals that there are multiple publicly accessible third-party websites offering fonts similar to the "stylized hand-lettering."

disguised as a Lanham Act claim").  As in *ComicMix*, no discovery is required to protect Plaintiffs' First Amendment rights.

The *ComicMix* court relied upon *Rogers v. Grimaldi*, and another Second Circuit case provides further support that the Play does not infringe Defendant's alleged trademarks because it is a parody: *Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Grp., Inc.*, 886 F.2d 490, 497 (2d Cir. 1989).  In *Cliffs Notes*, the Second Circuit held that the public interest in free expression and parody outweighed risk of consumer confusion between covers of the plaintiff's *Cliffs Notes* study guide and the defendant's parody *Spy Notes*.

Here, the public interest in free expression and parody similarly outweighs the (non-existent) risk of consumer confusion between *Grinch* and the Play.  The following cases further support dismissal of the trademark related counterclaims because Plaintiffs' alleged unauthorized use is for expressive purposes of comedy and parody rather than for identification of origin: *Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F. Supp. 2d 410 (S.D.N.Y. 2002) (granting summary judgment to defendant manufacturer of pet perfume whose name parodied the plaintiff seller of an elegant brand of perfume for human consumption); *Charles Atlas, Ltd. v. DC Comics, Inc.*, 112 F. Supp. 2d 330, 335 (S.D.N.Y. 2000) (defendant's comic books imitated plaintiff's comic ad and took it to an absurd conclusion); *Yankee Pub. Inc. v. News Am. Pub. Inc.*, 809 F. Supp. 267, 275 (S.D.N.Y. 1992) ("Even if there was some likelihood of confusion, I would still conclude that New York's cover did not violate Yankee's trademark rights. This is because the First Amendment confers a measure of protection for the unauthorized use of trademarks when that use is a part of the expression of a communicative message."); *Tetley, Inc. v. Topps Chewing Gum, Inc.*, 556 F. Supp. 785 (E.D.N.Y. 1983).  Plaintiffs' First Amendment

23

free speech interests far outweigh Defendant's interest in protecting its alleged trademarks from unlikely-to-occur confusion.  *Yankee Pub.*, 809 F. Supp. at 281.

Parody in the trademark context was recently discussed in depth by the District Court in *Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*, 156 F. Supp. 3d 425 (S.D.N.Y. 2016) (Furman, J.), *aff'd* 2016 WL 7436489 (2nd Cir. Dec. 22, 2016).  In *My Other Bag*, defendant sold simple canvas bags with the text "My Other Bag" printed on one side and a drawing meant to evoke iconic handbags by luxury designers (like Louis Vuitton) on the other.  Judge Furman, in granting the defendant summary judgment, recognized that the defendant's bags were "obviously a joke," but one that the plaintiff perhaps "cannot take."  *Id.*, at 430.  "In some cases [like here]… it is better to accept the implied compliment in a parody and to smile or laugh than it is to sue."  *Id.*, at 445 (internal quot. om.).

It is unlikely that an ordinarily prudent purchaser would think that the Play is actually a work written by Defendant (or Dr. Seuss), as opposed to a parody of *Grinch*.  *Cliffs Notes*, 886 F.2d at 495.  There is no reasonable likelihood of confusion, but to the extent that the Court finds it is necessary to work through the *Polaroid* factors for analyzing likelihood of confusion,[10] the Second Circuit has characterized the *Polaroid* test as "at best awkward in the context of parody, which must evoke the original and constitutes artistic expression."  *Cliffs Notes*, 886 F.2d at 495, fn. 3.  Continuing, the Second Circuit stated, "In such a situation, the *Polaroid* factors should be applied with proper weight given to First Amendment considerations" (*id.*).

---

[10] *Polaroid v. Polared Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961).  "The eight factors are: (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market." *My Other Bag*, 156 F. Supp. 3d at 440-41.

Beginning with the first *Polaroid* factor, the strength and distinctiveness of the Dr. Seuss brand actually favors Plaintiffs because it makes it "easier for the audience to realize that the use is a parody and a joke." *My Other Bag*, 156 F. Supp. 3d at 495.  The second factor also favors Plaintiffs because there are obvious differences between the parties' uses of the marks, which in the context and overall setting convey to the ordinary viewer that the Play is a parody and therefore unlikely to cause confusion as to source, sponsorship or affiliation. *Id.*, at 441-42.  As to the other factors, like in *My Other Bag* the off-Broadway Play is in no meaningful sense competitive with *Grinch*, Defendant has not identified any actual evidence of consumer confusion (nor could it, since no tickets were sold to the Play and there was a "parody" disclaimer and other indicators on Plaintiffs' website and the ticketing website), and Plaintiffs have not acted with the intent relevant to trademark cases because the Play is a parody designed to amuse rather than confuse. *Id.* at 442-43.

Taken as a whole, the Play "pokes fun" at *Grinch* and there are sufficient reasons to conclude that consumers will realize it is a parody. *Cliffs Notes*, 886 F.2d at 495-96.  For example, Plaintiffs' website (along with the third-party website that sold the tickets) identifies the Play as a "parody" thereby alerting consumers that the Play is, in fact, a parody.  The website also includes a cartoon image of Cindy-Lou Who as an adult drinking a martini and smoking a cigarette in a trailer; the artistic styling on the website also differs from the images in *Grinch*.

Lastly, there are other grounds to dismiss the trademark-related counterclaims.  First, as pre-empted by 17 U.S.C. § 301 because Defendant is attempting to use trademark law to vindicate rights equivalent to its copyright in *Grinch*: Plaintiff's alleged copying of (and creation of a derivative of) *Grinch* and the Characters.  *Urbont v. Sony Music Entertainment*, 831 F. 3d 80, 93 (2d Cir. 2016); *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 305 (2d Cir.

2004).  Second, as barred by the Supreme Court's decision in *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003), and its progeny, *e.g.*, *Agence France Presse v. Morel*, 769 F. Supp.2d 295, 306-08 (S.D.N.Y. 2011); *Atrium Group De Dediciones Y Publicaciones, S.L. v. Harry N. Abrams, Inc.*, 565 F. Supp.2d 505 (S.D.N.Y. 2008).  In *Dastar*, the Supreme Court admonished that section 43(a) of the Lanham Act cannot be invoked as an end run around the copyright laws or to add another layer of protection to copyright holders.  *Dastar*, 539 U.S. at 33–34, 37.  Mr. Lombardo is, in fact, the author of the Play; the LLC is, in fact, the manager. Plaintiffs did not falsely designate the origin of the Play.  Third, and coming full-circle to where this memorandum began, Plaintiffs did not use the alleged marks in commerce, 15 U.S.C. § 1125(a), or unfairly compete with Defendant or dilute their alleged marks, because Defendant's cease and desist letters halted performances of the Play before they even began, and moreover there are no damages recoverable given the losses that Plaintiffs themselves incurred, 15 U.S.C. § 1117 (*see* Plaintiffs' claim for money damages in the original complaint).

## VI.  CONCLUSION

Based on the foregoing, Plaintiffs' motion should be granted so that they may perform the Play this holiday season without the cloud of infringement.  Defendant's counterclaims should be dismissed with prejudice and without leave to amend, and the Play should be declared a fair use.   If the motion is granted, then Plaintiffs intend to move for attorney's fees, and therefore Plaintiffs respectfully request that a submission schedule be set by the Court.

Dated:  June 30, 2017
Brooklyn, New York                       J. GREENBERGER, PLLC
                                          *Counsel for Plaintiffs*
                                            /s/ Jordan Greenberger
                                          Jordan Greenberger, Esq.
                                          195 Montague Street, 14th Floor
                                          Brooklyn, New York 11201
                                          Tel: (718) 502-9555
                                          jordan@jgreenbergerlaw.com