UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MATTHEW LOMBARDO AND WHO'S            :
HOLIDAY LLC,                          :
                                      :        **ECF CASE**
                Plaintiffs,           :
                                      :        1:16-cv-09974 (AKH)
        -against-                     :
                                      :        **<u>DEFENDANT DR. SEUSS</u>**
DR. SEUSS ENTERPRISES, L.P.,          :        **<u>ENTERPRISES, L.P.'S MEMORANDUM</u>**
                                      :        **<u>OF LAW IN OPPOSITION TO</u>**
                Defendant.            :        **<u>PLAINTIFFS' MOTION FOR</u>**
                                      :        **<u>JUDGMENT ON THE PLEADINGS</u>**
                                      :
                                      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                      :
DR. SEUSS ENTERPRISES, L.P,           :
                                      :
                Counterclaim-Plaintiff, :
                                      :
        -against-                     :
                                      :
MATTHEW LOMBARDO AND WHO'S            :
HOLIDAY LLC,                          :
                                      :
                Counterclaim-Defendants. :
                                      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


Dated: New York, New York              DLA PIPER LLP (US)
       July 28, 2017                   1251 Avenue of the Americas
                                       New York, New York 10020
                                       (212) 335-4500


Of Counsel:
                                       *Attorneys for Defendant Dr. Seuss*
Tamar Y. Duvdevani                     *Enterprises, L.P.*
Ryan C. Compton (admitted *pro hac vice*)
Ashley H. Joyce

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      PRELIMINARY STATEMENT ...................................................................... 1

II.     FACTS ............................................................................................................ 4

III.    STANDARD ON A MOTION FOR JUDGMENT ON THE PLEADINGS ................... 9

IV.     ARGUMENT ................................................................................................. 10

        A.      Plaintiffs' Copyright Fair Use Defense Is Inappropriate For Determination
                On A Rule 12(c) Motion ................................................................. 10

        B.      Copyright Fair Use, if Considered, Does Not Absolve Plaintiffs of
                Liability ......................................................................................... 12

                1.      The Purpose and Character of the Use .................................... 12

                2.      The Nature of the Copyrighted Work ..................................... 22

                3.      The Amount and Substantiality of Use ................................... 23

                4.      The Effect on the Potential Market ........................................ 28

        C.      Plaintiffs' Motion to Dismiss Dr. Seuss's Trademark Claims Fails ................... 32

                1.      Dr. Seuss's Trademark Claims Are Not Preempted ............................ 33

                2.      Plaintiffs' First Amendment Arguments Fail .......................................... 34

                3.      Plaintiffs Infringe Dr. Seuss's Trademarks ............................................. 35

V.      CONCLUSION ............................................................................................. 38

## TABLE OF AUTHORITIES

Page

*Abilene Music, Inc. v. Sony Music Entm't,*
    320 F. Supp. 2d 84 (S.D.N.Y. 2003).......................................................................26

*Adjmi v. DLT Entm't Ltd.,*
    97 F. Supp. 3d 512 (S.D.N.Y. 2015)............................................................. passim

*Am. Geophysical Union v. Texaco Inc.,*
    60 F.3d 913 (2d Cir. 1994)......................................................................12, 21, 22, 30

*Arrow Productions Ltd. v. Weinstein Co. LLC,*
    44 F. Supp. 3d 359 (S.D.N.Y. 2014)....................................................... 11, 30, 36

*Associated Press v. Meltwater U.S. Holdings, Inc.,*
    931 F. Supp. 2d 537 (S.D.N.Y. 2013) ....................................................................18

*Authors Guild v. Google, Inc.,*
    804 F.3d 202 (2d Cir. 2015).................................................................. 13, 17, 18

*Authors Guild, Inc. v. HathiTrust,*
    755 F.3d 87 (2d Cir. 2014).......................................................................................27

*A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC,*
    131 F. Supp. 3d 196 (S.D.N.Y. 2015).....................................................................33

*Berlin v. E. C. Publs., Inc.,*
    329 F.2d 541 (2d Cir. 1964).....................................................................................10

*Bertolli USA, Inc. v. Filippo Bertolli Fine Foods, Ltd.,*
    662 F. Supp. 203 (S.D.N.Y. 1987) ..........................................................................37

*Blanch v. Koons,*
    467 F.3d 244 (2d Cir. 2006)................................................................................9, 10

*Boarding School Review, LLC v. Delta Career Educ. Corp.,*
    No. 11 Civ. 8921, 2013 WL 6670584 (S.D.N.Y. March 29, 2013).........................11

*Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.,*
    373 F.3d 296 (2d Cir. 2004)....................................................................................37

*Brownmark Films, LLC v. Comedy Partners,*
    682 F.3d 687 (7th Cir. 2012) ..................................................................................11

*Burnett v. Twentieth Century Fox Film Corp.,*
    491 F. Supp. 2d 962 (C.D. Cal. 2007) ...................................................................30

## <u>TABLE OF AUTHORITIES</u>
### (CONT.)

Page

*BWP Media USA, Inc. v. Gossip Cop Media, LLC*,
    87 F. Supp. 3d 499 (S.D.N.Y. 2015)..................................................................9, 11

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994)...................................................................................... passim

*Cariou v. Prince*,
    714 F.3d 694 (2d Cir. 2013)..............................................................................18

*Castle Rock Entm't v. Carol Pub. Grp., Inc.*,
    955 F. Supp. 260 (S.D.N.Y. 1997) ................................................23, 25, 28, 32

*Castle Rock Entm't, Inc. v. Carol Pub. Grp., Inc.*,
    150 F.3d 132 (2d Cir. 1998)........................................................................ passim

*CCA & B, LLC v. F+W Media Inc.*,
    819 F. Supp. 2d 1310 (N.D. Ga. 2011) .............................................................17

*Charles Atlas, Ltd. v. DC Comics, Inc.*,
    112 F. Supp. 2d 330 (S.D.N.Y. 2000)..............................................................35

*Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Grp., Inc.*,
    886 F.2d 490 (2d Cir. 1989)........................................................................34, 35

*Conan Properties, Inc. v. Mattel, Inc.*,
    712 F. Supp. 353 (S.D.N.Y. 1989) ...................................................................27

*Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.*,
    600 F.2d 1184 (5th Cir. 1979) ....................................................................24, 34

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
    539 U.S. 23 (2003).......................................................................................34, 37

*DC Comics Inc. v. Reel Fantasy*,
    696 F.2d 24 (2d Cir. 1982)................................................................................10

*DeCarlo v. Archie Comic Publ'ns, Inc.*,
    11 F. App'x. 26 (2d Cir. 2001) .........................................................................22

*Dr. Seuss Enterprises, L.P. v. ComicMix LLC*,
    No. 3:16-cv-02779, 2017 WL 2505007 (S.D. Cal. June 9, 2017) ...........................11

*Dr. Seuss Enterprises, L.P. v. Penguin Book USA, Inc.*,
    109 F.3d 1394 (9th Cir. 1997) ................................................................... passim

# TABLE OF AUTHORITIES
## (CONT.)

Page

*Durham Indus. v. Tomy Corp.*,
630 F.2d 905 (2d Cir. 1980)..........................................................................34

*Effie Film, LLC v. Murphy*,
932 F. Supp. 2d 538 (S.D.N.Y. 2013)............................................................9

*EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.*,
228 F.3d 56 (2d Cir. 2000)............................................................................33

*Essie Cosmetics, Ltd. v. Dae Do Int'l, Ltd.*,
808 F.Supp. 952 (E.D.N.Y. 1992) ................................................................37

*Estate of James Oscar Smith v. Cash Money Records, Inc.*,
No. 14-cv-2703, 2017 WL 2333770 (S.D.N.Y. May 30, 2017) (Pauley, J.) ...........................17

*Federal Treasury Enter. Sojuzplodoimport v. Spirits Intern. N.V.*,
623 F.3d 61 (2d Cir. 2010)............................................................................33

*Fioranelli v. CBS Broadcasting Inc.*,
15 Civ. 952, 2017 WL 1400119 (S.D.N.Y. Jan. 19, 2017)...........................34

*Fischer v. Forrest*,
14 Civ. 1304, 2015 WL 195822 (S.D.N.Y. Jan. 13, 2015)...........................33

*Harley Davidson, Inc. v. Grottanelli*,
164 F.3d 806 (2d Cir. 1999)..........................................................................36

*Harper & Row Publishers v. Nation Enterprises*,
471 U.S. 539 (1985).................................................................22, 25, 28, 29

*Keeling v. New Rock Theatre Prod., LLC*,
No. 10 Civ 9345, 2011 WL 6202796 (S.D.N.Y. Dec. 13, 2011)...........................10

*Kienitz v. Sconnie Nation LLC*,
766 F.3d 756 (7th Cir. 2014) ........................................................................18

*Kouf v. Walt Disney Pictures & Television*,
16 F.3d 1042 (9th Cir. 1994) ........................................................................27

*LaChapelle v. Fenty*,
812 F. Supp. 2d 434 (S.D.N.Y. 2011)...........................................................10

iv

## TABLE OF AUTHORITIES
### (CONT.)

Page

*Leibovitz v. Paramount Pictures Corp.*,
    137 F.3d 109 (2d Cir. 1998)........................................................................17, 23

*Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*,
    156 F. Supp. 3d 425 (S.D.N.Y. 2016).................................................................36

*Mathieson v. Associated Press*,
    No. 90 Civ. 6945, 1991 WL64453 (S.D.N.Y. April 16, 1991)..............................11

*Mattel, Inc. v. Pitt*,
    229 F. Supp. 2d 315 (S.D.N.Y. 2002)................................................................31

*Mattel, Inc. v. Walking Mountain Prods.*,
    353 F.3d 792 (9th Cir. 2003) .............................................................................31

*MCA, Inc. v. Wilson*,
    425 F. Supp. 443 (S.D.N.Y. 1976) ....................................................................16

*MCA, Inc. v. Wilson*,
    677 F.2d 180 (2d Cir. 1981)..............................................................................14

*Merck & Co., Inc. v. Mediplan Health Consulting, Inc.*,
    425 F. Supp. 2d. 402 (S.D.N.Y. 2006)...............................................................35

*Metro-Goldwyn-Mayer, Inc. v. Showcase Atlanta Co-op. Productions, Inc.*,
    479 F. Supp. 351 (N.D. Ga. 1979) ...........................................................15, 24, 25

*Micro Star v. FormGen Inc.*,
    154 F.3d 1107 (9th Cir. 1998) ..........................................................................15

*Myrieckes v. Woods*,
    No. 08 Civ. 4297, 2009 WL 884561 (S.D.N.Y. Mar. 31, 2009) .....................15, 29

*New Line Cinema Corp. v. Bertlesman Music Grp., Inc.*,
    693 F. Supp. 1517 (S.D.N.Y. 1988)..............................................................24, 27

*New York Stock Exch., Inc. v. Gahary*,
    196 F. Supp. 2d 401 (S.D.N.Y. 2002)................................................................35

*On Davis v. The Gap, Inc.*,
    246 F.3d 152 (2d Cir. 2001)..............................................................................30

*Playboy Enterprises Int'l Inc. v. Mediatakeout.com LLC*,
    No. 15 Civ. 7053, 2016 WL 102332 (S.D.N.Y. March 8, 2016)............................10

**TABLE OF AUTHORITIES**
**(CONT.)**

Page

*Ringgold v. Black Entm't Television, Inc.*
126 F.3d 70 (S.D.N.Y. 1997) ................................................... 19

*Ritani, LLC v. Aghjayan*,
880 F. Supp. 2d 425 (S.D.N.Y. 2012) ...................................... 35

*Rogers v. Grimaldi*,
875 F.2d 994 (2d Cir. 1989) ..................................................... 34

*Rogers v. Koons*,
960 F.2d 301 (2d Cir. 1992) ..................................................... 16

*Salinger v. Colting*,
641 F. Supp. 2d 250 (S.D.N.Y. 2009) .................................. passim

*Salinger v. Colting*,
607 F.3d 68 (2d Cir. 2010) .............................................. 1, 22, 29

*Sarl Louis Feraud Int'l v. Viewfinder, Inc.*,
627 F. Supp. 2d 123 (S.D.N.Y. 2008) ...................................... 11

*Silas v. Home Box Office, Inc.*,
201 F. Supp. 3d 1158 (C.D. Cal. 2016) ................................... 27

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984) ................................................................. 33

*Star Indus., Inc. v. Bacardi & Co.*,
412 F.3d 373 (2d Cir. 2005) ..................................................... 34

*Stewart v. Abend, d/b/a Authors Research Co.*,
495 U.S. 207 (1990) ................................................................. 22

*Suntrust Bank v. Houghton Mifflin Co.*,
268 F.3d 1252 (11th Cir. 2001) ..................................... 4, 20, 23

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
808 F. Supp. 2d 634 (S.D.N.Y. 2011) ........................................ 9

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
756 F.3d 73 (2d Cir. 2014) ....................................................... 31

*TCA Televison Corp. v. McCollum*,
839 F.3d 168 (2d Cir. 2016) ................................................ passim

**TABLE OF AUTHORITIES**
**(CONT.)**

Page

*Tetley, Inc. v. Topps Chewing Gum, Inc.*,
    556 F. Supp. 785 (E.D.N.Y. 1983) ........................................................................35

*The Name LLC v. Arias*,
    No. 10 Civ. 3212, 2010 WL 4642456 (S.D.N.Y. Nov. 16, 2010) ...........................35

*Tin Pan Apple, Inc. v. Miller Brewing Co., Inc.*,
    737 F. Supp. 826 (S.D.N.Y. 1990) ........................................................................17

*Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*,
    221 F. Supp. 2d 410 (S.D.N.Y. 2002)....................................................................35

*Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*,
    996 F.2d 1366 (2d Cir. 1993).........................................................................22, 33

*UMG Recordings Inc. v. MP3.com, Inc.*,
    92 F. Supp. 2d 349 (S.D.N.Y. 2000)......................................................................32

*United Feature Syndicate, Inc. v. Koons*,
    817 F. Supp. 370 (S.D.N.Y. 1993) .................................................................16, 28

*Urbont v. Sony Music Entm't*,
    831 F.3d 80 (2d Cir. 2016)......................................................................................37

*Walt Disney Prods. v. Air Pirates*,
    581 F.2d 751 (9th. Cir. 1978) .................................................................................24

*Warner Bros. Inc. v. American Broadcasting Companies, Inc.*,
    720 F.2d 231 (2nd Cir. 1983)..........................................................................27, 33

*World Trade Centers Association, Inc. v. Port Authority of N.Y. & N.J.*,
    No. 15 Civ. 7411, 2016 WL 8292208 (S.D.N.Y. Dec. 12, 2016)....................35, 36

*Wright v. Warner Books, Inc.*,
    953 F.2d 731 (2d Cir. 1991)......................................................................................9

*Yankee Pub. Inc. v. News Am. Pub. Inc.*,
    809 F. Supp. 267 (S.D.N.Y. 1992) ........................................................................35

**STATUTES**

17 U.S.C. § 101........................................................................................................15, 18

17 U.S.C. § 107................................................................................................................12

17 U.S.C. § 107(1) ...................................................................................................12, 21

# TABLE OF AUTHORITIES
## (CONT.)

Page

17 U.S.C. § 107(3) ...........................................................................................................23

17 U.S.C. § 107(4) ...........................................................................................................28

17 U.S.C. § 301 ................................................................................................................37

**OTHER AUTHORITIES**

1 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 6:17.50 (4th ed.)...........................33

2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 12:59 (4th ed.) ...........................34

5 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 27:78 (4th ed.) ...........................37

Fed. R. Civ. P. 12(c) ................................................................................................. passim

NIMMER ON COPYRIGHT § 13.05[A][3] .......................................................................23

NIMMER ON COPYRIGHT § 13.05[A][5][a].....................................................................11

NIMMER ON COPYRIGHT § 13.05[B][6] ........................................................................18

Dr. Seuss Enterprises, L.P. ("Dr. Seuss") respectfully submits this memorandum of law in opposition to plaintiffs Matthew Lombardo and Who's Holiday LLC's (collectively, "Plaintiffs") Fed. R. Civ. P. 12(c) motion for judgment on the pleadings ("Motion").

## I.    PRELIMINARY STATEMENT

Anyone who has seen the Tony Award-winning musical *Avenue Q* knows that it was inspired by *Sesame Street*, despite the fact that the words "Sesame Street" were never uttered in the production, the setting was different, the back story was different, the songs were original, and every single character had a different identity, name and appearance from the children's show.  In fact, when asked by the *New York Times* why *Sesame Street* did not pursue claims against the musical despite being fiercely protective of its intellectual property, a spokesperson explained "They're not our characters.  It's not like they took Cookie and Big Bird and put them into adult situations. They are different puppets."[1]  Simply put, *Avenue Q*'s creators were able to expend creative juices to create a grown-up world of "Gen-X angst" that was truly transformative – and even parodic – without stealing the characters, the places, and the storylines of the original series.  *Avenue Q* did not need to engage in that misappropriation in order to put theatre-goers in the seats.  The authors of *Avenue Q* did not "avoid the drudgery in working up something fresh."  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 580-81 (1994).

The same could not be said for Plaintiffs' *Who's Holiday!* (the "Play"), the unauthorized sequel of the beloved Dr. Seuss work *How the Grinch Stole Christmas!* ("*Grinch*").  Much like the infringing work in *Salinger v. Colting*, 641 F. Supp. 2d 250 (S.D.N.Y. 2009), *vacated and remanded on other grounds,* 607 F.3d 68 (2d Cir. 2010), the Play, a sequential Christmas-themed foray into the future lives of Seuss characters Cindy-Lou Who (thus the Play's name, *Who's*

---

[1] Jake Tapper, *THEATER; Is This Town Big Enough For Two Puppet Boulevards?,* N.Y. TIMES (July 27, 2003), http://www.nytimes.com/2003/07/27/theater/theater-is-this-town-big-enough-for-two-puppet-boulevards.html.

*Holiday*), the Grinch, and his dog Max, which takes place in the Seuss-created imaginary settings of Who-ville and Mount Crumpit, is a blatant infringement of *Grinch* and its characters.  Despite Plaintiffs' conclusory leaps to the contrary, the Play is not a parody and is not otherwise a fair use.  It does not poke fun of, ridicule, comment upon, criticize, or otherwise transform *Grinch*.  It is a story that Plaintiffs tell by unnecessarily misappropriating Seuss intellectual property.  If aging Cindy-Lou and the other Seuss characters used by Plaintiffs in order to create a sequel, off-color though it may be, constitutes "transforming" those characters and *Grinch* for fair use purposes, it is hard to discern where the line is for when a sequel featuring the main characters and settings of an original work could infringe.  By Plaintiffs' logic, any unimaginative playwright could take well-known children's characters, age them, use them as the butt of raunchy jokes, label it parody, and commercialize that work.  This is not commentary or a ridicule on a work, it is a lazy way to get laughs and sell tickets.  Turning Charlie Brown into a middle-aged drug addict would not be parody, and turning Cindy-Lou Who into a middle-aged widow is not parody either.  Rather, these are examples of derivative works.  Dr. Seuss, and Dr. Seuss alone, has the right to create or license an adult-themed version of *Grinch* should it chose to do so.  There is no legal authority supporting the contrary position.

The Play is not a fair use, but rather a sequential appropriation of the heart of *Grinch*, with the key, source-identifying elements taken by the author to attract the (literally) millions of Dr. Seuss fans.  (Indeed, Plaintiffs even admit in their briefing that a copyrighted image of Cindy-Lou Who was taken to advertise a reading for prospective investors).  (Dkt. No. 46 at 18.)

Copyright and trademark fair use defenses involve highly specific, fact-intensive inquiries.  As such, courts routinely reject fair use as a basis to dismiss intellectual property claims at the pleading stage.  Plaintiffs have not come close to demonstrating that their Motion

should be the exception to this rule. Nevertheless, an analysis of the relevant factors demonstrates the weakness of those defenses to Plaintiffs' infringement, even at this early stage. The four factors used by courts to determine fair use under the Copyright Act all weigh in Dr. Seuss's favor. Indeed, no court has found that a commercial work like the Play, a sequel which directly copies so many key elements of the original *Grinch*, particularly the exact characters, Grinch and Cindy-Lou Who, and their back story, the distinctive settings of Who-ville and Mount Crumpit, and the redemptive theme, even with dark turns, constitutes "fair use."

This is not *Adjmi v. DLT Entm't Ltd.,* 97 F. Supp. 3d 512 (S.D.N.Y. 2015), the district court case Plaintiffs incorrectly believe provides precedential authority. In *Adjmi's 3C,* the work found to be a fair use of *Three's Company*, there was no Chrissy Snow or Jack Tripper, there was no Janet Wood, no Mr. and Mrs. Roper, no Mr. Furley, there was no Regal Beagle. The authors of *3C* did not pick up where *Three's Company* left off. There was, just as with *The Wind Done Gone*, an important transformative purpose to *3C*. Neither of those works were sequels, but rather were satires using the familiar constructs of the originals, both serving societal purpose, and both taking far less than what Plaintiffs took from *Grinch*. These concepts are utterly absent from the Play's misappropriation of *Grinch* and its source-identifiers, and cheap laughs do not a parody or transformative work make. The Play is far more akin to the infringing *The Cat NOT in the Hat!* analyzed in *Dr. Seuss Enterprises, L.P. v. Penguin Book USA, Inc*., 109 F.3d 1394 (9th Cir. 1997), and *60 Years Later*, the unauthorized sequel of *Salinger v. Colting,* than any of the works discussed by Plaintiffs in the Motion, all of which either take far less of the original and/or are not literary pieces that continue a story. As such, even if Plaintiffs could scrape by in casting their dirty sequel as parodic of *Grinch*, "not every parody is a fair use" where, as here,

"more of the protected elements" of *Grinch* were taken "than was necessary to serve a parodic function." *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1272 (11th Cir. 2001).

Plaintiffs' remaining arguments also fail, as each one misapplies, misstates, or ignores the relevant law. Plaintiffs argue that (1) Dr. Seuss's trademark claims are preempted by the Copyright Act; (2) use of Dr. Seuss's marks is not infringement under the First Amendment; and (3) there is no likelihood of confusion between the Play and Dr. Seuss marks. Each of these arguments has no basis in the applicable law and should be rejected.

Plaintiffs' Motion should be denied.

## II.   FACTS

### *How the Grinch Stole Christmas!*

The 1957 book *How the Grinch Stole Christmas!* is one of Dr. Seuss's most famous and beloved works. (Dkt. No. 33 at ¶ 1.) It tells the story of the Grinch, a green, hairy creature with skinny legs, a long neck, evil eyes and a wicked smile, who lives in a cave on Mount Crumpit above the whimsical and snowy town of Who-ville with his sad dog, Max. (*See* Dkt. No. 45-2 at 3-5, 15; Dkt. No. 33 at ¶¶ 15-17.) Who-ville is home to the Whos, human-like creatures who have lots of Christmas cheer. (Dkt. No. 45-2 at 1, 6,-11, 42-45; Dkt. No. 33 at ¶ 17.) The Grinch, however, who has a small, bitter, and lonely heart, cannot stand Christmas, so he attempts to ruin it for Who-ville by robbing the town on Christmas Eve, disguised as Santa Claus on a sleigh with Max disguised as a reindeer. (Dkt. No. 45-2 at 3-5, 13-28, 32-39; Dkt. No. 33 at ¶ 16.) During his robbing spree, the only Who the Grinch encounters is Cindy-Lou Who. (Dkt. No. 45-2 at 28-29; Dkt. No. 33 at ¶ 16.) She asks the Grinch why he is taking her Christmas tree; the Grinch lies to her by saying he will return it in the morning and sends her back to bed. (Dkt. No. 45-2 at 29-31; Dkt. No. 33 at ¶ 16.)

4

The next day, on Christmas morning, the Grinch has a change of heart when, even without their presents, the Whos of Who-ville remain festive and merry.  (Dkt. No. 45-2 at 40-50; Dkt. No. 33 at ¶ 16.)  The Grinch's heart "[g]rew three sizes that day" and he returns the stolen goods and joins the Whos for their Christmas feast.  (Dkt. No. 45-2 at 48; Dkt. No. 33 at ¶ 16.)

*Grinch* is written in the rhyming couplets of "Seussian rhyming style," meaning "of, relating to, or suggestive of the works of Dr. Seuss (Theodor Geisel); especially: having a playfully inventive or outlandish quality typical or reminiscent of the words and images found in children's stories like *The Cat in the Hat* and *How the Grinch Stole Christmas!*"  (Dkt. No. 33 at ¶ 13.)[2]  *Grinch* is the only original Dr. Seuss book to address the meaning of Christmas and that has a seemingly-evil protagonist.  (*Id.* at ¶¶ 14-15.)

**The Cindy-Lou Who Character**

Cindy-Lou Who is a tiny, trusting, "not more than two" Who from Who-ville, with huge eyes and lashes, a pink outfit, and antennae that give her a bug-like appearance.  (Dkt. No. 45-2 at 28-31; Dkt. No. 33 at ¶ 16.)  On Christmas Eve she wakes to get a cup of water and she sees the Grinch taking her Christmas tree.  (*Id.*)  She emphatically asks him why is he taking her tree and the Grinch lies to her by telling her he is repairing it, pats her on the head, and sends her back to bed.  (*Id.*)  Cindy-Lou Who is the only Who to interact with the Grinch, and because of this the Grinch has a special relationship with her.  (*See id.*)

**Dr. Seuss's Protection and Exploitation of Its Intellectual Property**

Dr. Seuss vigorously protects against unauthorized uses of its intellectual property.  (Dkt. No. 33 at ¶ 18.)  It is not uncommon for Dr. Seuss to license its intellectual property in connection with the creation of new works based upon, and incorporating, Dr. Seuss intellectual

---

[2] Just this year the definition of "Seussian" was added to the Merriam-Webster Dictionary of the English language. (Dkt. No. 33 at ¶ 13.)

property.  (*Id.* at ¶ 33.)  The authorized derivative market for *Grinch* alone is robust:  it includes a 1966 television special; a 1997 Old Globe Theatre musical of *Grinch* that has run every year since to tell the story of *Grinch* and the characters therein; a 2000 live-action film; a 2000 Broadway musical, *Seussical*, in which the Grinch and Cindy-Lou Who are featured characters; two ABC television specials produced in 2007; and a travelling *Grinch* stage show that has been running annually since 2008.  (*Id.*)  Dr. Seuss also authorized a new *Grinch* film to be released in the Fall of 2018.  (*Id.* at ¶¶ 18, 55.)  Each of these works expand on *Grinch's* characters, in particular, the character of Cindy-Lou Who, and several of these authorized derivative works include themes and jokes aimed at adult audiences.  (*Id.* at ¶ 18.)  The producers of these derivative works negotiated and paid for exclusive licenses and/or partial assignments from Dr. Seuss.  (*Id.*)

### A Comparison of *Grinch* and the Play

The Play is an unauthorized sequel to *Grinch*.  (*Id.* at ¶¶ 21, 26.)  It generously uses *Grinch's* widely identifiable and distinctive main characters, Grinch and Cindy-Lou Who, recites their backstory, and continues that story in the same Seussian rhyming couplets and in the same setting of Who-ville and Mount Crumpit, 43 years later.  (*See* Dkt. No. 30-1 at 2; Dkt. No. 33 at ¶¶ 2, 14-15, 17, 27, 36, 38, 44, 46, 54.)  In the first fourteen pages of the Play, Cindy-Lou Who recounts the entire plot of *Grinch*.  (*See* Dkt. No. 30-1 at 4-14.)  In the Play, Grinch and Cindy-Lou Who are the focal points, and are used without changing their names, distinctive attributes, or character traits.  (*Id.* at 4, 14.)  The Play's Grinch is the same Grinch as in the Dr. Seuss work (*id.* at 13-15, 19-20, 25, 28, 34, 40), and is used generously throughout the Play.  (*Id.* at 13-15, 19-20, 25, 28, 34, 40.)  He is green and not human, but bipedal.  (*Id.* at 5 ("He was green and quite large.  Not man and not beast.").)  He is also a resident of Mount Crumpit (*id.* at 25), who dressed as Santa and disguised his dog as a reindeer (*id.* at 5) to steal Who-ville's Christmas decorations (*id.* at 10), prior to returning them in a change of heart the next day.  (*Id.* at 13-14.)

The Play's Cindy-Lou Who is the same Cindy-Lou Who as in the Dr. Seuss work, and was once young and innocent with distinctive eyes.  (*Id*. at 4 ("You remember me, right?  Oh, I'm sure that you do.  When I was a youngster?  I was Cindy Lou Who. //  You recall my blue eyes.  My pink one piece pajama. . . . Such an innocent I was.  Oh, the ignorance of youth.").)  She is now 45 years old in the Play, a former resident of Who-ville, and a current resident of Mount Crumpit. (*Id*. at 2, 4).  She was two years old when she first met the Grinch (*id*. at 5), and experienced the entire story from the original *Grinch* (*id*. at 4-14.).

The Play also misappropriates characters from other Dr. Seuss stories, including Thidwick, the big-hearted moose (*id*. at 6), Yertle the Turtle (*id*. at 15), One Two Red and Blue Fish (*id*. at 30), Morris McGurk (*id*. at 22, 24, 28), Horton, the Cat in the Hat, the Lorax, the Sneeches and Wocket, Thing Two, and Sylvester McMonkey McBean (*id*. at 25), and Motta-fa-Potta-fa-Pell (*id*. at 33) (the Play's location of the prison where Cindy-Lou served her sentence for killing the Grinch). (Dkt. No. 33 at ¶ 28.)

The Play is written in Seussian rhyming couplets distinctive to Dr. Seuss.  (*See, e.g.*, Dkt. No. 30-1 at 3 ("Oh hi! Well hello!  I'm so glad that you're here. // But I can't talk that long cause it's that time of year. // See, I'm throwing a party tonight for some pals. // Just a little soiree for some guys and some gals.").)  The Play references the Dr. Seuss song "Fahoo Fores Dahoo Dores" (*id*. at 4), *Grinch*'s fictional "goo-goo-gums" and "foo-foo-fluffs" (*id*.), and uses the same dog Max from the original *Grinch* (*id*. at 14), if only to kill him off in the most grotesque manner (*id*. at 28-29 ("I put Max in the oven now I know this might sicken -- // But I sliced him and served.  Dog tastes just like chicken.")).  (Dkt. No. 33 at ¶ 27, 36.)

Like *Grinch*, the Play has a redemptive theme, apart from the fact that it recites the story of the Grinch having a change of heart on Christmas after robbing Who-ville.  (Dkt. No. 30-1 at

13-14.)  In the Play, Cindy-Lou Who has an estranged relationship with her daughter, Patti, after killing the Grinch and spending 20 years in jail.  (*Id.* at 32, 34-35, 41.)  But at the end of the Play, after worrying about spending Christmas alone, Patti knocks on the door of Cindy-Lou Who's trailer for a visit and Cindy-Lou Who screams, "It's Patti!!!"  (*Id.* at 42-47.)

In the Play and in advertisements for the Play, Plaintiffs used Dr. Seuss's marks GRINCH and CINDY-LOU WHO, the stylized hand-lettering used throughout Dr. Seuss books and other works, and the drawn images of Cindy-Lou Who (collectively, the "Dr. Seuss Marks") (the "Dr. Seuss Marks," together with "The Dr. Seuss Copyrighted Works," the "Dr. Seuss Intellectual Property").  (Dkt. No. 33 at ¶¶ 3, 20, 29.)  Plaintiffs admit that the marks GRINCH and CINDY-LOU WHO and the font on the cover of *Grinch* are all recognizable and associated with Dr. Seuss.  (Dkt. No. 36 at ¶¶ 20, 60, 75.)  Plaintiffs also admit they used advertisements featuring an image of Cindy-Lou Who for investor readings of the Play.  (*Id.* at ¶ 31.)

### Dr. Seuss Learns of the Unauthorized Sequel And This Case Is Filed

Once Dr. Seuss learned of the Play, its counsel sent Plaintiffs and related parties cease and desist letters on July 26, 2016, August 22, 2016, September 21, 2016, and September 27, 2016.  (Dkt. No. 16 at Exs. A-F.)  Plaintiffs' counsel eventually corresponded with Dr. Seuss's counsel and transmitted a version of the Play's script.  (*Id.* at Ex. H.)  The Play was not produced, and on December 27, 2016, Plaintiffs filed this action.  On April 7, 2017, the Court dismissed with prejudice Plaintiffs' "tort" claim.  (Dkt. No. 28.)  Plaintiffs filed their Amended Complaint on April 24, 2017.  (Dkt. No. 30.)  The version of the Play attached to the Complaint is different than the one Plaintiffs sent to Dr. Seuss before filing suit.  (Dkt. No. 33 at ¶ 37.)  Plaintiffs also attach cherry-picked documents to their Answer to Dr. Seuss's Counterclaims. (Dkt. No. 36 at ¶ 82, Ex. A.)

### III.     STANDARD ON A MOTION FOR JUDGMENT ON THE PLEADINGS

Plaintiffs assert that for the purposes of deciding their Rule 12(c) motion, the Court only need compare *Grinch* and the Play to make a determination on fair use.  (Dkt. No. 46 at 2, 4.)  In doing so, they ignore that "there is a dearth of cases granting such a motion."  *BWP Media USA, Inc. v. Gossip Cop Media, LLC*, 87 F. Supp. 3d 499, 505 (S.D.N.Y. 2015).  The fair-use defense is so fact-sensitive that the Second Circuit has instructed district courts to be "cautious" in granting even summary judgment motions on this issue.  *Wright v. Warner Books, Inc*., 953 F.2d 731, 735 (2d Cir. 1991); *see also TCA Televison Corp. v. McCollum,* 839 F.3d 168, 178 (2d Cir. 2016); *Blanch v. Koons*, 467 F.3d 244, 250 (2d Cir. 2006); *c.f. Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 808 F. Supp. 2d 634, 641 (S.D.N.Y. 2011) (Hellerstein, J.) (declining to address "such a fact-intensive issue before the parties have had an opportunity for discovery").

In deciding a Fed. R. Civ. P. 12(c) motion, "a plaintiff must plead sufficient facts to state a claim for relief that is plausible on its face." . . . [In] an action for a declaratory judgment of *non*-infringement, [Plaintiffs'] burden on this motion is turned on its head.  [Plaintiffs] may prevail on [their] Rule 12(c) motion only if the pleadings establish that there can be no set of facts to support an action for copyright *infringement* by [Dr. Seuss] against [Plaintiffs]."  *Effie Film, LLC v. Murphy*, 932 F. Supp. 2d 538, 555 (S.D.N.Y. 2013), *aff'd*, 2014 WL 1797466 (2d Cir. May 7, 2014) (internal cites omitted).  In deciding the Motion, Dr. Seuss's Answer and Counterclaims are taken to be true.  *Id.* Any inconsistencies between the allegations in these pleadings must be resolved in Dr. Seuss's favor.  *Id.*

## IV.  ARGUMENT

### A.  Plaintiffs' Copyright Fair Use Defense Is Inappropriate For Determination On A Rule 12(c) Motion

Plaintiffs argue that discovery is not necessary to determine fair use in this case.  (Dkt. No. 46 at 4-6.)  Ironically, Plaintiffs, in making this assertion, attach cherry-picked documents to their Answer, and rely upon those documents in their Motion.[3]  Dr. Seuss is entitled to all versions of the website and advertisements for the Play (as well as additional versions of the Play and other relevant discovery), not just those that Plaintiffs opted to attach to their pleading.

For example, Plaintiffs' counsel sent Dr. Seuss's counsel a different version of the Play than that attached to the Complaint.  (Dkt. No. 33 at ¶ 37.)  Dr. Seuss is entitled to *all* drafts of the Play to fully understand the amount of *Grinch* that Plaintiffs took.  Dr. Seuss is also entitled to review the set and costume designs, and take deposition testimony from relevant witnesses, including plaintiff Playwright Matthew Lombardo, Director Carl Andress, Set Designer David Gallo, and Costume Designer Jess Goldstein.  The Supreme Court and the Second Circuit have regularly found such discovery necessary for fair use determinations.  *Campbell*, 510 U.S. at 594 (noting the need, upon remand, for evidence on the market of a rap version of "Oh, Pretty Woman."); *Blanch*, 467 F.3d at 252-55 (relying on the "different objectives" of the original and accused artists, as reflected in testimony, as probative of whether the accused work was transformative); *DC Comics Inc. v. Reel Fantasy*, 696 F.2d 24 (2d Cir. 1982) (reversing district court where fair use was resolved with no pre-trial discovery and unsworn statements).[4]  Judges in this district have denied similar motions due to factual disputes concerning fair use, including

---

[3] *See* Dkt. No. 36 at ¶ 82 and Ex. A:  "In addition to the reasons pleaded in Plaintiffs' amended complaint, Plaintiffs' website, http://whosholiday.com, (the "Website"), and the third-party page to which the Website links for ticket sales (the "Telecharge Page") (together, Exhibit A), communicate that the Play is fair use because . . . . "  *See also* Dkt. No. 46 at 25 (In supporting its assertion the Play is a parody, Plaintiffs state: "For example, Plaintiffs' website (along with the third-party website that sold the tickets) identifies the Play as a 'parody' . . . .  The website . . . .")
[4] *See also Berlin v. E. C. Publs., Inc.*, 329 F.2d 541, 545 (2d Cir. 1964) (considering whether "the parody [had] . . . the intent [or] the effect of fulfilling the demand for the original").

"which script or scripts defendants used in their live performances." *Keeling v. New Rock Theatre Prod., LLC*, No. 10 Civ. 9345, 2011 WL 6202796, at *2 (S.D.N.Y. Dec. 13, 2011).[5] *See also LaChapelle v. Fenty*, 812 F. Supp. 2d 434, 448 (S.D.N.Y. 2011) ("Defendants raise a fair use defense to copyright infringement, but the record is insufficient to make such a fact-intensive ruling as a matter of law."); *Sarl Louis Feraud Int'l v. Viewfinder, Inc.*, 627 F. Supp. 2d 123, 133, n.13 (S.D.N.Y. 2008) (denying even summary judgment on fair use defense due to factual disputes); NIMMER ON COPYRIGHT § 13.05[A][5][a] ("Given the need to explore the factors as they interact, it is typically impossible to dismiss a copyright infringement claim on the basis of fair use . . . ."). Thus, while possible in rare instances to decide fair use at the pleading stage, it is inappropriate here, where material facts are necessary to make a determination of fair use.

Plaintiffs rely heavily on *Adjmi,* 97 F. Supp. 3d 512, for the proposition that fair use should be decided on a Rule 12(c) motion, but the *Adjmi* Court found *3C* to be so "overwhelmingly transformative" that discovery was not needed. *Id*. at 531. Similarly, the Court in *Arrow Productions Ltd. v. Weinstein Co. LLC,* 44 F. Supp. 3d 359 (S.D.N.Y. 2014) found that the biography involving "behind the scenes" clips to the original pornography "clearly constitute[d] a transformative use," *id.* at 372, and the Court in *Brownmark Films, LLC v. Comedy Partners,* 682 F.3d 687 (7th Cir. 2012) found the *South Park* episode at issue to be fair use "at a fleeting glance." *Id.* at 689. As discussed herein (Section B.1.b.), such is not the case here. Plaintiffs also cite a recent order in *Dr. Seuss Enters., L.P. v. ComicMix LLC*, No. 3:16-cv-

---

[5] *See also Playboy Enterprises Int'l Inc. v. Mediatakeout.com LLC*, No. 15 Civ. 7053, 2016 WL 102332 (S.D.N.Y. March 8, 2016) (denying defendant's motion to dismiss plaintiff's copyright claim due to fact-intensive defense of fair use); *BWP Media USA, Inc.*, 87 F. Supp. 3d at 505 (denying motion to dismiss plaintiff's copyright infringement claim in part because factual issues remained as to defendant's motive and whether use of the photos was transformative for purposes of fair use); *Boarding School Review, LLC v. Delta Career Educ. Corp.*, No. 11 Civ. 8921, 2013 WL 6670584 (S.D.N.Y. March 29, 2013) (denying motion to dismiss copyright infringement counterclaims as fair use defense is a fact-intensive inquiry); *Mathieson v. Associated Press*, No. 90 Civ. 6945, 1991 WL64453 (S.D.N.Y. April 16, 1991) (same).

11

02779 at Dkt. No. 38, 2017 WL 2505007 (S.D. Cal. June 9, 2017), but this order *denied* the motion and allowed Dr. Seuss discovery on market harm.  *Id.*  Accordingly, discovery is necessary to determine Plaintiffs' fair use defense.

**B.    Copyright Fair Use, if Considered, Does Not Absolve Plaintiffs of Liability**

Plaintiffs do not dispute that they take key elements from *Grinch*, instead arguing only that the Play constitutes a fair use.  (Dkt. No. 46 at 6-7.)  Because fair use is an affirmative defense, the party claiming it carries the burden of proof in establishing it.  *Am. Geophysical Union v. Texaco Inc.,* 60 F.3d 913, 918 (2d Cir. 1994).  The Copyright Act sets forth four non-exclusive factors to be considered in determining whether the use made of a work in any particular case is a fair use.  17 U.S.C. § 107.  "All are to be explored, and the results weighed together, in light of the purposes of copyright."  *Campbell*, 510 U.S. at 578.  All four of these factors, taken individually and collectively, weigh against fair use here.

**1.    The Purpose and Character of the Use**

The first statutory factor analyzes "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes."  17 U.S.C. § 107(1).  The "central purpose" of this factor is to ask "whether and to what extent the new work is 'transformative.'"  *Campbell*, 510 U.S. at 579.  "The enquiry here  . . . [looks] to whether the use is for criticism, or comment, [and] . . .  whether the new work merely 'supersede[s] the objects' of the  original creation . . .  or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is 'transformative.'"  *Id.* (emph. added).

**a.    The Play is Not a Parody**

A parody is a form of comment or criticism, defined by the Supreme Court as a "literary or artistic work that imitates the characteristic style of an author or a work for comic effect or ridicule."  *Campbell*, 510 U.S. at 580.  Indeed, "the heart of any parodist's claim to quote from existing material . . .  is the use of . . . a prior author's composition to  . . . *comment[ ] on that*

*author's works* . . . If, on the contrary, the commentary has no critical bearing on the substance or style of the original composition, which the alleged infringer merely uses *to get attention or to avoid the drudgery in working up something fresh*, the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish) . . . ." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 214-15 (2d Cir. 2015) (citing *Campbell*, 510 U.S. at 580-81) (emph. added). If no commentary, criticism, or ridicule exists, "the taker would need to show a justification." *Authors Guild*, 804 F.3d at 215.

The Play, which uses key copyrighted elements from *Grinch* – its exact characters, backstory, settings, and redemptive theme – is not a parody of *Grinch* or its characters.  It does not poke fun and comment on the original work merely because it places those same characters in an unfortunate future meant to provoke laughter.  It does not poke fun of the Seussian rhyming style, it takes it to sell a commercial work, without any actual ridicule on that style.  *See Campbell*, 510 U.S. at 567.  Rather, the Play uses *Grinch*, Cindy-Lou, the Grinch character, and the dog Max as building blocks for a sequential work, featuring those same characters in the Seuss-created settings of Mount Crumpit and Who-Ville.  (*See, e.g.* Dkt. No. 30-1 at 2-5.)  If Plaintiffs wanted to write a dark comedy about a middle aged woman who goes through an unfortunate series of events to show that "life is not easy, perfect, and often does not work out the way we hoped as children" (Dkt. No. 46 at 12), there was no need to take from *Grinch* at all. Plaintiffs could have told the same story and made the same purported social commentary discussed in their brief without taking *Grinch's* copyrighted elements.  Plaintiffs' conclusory arguments notwithstanding, parody is not what they created when taking the key copyrightable elements and storyline of *Grinch* and creating their sequel.  There is no juxtaposition from the original, just cheap jokes.  Cindy-Lou referencing sexual contact with Grinch when she turned

13

eighteen and mentioning the size of his genitalia is not commentary on the original Seuss work. (*See* Dkt. No. 30-1 at 15.)  Eating Max (who apparently tastes like chicken) is not poking fun of *Grinch*.  (*Id*. at 29.)  Nor are the direct references to and appropriation of the many other Seuss works found in the Play.  (*See id*. at 6, 15, 22, 25, 30, 33.)

It is not as if, as in other well-known spoofs such as Mel Brooks' classic *Spaceballs* and Tony Award winning *Avenue Q*, Plaintiffs cleverly retold a story while poking fun at the authors' creative choices.  *Spaceball's* "Yogurt" and his mystical "Schwartz" powers, along with Rick Moranis' heavy breathing yet small statured "Dark Helmit" are not analogous to a (comically?) sad middle-aged Cindy-Lou Who that had to eat Max for lack of a better meal.  (*Id*. at 29.)

Contrary to Plaintiffs' central thesis, turning something innocent into something off-color and characterizing it as parody does not magically make it so.  The Second Circuit is "not prepared to hold that a commercial [playwright] can plagiarize a competitor's copyrighted [work], substitute dirty [words] of his own, perform it for commercial gain, and then escape liability by calling the end result a parody or satire on the mores of society.  Such a holding would be an open-ended invitation to [creative] plagiarism."  *MCA, Inc. v. Wilson*, 677 F.2d 180, 185 (2d Cir. 1981).

While a parody determination is fact-intensive and requires a case by case analysis, the Play, if anything, is far closer to both the unauthorized sequel *60 Years Later* in *Salinger v. Colting* and *The Cat NOT in the Hat!* analyzed in *Dr. Seuss Enterprises, L.P. v. Penguin Book USA, Inc*., 109 F.3d 1394 (9th Cir. 1997) than any of the works Plaintiffs discuss.  Regarding the former, while Colting admitted *60 Years Later* was a sequel, his taking of the original *Catcher* characters and aging them for a sequential work is precisely what Plaintiffs have done here and a primary issue of concern in *Salinger*.  641 F.Supp.2d at 267 ("[W]hether Defendants term *60*

14

*Years* a sequel or not, the Court finds that as a novel that continues the story of *Catcher* and its protagonist . . . it is the kind of work that an author would 'in general' develop or license others to develop and 'recast[s], transform[s] or adapt[s]' *Catcher* such that it constitutes a derivative work as defined by 17 U.S.C. § 101.") (citing *Myrieckes v. Woods*, No. 08 Civ. 4297, 2009 WL 884561, at *5 (S.D.N.Y. Mar. 31, 2009) (finding that if Plaintiff proved allegations that Defendant's work was a "continuation of" Plaintiff's novel, it "would qualify as a derivative work that infringes on Plaintiff's copyright") & *Micro Star v. FormGen Inc.,* 154 F.3d 1107, 1112 (9th Cir. 1998) (noting that "a copyright owner holds the right to create sequels")). Regarding the latter, Plaintiffs, just like defendants in *Penguin Book USA, Inc.,* took the essence of a beloved Dr. Seuss work to tell a story:  there, the O.J. Simpson trial, here, a single mother struggling to make ends meet.  While both works "broadly mimic[ked] Dr. Seuss' characteristic style," the Play, like *The Cat NOT in the Hat*, "does not hold his style up to ridicule."  *Penguin Books USA, Inc*., 109 F.3d at 1401.  Nor does the Play have a "critical bearing on the substance or style of the [Dr. Seuss Works]."  *Campbell*, 510 U.S. at 580.  Plaintiffs have simply taken the Grinch and Cindy-Lou Who and continued the story to "get attention or maybe even to avoid the drudgery in working up something fresh."  *Id*.  Accordingly, the Play is not a parody, nor may it reasonably be perceived as one, even if Plaintiffs call it so.  *Id.* at 582.  ("The threshold question when fair use is raised in defense of parody is whether a parodic character may reasonably be perceived.").[6]

---

[6] *See also Metro-Goldwyn-Mayer, Inc. v. Showcase Atlanta Co-op. Productions, Inc*., 479 F. Supp. 351 (N.D. Ga. 1979), where the court found that *Scarlett Fever*, despite its comedic overtones, was not a parody of *Gone With The Wind*, but a musical adaptation of the film and novel, "generally in the nature of comedy, with some elements of parody but also with some elements of tragedy or straight drama." *Id*. at 357.  While *Scarlett Fever's* Charlotte would, at times, comically exaggerate the traits of the original's Scarlett (and thus critically comment upon them), at other times, Charlotte was treated "strictly comically . . . just for laughs." *Id.* at 358.

Plaintiffs claim that the Play comments by "humorously juxtapose[ing] the rhyming innocence of *Grinch* with, among other things, profanity, bestiality, teen-age pregnancy, familial estrangement, ostracization and scandal, poverty, drug and alcohol abuse, the eating of a family pet, domestic violence and murder."  (Dkt. No. 46 at 7, 10).  Such general societal commentary is not commentary on the original.  *Campbell*, 510 U.S. at 580.  In *Rogers v. Koons*, 960 F.2d 301 (2d Cir. 1992), artist Jeff Koons made a three-dimensional form as a wooden sculpture from a photograph called "Puppies" of a husband and wife holding a litter of eight German Shepherd puppies, and called it "String of Puppies." *Id*.  The Court found the sculpture was not a parody because the photograph was not "an object of the parody" and rejected Koons' argument that he was "acting within an artistic tradition of commenting upon the commonplace." *Id.* at 310. Similarly, in *United Feature Syndicate, Inc. v. Koons*, 817 F. Supp. 370 (S.D.N.Y. 1993), the court found that a sculpture of "Odie," the well-known cartoon dog from the famous Garfield comic, did not qualify as parody where the parody was "at best, a parody of society at large, rather than a parody of the copyrighted 'Odie' character." *Id.* at 384; *see also MCA, Inc. v. Wilson*, 425 F. Supp. 443, 453 (S.D.N.Y. 1976), *aff'd*, 677 F.2d 180 (2d. Cir. 1981) ("Defendants may have sought to parody life, or particularly sexual mores and taboos, but it does not appear that they attempted to comment ludicrously upon [the original work].")

Nor can the connection with the original be for the purpose of attention, which is what the Plaintiffs have done here.  In *McCollum*, 839 F.3d at 168, the Second Circuit found that the *Hand to God* play, "a dark comedy" that incorporated more than a minute of the comedy routine *Who's on First?*, was not fair use. *Id.* at 171.  The Court found that even though the work conveyed "a dark critique of society . . . it does not transform [the routine] so that it conveys that message.  To the contrary, it appears that the Play specifically has its characters perform [the

routine] without alteration so that the audience will readily recognize both the famous routine and the boy's false claim to having created it."  *Id.* at 181-182.  "Such unaltered use . . . having no bearing on the original work, requires justification to qualify for a fair use defense."  *Id.* (*citing Authors Guild v. Google, Inc*., 804 F.3d at 215).  "More than the [original's] ability to capture audience attention is necessary to provide such justification."  *Id.*

Plaintiffs assert that the Play "has a critical bearing" on *Grinch* and "imitates the style of *Grinch* for comic effect or ridicule."  (Dkt. No. 46 at 10-11.)  But the parody must not target "just [the] general style [of the original], the genre of art to which it belongs . . . ."  *Campbell*, 510 U.S. at 597 (Kennedy, J., concurring); *see also Tin Pan Apple, Inc. v. Miller Brewing Co., Inc.,* 737 F. Supp. 826, 832 (S.D.N.Y. 1990) (finding defendants' commercial using rap group sound-alikes and look-alikes was not fair use as it "in no manner 'builds upon the original,' nor does it contain elements 'contributing something new for humorous effect or commentary.'") (citations omitted).

Plaintiffs next claim that "[t]he Play may reasonably be taken as a comment on the naiveté of *Grinch*, expressing that not everyone who grew up in Who-ville has had the uber-cheery, terminally smiling lifestyle of their ancestors and neighbors."  (Dkt. No. 46 at 10.) *Salinger*, however, found that "[i]t is hardly parodic to repeat [the same elements of the original] just because society and the characters have aged."  *Salinger*, 641 F. Supp. 2d at 259 (citing *Campbell*, 510 U.S. at 599 (Kennedy, J., concurring) ("Almost any revamped modern version of a familiar composition can be construed as a comment on the naiveté of the original because . . . it will be amusing to hear how the old tune sounds in the new genre.")).[7]  For these reasons, the

---

[7] The cases on which Plaintiffs rely to argue parody actually favor Dr. Seuss as these cases involve direct "commentary" on the original work.  For example, in *Leibovitz v. Paramount Pictures Corp*., 137 F.3d 109, 114 (2d Cir. 1998), the Court noted "the smirking face of Nielsen contrasts *so strikingly* with the serious expression on the face of Moore, the ad may reasonably be perceived as commenting on the seriousness, even the pretentiousness,

Play is not a parody.  But even if it were, as discussed *infra* (Section B.3), not every parody is automatically a fair use.

### b.        The Play is Not Transformative

Plaintiffs argue that even if the play is not a parody, it is transformative.  (Dkt. No. 46 at 12-15.)  The point of the transformative inquiry for the "purposes and character" factor, as mentioned above, is "whether the new work merely 'supersede[s] the objects' of the original . . . or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning or message . . . ." *Campbell,* 510 U.S. at 579.[8]

In the Second Circuit, "transformative use" requires consideration of how much of the original was taken and requires more than adding a dark, updated setting.  As noted in *Castle Rock*, just because a work "recast[s], transform[s], or adapt[s] . . . an original work into a new mode of presentation," thus making it a "derivative work" under 17 U.S.C. § 101, the work is not "transformative" in the sense of the first fair use factor under *Campbell.  Castle Rock Entm't, Inc. v. Carol Pub. Grp., Inc*., 150 F.3d 132, 143 (2d Cir. 1998); *see also Salinger*, 641 F. Supp. 2d at 262 ("Nor do the mere facts that Holden Caulfield's character is 60 years older, and the novel

---

of the original." *Id.* (emph. added).  Likewise, in *CCA & B, LLC v. F+W Media Inc*., 819 F. Supp. 2d 1310,1316-19 (N.D. Ga. 2011), the Court found the *Elf Off the Shelf* book was a parody of the "Elf On the Shelf" doll as the "bad" Elf wore a different costume and his storyline was the complete opposite of the "good" Elf.  Plaintiffs also rely on *Estate of James Oscar Smith v. Cash Money Records, Inc*., No. 14-cv-2703, 2017 WL 2333770 at *6-*7 (S.D.N.Y. May 30, 2017); this case did not involve a parody, but a Drake song using Jimmy Smith Rap lyrics.

[8] Plaintiffs rely on *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) for the proposition that there is no requirement that a work comment on the original in order to be considered transformative, but *Cariou* was decided before *Authors Guild*, 804 F.3d 202, which endorsed the "commentary" requirement of *Campbell*, 510 U.S. at 580-81 for transformative works, and cautioned that "that the word 'transformative,' if interpreted too broadly, can also seem to authorize copying that should fall within the scope of an author's derivative rights." *Authors Guild*, 804 F.3d at 216 n.18.  Further, *Cariou*, which related to alteration of and additions to photographic works, not sequels of literary works, that were not claimed to be parodies, is not only distinguishable for this reason, it has drawn criticism.  *See TCA Television Corp.*, 839 F.3d at 181; *Kienitz v. Sconnie Nation LLC*, 766 F.3d 756, 758 (7th Cir. 2014) (expressing skepticism as to *Cariou's* approach and criticizing reliance on transformativeness as substitute for the statutory factors, which threatens to override the copyright owner's exclusive right to prepare derivative works); *see also* NIMMER ON COPYRIGHT § 13.05[B][6], at 13.224.20 (stating with respect to *Cariou*: "It would seem that the pendulum has swung too far in the direction of recognizing any alteration as transformative, such that this doctrine now threatens to swallow fair use.  It is respectfully submitted that a correction is needed in the law.").

takes place in the present day make *60 Years* 'transformative.'").[9]  For example, in *McCollum,* 839 F.3d 168, the Second Circuit found that the *Hand to God* "dark comedy" that incorporated more than a minute of the original comedy routine *Who's on First?* merely placed the original in a sharply different context.  *See also Campbell*, 510 U.S. at 598 (Kennedy, J., concurring) (observing that courts should not afford fair use protection to persons who merely place characters from familiar copyrighted works into novel or eccentric settings).  "No new dramatic purpose was served by so much copying. . . . The only purpose served by the extent of defendants' taking is identically comedic to that of the original authors, that is, to have two performers expand on a singular joke in order to generate increasing audience laughter." *McCollum,* 839 F.3d at 182.

Similarly, in *Castle Rock*, 150 F.3d 132, the Second Circuit affirmed the finding that the *Seinfeld* trivia game was not transformative and merely "repackage[d] *Seinfeld* to entertain *Seinfeld* viewers."  *Id.* at 143.  While the infringing work may have literally "transformed Seinfeld's expression into trivia quiz book form [it was] with little, if any, transformative *purpose*," thus the first fair use factor weighed against the defendants.[10] *Id.* (emph. added).

The Play, which uses *Grinch*'s two main characters, Grinch and Cindy-Lou Who, the same story arc, and the same settings of Who-ville and Mount Crumpit, has no transformative purpose, and Plaintiffs provide no explanation as to how this purpose exists, as their burden requires, merely stating in conclusory fashion that the Play adds "a further purpose." (Dkt. No. 46 at 15.)  If Plaintiffs mean that this "purpose" is parody or societal commentary, as discussed

---

[9] *See also Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 551 (S.D.N.Y. 2013) ("In considering whether the second work has transformed the original, it is appropriate to consider the percentage of the allegedly infringing work that is made up of the copyrighted work since this offers some indication of whether the defendant's use of the 'original materials has been sufficiently transformative.'").

[10] *See also Ringgold v. Black Entm't Television, Inc.* 126 F.3d 70, 79 (S.D.N.Y. 1997) (finding "defendants have used Ringgold's [story quilt] for precisely a central purpose for which it was created – to be decorative" as a poster of the quilt on a set.)

above, their argument fails.  If the further purpose is to add "new expression" apart from parody (*id.*), Plaintiffs fail to show transformative purpose for the same reasons as discussed in *Salinger*, 641 F. Supp. 2d at 262-63 (finding no transformative purpose where "Holden Caulfield's character is 60 years older, and the novel takes place in the present day.").  Moreover, "[w]hile there [was] some non-parodic transformative element in *60 Years* with regard to its use of the Salinger character to criticize the author J.D. Salinger, its effect [was] diminished" because the work "borrowed quite extensively from *Catcher*, both substantively and stylistically such that, when combined with the inconsistent use of the transformative element of the character of Salinger, the ratio of the borrowed to the novel elements is quite high, and its transformative character is diminished."  *Id.* at 263.  *See also Campbell,* 510 U.S. at 583 n.16 (stating in the context of parody, "only further judgment, indeed, that a court may pass on a work goes to an assessment of whether the parodic element is slight or great, and the copying small or extensive in relation to the parodic element"); *cf. Suntrust Bank,* 268 F.3d at 1280 (finding the issue of transformative character to cut "decisively in [Defendant's] favor" where the ratio of "the borrowed and the new elements" is "very low, and the incongruity between them wide").  Thus, when there is egregious taking from the original, as there is in the Play, "transformative" purpose cannot be found, or is at least diminished.  *Campbell,* 510 U.S. at 579.

Plaintiffs cite *Adjmi* (a decision Plaintiffs sent to Dr. Seuss prior to this action) throughout their brief.  (Dkt. No. 46 at 1-7, 9, 13, 15-16, 19.)  Tellingly, Plaintiffs provide no analysis whatsoever as to why they believe that the Play and *3C* are analogous, because they are not.  In *Adjmi*, *3C* was not a sequel that used the exact same characters as *Three's Company* to evoke laughter.  Rather, *3C* "turned [*Three's Company*] into a nightmarish version of itself, using the familiar *Three's Company* construct as a vehicle to criticize and comment on the

original's light-hearted, sometimes superficial, treatment of certain topics and phenomena." *Adjmi,* 97 F. Supp. 3d at 531.  For example, notes the court, "Brad" was a "far cry from Jack – the former is almost a reimagining of what Jack would have actually experienced if he were homosexual: the abusive, demeaning treatment from Mr. Wicker, constant homosexual slurs from Larry; and even rejection from his own family."  *Id.*  The court also pointed out the "stark contrast" between the Jack and Brad characters and the works as a whole:  while Jack Tripper was a source of slapstick comedy pretending to be gay while actually womanizing behind his landlords' backs, Brad spends the entirety of *3C* "grappling" with his closeted secret.  *3C* criticizes *Three's Company's* "happy-go-lucky treatment of that issue."  *Id.*  In *3C*, the transformative purposes were clear:  where *Three's Company* made light of the discrimination against homosexuality prevalent in the 1970s, *3C* showcased that this topic should not have been the fodder of humor.  No such comparisons can credibly be made between *Grinch* and the Play. Further, the *Adjmi* plaintiff took a common experience – an apartment and the story of three people living together – and lent it different main characters with different names from *Threes Company,* thereby taking far less of the original than the Play takes from *Grinch.*  *Id.* at 533. Accordingly, Plaintiffs' "aha case" does not support their arguments in the least.

### c.    The Play is a Commercial Work

The first statutory factor specifically instructs courts to consider whether copyrighted materials are used for a "commercial or nonprofit educational [purpose]," the former tending "to weigh against a finding of fair use." *Campbell*, 510 U.S. at 585 (internal quotation marks omitted).  Plaintiffs' Play is indisputably commercial.  17 U.S.C. § 107(1).  This factor should not be discounted as Plaintiffs suggest, particularly here where Plaintiffs also advertised the Play – and even sought investors – by using a copyrighted image of Cindy-Lou Who.  (Dkt. No. 36 at ¶ 29.)  Such "conduct which reasonably qualifies as commercial exploitation weigh[s] strongly

against fair use." *McCollum*, 839 F.3d at 183 (citing *Campbell*, 510 U.S. at 585) (the use of copyrighted work "to advertise a product, even in a parody, will be entitled to less indulgence under the first factor of the fair use enquiry than the sale of a parody for its own sake"); *Am. Geophysical Union*, 60 F.3d at 922 (a fair use claim will not be sustained when secondary use can fairly be characterized as "commercial exploitation"). Plaintiffs' excessive copying from *Grinch* and their advertising focus on Cindy-Lou Who "raises particular commercial exploitation concerns." *Id*.

In sum, Plaintiffs' commercial Play is neither a parody nor otherwise transformative. Instead, it duplicates to a significant degree the copyrighted elements and Christmas draw of *Grinch* for commercial gain. Thus, the first factor, far from weighing in Plaintiffs' favor, weighs in favor of Dr. Seuss.

## 2. The Nature of the Copyrighted Work

It is well-settled that creative and fictional works are less amenable to fair use findings than are factual works. *Stewart v. Abend, d/b/a Authors Research Co.,* 495 U.S. 207, 237 (1990) ("In general, fair use is more likely to be found in factual works than in fictional works."); *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 563 (1985) ("The law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy."); *Castle Rock*, 150 F.3d at 143-144 (finding that the second factor favored plaintiff given the fictional nature of the copyrighted work); *Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.,* 996 F.2d 1366, 1376 (2d Cir. 1993) (the second factor "must favor a creative and fictional work").

Plaintiffs do not dispute that *Grinch* is entitled to protection. (Dkt. No. 46 at 15.) The characters of *Grinch* are similarly entitled to protection. *See Salinger v. Colting*, 607 F.3d 68, 73 (2d Cir. 2010) (finding valid copyrights in the character of Holden Caulfield as he "is sufficiently delineated so that a claim for infringement will lie"); *DeCarlo v. Archie Comic*

*Publ'ns, Inc.*, 11 F. App'x. 26, 28-29 (2d Cir. 2001) ("[I]t is settled law that the Act extends copyright protection to cartoon characters developed with sufficient particularity. . .").

There is no question that *Grinch* is a "creative expression for public dissemination [that] falls within the core of the copyright's protective purposes." *Campbell*, 510 U.S. at 586. Consequently, this factor weighs against a finding of fair use.

### 3. The Amount and Substantiality of Use

The third fair use factor is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," 17 U.S.C. § 107(3), which necessarily "includes a determination of not just quantitative, but also qualitative substantiality." *Campbell*, 510 U.S. at 587; NIMMER ON COPYRIGHT, §13.05[A][3]; *Castle Rock Entm't v. Carol Pub. Grp., Inc.*, 955 F. Supp. 260, 269 (S.D.N.Y. 1997), *aff'd,* 150 F.3d 132 (2d. Cir. 1998) ("If a challenged work appropriates what amounts to 'the heart' of an original work, even if only in a few words, then such an appropriation is substantial for purposes of the fair use inquiry."). In this Circuit, the question is whether "no more was taken than necessary" – in other words, "whether the selection and quantity of the material taken are reasonable in relation to the purported justification." *McCollum*, 839 F.3d at 185 (citations omitted). "[T]he larger volume (or the greater importance) of the original taken, the less likely the taking will qualify as a fair use." *Adjmi,* 97 F. Supp. 3d at 533.

Plaintiffs contend that they took from *Grinch* no more than is necessary for their intended use: parody. (Dkt. No. 46 at 17.) "But not every parody is a fair use." *Suntrust Bank*, 268 F.3d at 1272. In *Suntrust*, the Eleventh Circuit noted that in *The Wind Done Gone* (which, unlike the Play, changed all of *Gone With The Wind* characters but one, "Mammy"), "taking of the descriptions of characters and the minor details of their histories and interactions that arguably are not essential to the parodic purpose of the work recur throughout" led the Court to state that

"we are reminded that literary relevance is a highly subjective analysis ill-suited for judicial inquiry." *Id*. at 1273; *see also Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 113-14 (2d Cir. 1998) ("[W]e have some concern about the ease with which every purported parodist could win on the first factor simply by pointing out some feature that contrasts with the original.  Being different from an original does not inevitably 'comment' on the original."); *Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.*, 600 F.2d 1184, 188 (5th Cir. 1979) ("Not all parodies and satires, however, are protected as fair use"); *Walt Disney Prods. v. Air Pirates*, 581 F.2d 751, 758 (9th. Cir. 1978) ("[W]hen persons are parodying a copyrighted work, the constraints of the existing precedent do not permit them to take as much of a component part as they need to make the 'best parody.'  Instead, their desire to make the 'best parody' is balanced against the rights of the copyright owner in his original expressions" and finding "defendants took more than is allowed . . . . as applied to both conceptual and physical aspects of the characters.");  *New Line Cinema Corp. v. Bertlesman Music Grp., Inc*., 693 F. Supp. 1517, 1525 (S.D.N.Y. 1988) (Parody is not classified a presumptively fair use); *Metro-Goldwyn-Mayer, Inc. v. Showcase Atlanta Co-op. Prods., Inc*., 479 F. Supp. 351, 358 (N.D. Ga. Oct. 12, 1979) ("Even if 'Scarlett Fever' was a parody or satire in its overall effect, the Court finds that the play is still not protected by 'fair use' because 'Scarlett Fever' incorporates more material from the [original works] than 'fair use' allows.").

Accordingly, even if the Court finds Plaintiffs' tenuous arguments of parody and transformative use credible, what is absolutely clear from a review of the Play is that to avoid the drudgery of creating something fresh, Plaintiffs took far too much, not only from *Grinch*, but from other Seuss works as well.  The Play recounts the entire plot of *Grinch* in its first 14 pages (*See* Dkt. No. 30-1 at 4-14.), uses the same settings at Christmas time (*id*. at 2, 4), and

appropriates by name, appearance, and trait Grinch and Cindy-Lou Who (*id*. at 4, 25) (Dr. Seuss suspects that discovery into set and costume design would further buttress this point).  The Play's Grinch is the same Grinch:  green and not human, but bipedal.  (*See id*. at 5 ("He was green and quite large.  Not man and not beast.").)  He is a resident of Mount Crumpit (*id*. at 25), who dressed as Santa and disguised his dog as a reindeer (*id*. at 5) to steal Who-ville's Christmas decorations (*id*. at 10), prior to returning them in a change of heart the next day (*id*. at 13-14).

The Play's Cindy-Lou Who is also the same as the original fictional character.  She is a former Who-ville resident, (*id*. at 4), and a current resident of Mount Crumpit (*id*. at 2).  She has blue eyes (*id*. at 4), was two years old when she first met the Grinch (*id*. at 5), and experienced the entire story from the original *Grinch* (*id*. at 4-14).  She is Dr. Seuss's character.  (*See, e.g., id*. at 4 ("You remember me, right?  Oh, I'm sure that you do.  When I was a youngster?  I was Cindy Lou Who.").)  The Play uses the song "Fahoo Fores Dahoo Dores" (*id*. at 4), including *Grinch*'s fictional "goo-goo-gums" and "foo-foo-fluffs" (*id*.), as well as Max from the original *Grinch* (*id*. at 14).

The Play also uses characters from other Dr. Seuss stories, including Thidwick (*id*. at 6), Yertle the Turtle (*id*. at 15), One Two Red and Blue Fish (*id*. at 30), Morris McGurk (*id*. at 22, 24, 28), Horton, the Cat in the Hat, the Lorax, the Sneeches and Wocket, Thing Two, Sylvester McMonkey McBean (*id*. at 25), and Motta-fa-Potta-fa-Pell (*id*. at 33).  None of these heavy takings are necessary to the Play's purported parodic purpose, but Plaintiffs nonetheless took them, for ticket sales.

"This manifests substantial copying."  *McCollum*, 839 F.3d at 185 (citing *Harper & Row*, 471 U.S. at 548, 565–66 (concluding that the third factor favored plaintiffs where defendants copied approximately 300 words verbatim in light of "expressive value of the excerpts")); *Castle*

*Rock*, 955 F. Supp. at 267 (citing *Harper & Row* as support for the proposition that copying even a few words of a challenged work can constitute substantial taking if it amounts to taking the heart of the original work).

Plaintiffs essentially admit they took too much, as they argue that a parodist need not take the bare minimum amount of material necessary to conjure up the original, (Dkt. No. 46 at 16), citing *Abilene Music, Inc. v. Sony Music Entm't*, 320 F. Supp. 2d 84, 89 (S.D.N.Y. 2003) and *Campbell*, 510 U.S. at 588 for support.  These cases, however, do not support Plaintiffs' position. In *Abilene Music*, the court concluded that the allegedly infringing rap song, "The Forest," took no more than what was necessary to "make its parodic point" when it took only the first three lines of "What a Wonderful World" and played it intentionally off-key, to a different tempo and rhythm, and with altered lyrics referring to marijuana.  *Abilene*, 320 F. Supp.2d at 86-87, 93. The *Abilene* court noted that "The Forest" never returned to the music or lyrics of the original after its opening verse, and each line from the original was modified in word, melody, or style. *Id*. at 93-94.  Here, Plaintiffs took expansively and did nothing to modify the style of the *Grinch*, instead writing the Play in rhyming couplets to mimic the original.

Plaintiffs also misstate *Campbell*, which does not, as Plaintiffs suggest, permit parodists to take as much material as desired as long as their purpose is to conjure up the original. *Campbell* expressly warns against this.  *See id*. at 589 ("This is not, of course, to say that anyone who calls himself a parodist can skim the cream and get away scot free.").  Instead, *Campbell* stands for the proposition that "in parody, as in news reporting, context is everything, and the question of fairness asks what else the parodist did besides go to the heart of the original."  *Id*. (citation omitted).  And in this Circuit, "an important inquiry is whether the selection and quantity of the material taken are reasonable in relation to the purported justification."

*McCollum*, 839 F.3d at 185; *see also Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 98 (2d Cir. 2014) ("The crux of the inquiry is whether no more was taken than necessary.").

The bottom line is that even if the Play could be considered a parody – which it cannot – Plaintiffs have taken far more than necessary to evoke the original *Grinch*, including nonessential elements from other Dr. Seuss stories.  *Salinger*, 641 F. Supp. 2d at 262-63; *New Line Cinema Corp.,* 693 F. Supp. at 1527 (no fair use finding of *A Nightmare on Elm Street* parody where defendants "appropriated more than is permitted. . . . Instead of using just the claw or just the slash marks or just the music or just the plot or just the imagery or just the murderous personality or just the dream sequences, [the defendants] appropriated them all.").

In defense of their copying the exact characters of *Grinch*, Plaintiffs appear to argue that adding detail to a character suddenly makes that character completely different.  (Dkt. No. 46 at 18-19.)  This is like claiming that a 60-year-old is a different person from her 30-year-old self. This argument lacks merit.  As *Salinger* instructs, whether an accused infringer has copied characters has very little to do with age or appearance, particularly when – as here – there can be little dispute that the characters are the same between the two works.  Plaintiffs cite for support *Warner Bros. Inc. v. American Broadcasting Companies, Inc*., 720 F.2d 231, 239-45 (2nd Cir. 1983); *Conan Properties, Inc. v. Mattel, Inc*., 712 F. Supp. 353, 361 (S.D.N.Y. 1989);  *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1046 (9th Cir. 1994); and *Silas v. Home Box Office, Inc*., 201 F. Supp. 3d 1158, 1177-80 (C.D. Cal. 2016) as examples of when courts have not found two characters to be "sufficiently similar."  Not only do these cases analyze substantial similarity, not fair use, but in all of them the characters were actually different beings, not the same characters at a different place or time.

Plaintiffs also argue that the amount and substantiality of their use is tempered by not

27

having an actor playing the Grinch, who appears in the Play through the recollection and dialogue of Cindy-Lou Who.  (Dkt. No. 46 at 18.)  This is an irrelevant distinction, as the Play uses the Grinch character generously – regardless of whether he shows up on stage – to progress the story told in the Play.  (*See, e.g.,* Dkt. No. 30-1 at 13-15, 19-20, 25, 28, 34, 40.)   Finally, Plaintiffs cite *United Feature Syndicate, Inc. v. Koons*, 817 F. Supp. 370 (S.D.N.Y. 1993), but Plaintiffs are hard-pressed to argue that the court's finding of no fair use because the artist "Koons, copies the Odie character virtually in its entirety" is not applicable here, where Plaintiffs did the same thing.  *Id.* at 377, 381.

In sum, Plaintiffs took far too much copyrighted content, more than any other case that has ever found fair use. The third fair use factor thus strongly favors Dr. Seuss.

### 4.        The Effect on the Potential Market

The fourth and "single most important element of fair use" also weighs strongly in favor of Dr. Seuss.  *Harper & Row*, 471 U.S. at 566; *Authors Guild*, 804 F.3d at 214.  This factor evaluates "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4).  The inquiry must take into account harm to the original market, *as well as harm to the market for derivative works.  Harper & Row*, 471 U.S. at 568 (emph. added); *see also Castle Rock*, 955 F. Supp. at 270-71("[T]he analysis is whether [the Play] occupies derivative markets that plaintiff may potentially enter.").  Derivative works are defined as those markets that the creators of the original work would in general develop or license others to develop.  *Castle Rock*, 150 F.3d 132, 145.[11]

---

[11] This factor is particularly unsuitable for resolution on Plaintiffs' Motion because fair use is an affirmative defense that requires its proponent to proffer favorable evidence about relevant markets.  *Campbell*, 510 U.S. at 590; *see also Penguin Books USA, Inc*., 109 F.3d at 1403 ("[defendants] must bring forward favorable evidence about relevant markets").

Plaintiffs argue that the Play will not cause Dr. Seuss harm because it "is intended for adult audiences and contains adult themes and content," is "a dark comedic work with explicit language geared towards only adult audiences," and "[t]he language and tone of the [Play] is shockingly different from *Grinch*."  (Dkt. No. 46 at 19.)  Plaintiffs, however, have not shown that a market intended for adult audiences or one for a "dark comedic work" are separate and distinct from the market for derivative works of the *Grinch*, or that "the language and tone of the [Play]" determines the market for that work.  Plaintiffs' arguments ignore the Play's extensive use of the *Grinch*, which forms the basis for the Play's potential appeal, and that both works target *Grinch* fans, no matter the age.  (Dkt. No. 33 at ¶¶ 2, 28-34.)

Plaintiffs further contend that the Play will not cause Dr. Seuss market harm because "no reasonable audience member of the [Play] could mistake it for a theatrical version of *Grinch*" . . . and that the Play "will not replace sales of *Grinch.*"  (Dkt. No. 46 at 19-20.)  Even if this were true, this is not the law.  The fourth factor examines harm to the original market *and* to the market for derivative works, *Harper & Row*, 471 U.S. at 568, not whether the Play is an exact substitute for the original *Grinch*.  It is well-settled that sequels are quintessential derivative works.  *See Myrieckes*, 2009 WL 884561, at *5 (S.D.N.Y. Mar. 31, 2009) (citing MELVILLE B. NIMMER & DAVID NIMMER, 1-2 NIMMER ON COPYRIGHT § 2.12 (2008)).  Accordingly, a sequel may harm the potential derivative market occupied by the copyright holder.  *See Salinger*, 607 F.3d at 74 ("[A]n unauthorized sequel might undermine the potential market for an authorized *Catcher* sequel, whether through loss of the novelty of a sequel or through confusion as to which of the sequels is the authorized one.").  The fact that Plaintiffs refer to the Play in marketing collateral as a parody does not "post-hoc" make it so.  *Campbell*, 510 U.S. at 600; *Penguin Books USA, Inc.*, 109 F.3d at 1403 (rejecting defendants' arguments that their work was a parody

29

as "pure shtick" and "completely unconvincing"); *cf. Burnett v. Twentieth Century Fox Film Corp.*, 491 F. Supp. 2d 962, 972 (C.D. Cal. 2007) ("[T]he cry of 'parody!' does not magically fend off otherwise legitimate claims of trademark infringement or dilution.").

If the Court elects to consider the merits of the Motion despite the need for discovery, Rule 12(c) requires the Court to accept as true Dr. Seuss's specific allegations as to the harm that will result from Plaintiffs' unauthorized use of the original *Grinch*.  *See Arrow Prods.*, 44 F. Supp. 3d at 367 ("[J]udgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) . . . is only appropriate if, drawing all reasonable inferences in favor of the non-moving party, it is apparent from the pleadings that no set of facts can be proven that would entitle the plaintiff to relief.").  Plaintiffs baldly assert in their opening brief that "[t]he Play plainly does not 'usurp' the market for *Grinch*," (Dkt. No. 46 at 19) but in doing so ignore the Rule 12 standard.

Dr. Seuss has alleged the existence of an active derivative market for *Grinch*, including in connection with theatrical productions.  (*See* Dkt. No. 33 at ¶ 18.)  Indeed, Dr. Seuss has pleaded that "[i]t is not uncommon for [Dr. Seuss] to license the Dr. Seuss Intellectual Property in connection with the creation of new works based upon, and incorporating, the Dr. Seuss Intellectual Property." (*Id*. at ¶ 33.)

Plaintiffs created the Play without license or authorization from Dr. Seuss, thereby usurping Dr. Seuss's licensing opportunities.  (*Id*. at ¶¶ 26, 33.)  This fact cuts sharply against Plaintiffs' conclusory and unsupported contention that "[t]he Play plainly does not 'usurp' the market for *Grinch.*  (Dkt. No. 46 at 19.)  *See Am. Geophysical Union*, 60 F.3d at 929 ("[T]he impact on potential licensing revenues is a proper subject for consideration in assessing the fourth factor."); *McCollum*, 839 F.3d at 187 (citing *On Davis v. The Gap, Inc.*, 246 F.3d 152, 175–76 (2d Cir. 2001) (concluding that fourth factor favored copyright owner where defendants' taking

30

caused both loss of royalty revenue and "diminution of [owner's] opportunity to license to others who might regard [owner's] design as preempted by [Plaintiffs'] ad")).

Plaintiffs argue that because the Play has an adult theme and tone, Dr. Seuss "would never develop a market for adaptations of *Grinch*" that could include a derivative work similar in style. (Dkt. No. 46 at 20.) Plaintiffs make quite a conclusory jump here; publicly available sources discuss the fact that Dr. Seuss has written adult-themed works; discovery would further buttress this fact.[12] Dr. Seuss has alleged that it has collaborated with licensees to develop derivative works that expand on the lives of the beloved *Grinch* characters, many of which have included themes and jokes aimed at adult audiences. (*See* Dkt. No. 33 at ¶ 18.)

Plaintiffs cite *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 806 (9th Cir. 2003) and *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 90-91 (2d Cir. 2014) for the proposition that the Play represents a work that Dr. Seuss would never entertain. (Dkt. No. 46 at 21.) But as alleged in Dr. Seuss's Counterclaims and asserted above, the derivative market for *Grinch* is expansive. (Dkt. No. 33 at ¶ 18.) Plaintiffs also contend that the Play "is not a true sequel because it is a parody," and thus cannot affect the potential market for an authorized sequel of *Grinch*. (Dkt. No. 46 at 21.) Plaintiffs are incorrect for two reasons: (1) the Play is not a parody, as discussed above; and (2) parodies can also be sequels or derivative works. Moreover, even a parody may harm the potential derivative market occupied by the copyright holder and thereby weigh against a finding of fair use. *Mattel, Inc. v. Pitt*, 229 F. Supp. 2d 315,

---

[12]     *See, e.g.,*   https://www.theatlantic.com/entertainment/archive/2012/03/dr-seusss-little-known-book-of-nudes/253891/ (discussing Dr. Seuss's adult-themed *The Seven Lady Godivas: The True Facts Concerning History's Barest Family*);   https://m.barnesandnoble.com/w/youre-only-old-once-dr-seuss/1102952837#id_sk_Overview (selling Dr. Seuss's adult book *You're Only Old Once*).  By Plaintiffs' argument, Dr. Seuss would have never published these stories because they clearly are not intended for children.  Yet, it did.

324 (S.D.N.Y. 2002) ("[A] copy could be a parody and still affect a protected derivative market.") (citing *Campbell*, 510 U.S. at 592).[13]

      The Play is the kind of derivative work that Dr. Seuss has the right to develop and could "in general develop or license others to develop."  *Campbell*, 510 U.S. at 592; *see also Castle Rock*, 955 F. Supp. at 270-71 ("[T]he analysis is whether [the Play] occupies derivative markets that plaintiff may potentially enter.").  Plaintiffs' contention that "Defendant cannot prevent others from entering fair use markets merely be [sic] developing or licensing a market for other uses of *Grinch* beyond the original book" (Dkt. No. 46 at 20) misstates Dr. Seuss's position.  Dr. Seuss certainly does not seek to prevent actual fair use of its intellectual property; much like the creators of *Sesame Street* chose their battles, so too does Dr. Seuss.  Rather, Dr. Seuss seeks only to prevent exploitative uses that misappropriate its copyrighted material under the guise of fair use.

      In sum, while Plaintiffs' fair use arguments are ill-suited for a motion for judgment on the pleadings, it is nevertheless clear that the defense is exceedingly weak.  Plaintiffs' motion should thus be denied.

### C.    Plaintiffs' Motion to Dismiss Dr. Seuss's Trademark Claims Fails

      Plaintiffs move to dismiss Dr. Seuss's trademark claims (Plaintiffs mention, but make no arguments, regarding Dr. Seuss's distinct Count VI state law dilution claim).  Plaintiffs argue that the trademark claims are: (1) preempted by the Copyright Act; (2) barred by the First Amendment; and that (3) there is no likelihood of confusion.  (Dkt. No. 46 at 22-26.)  All of these arguments fail and/or are premature.

---

[13] That Dr. Seuss has not yet created a purely adult *Grinch* sequel is irrelevant: "Although Castle Rock has evidenced little if any interest in exploiting this market for derivative works based on Seinfeld . . . the copyright law must respect that creative and economic choice." *Castle Rock*, 150 F.3d at 146; *UMG Recordings Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349, 352 (S.D.N.Y. 2000) (A copyright owner's rights include the right "to curb the development of such a derivative market by refusing to license a copyrighted work or by doing so only on terms the copyright owner finds acceptable").

### 1.    Dr. Seuss's Trademark Claims Are Not Preempted

First, Plaintiffs' assertion that Dr. Seuss's trademark claims are preempted by the Copyright Act (*id.* at 22-23) is incorrect.  Copyrights and trademark rights are recognized as distinct areas of law with distinct rights.  *See, e.g., Federal Treasury Enter. Sojuzplodoimport v. Spirits Intern. N.V.,* 623 F.3d 61, 69 n.9 (2d Cir. 2010) ("We acknowledge that trademark and copyright are distinct fields of law, and concepts that apply to one might not be applicable to the other."); *EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.,* 228 F.3d 56, 63-64 (2d Cir. 2000) ("The Supreme Court has stressed that there are 'fundamental differences between copyright law and trademark law.'") (citing *Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417, 439 n. 19 (1984); *A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC*, 131 F. Supp. 3d 196, 207 (S.D.N.Y. 2015); (internal citations omitted); *Fischer v. Forrest*, 14 Civ. 1304, 2015 WL 195822, at *9 (S.D.N.Y. Jan. 13, 2015); *Twin Peaks Prods.*, 996 F.2d at 1370.  While true that the protection of the entire creative expression of an artistic work falls within the purview of copyright, and not trademark law, Dr. Seuss's trademark claims are not for the entirety of the Dr. Seuss works at issue, but rather for discrete "aspects" of those works that are alleged to function as "indicators of source."  (*See* Dkt. No. 33 at ¶ 20.)  Dr. Seuss asserts discrete claims: copyright infringement of its creative works, and unauthorized use of certain source-identifying aspects of those works (i.e., the GRINCH and CINDY-LOU WHO marks, Cindy-Lou Who's animated characterization used on advertisements, and Dr. Seuss's distinctive typeface), such that consumer confusion is likely.  1 McCarthy on Trademarks and Unfair Competition § 6:17.50 (4th ed.) ("In general, there is no reason why a given work cannot be the subject of both trademark and copyright protection.").  Dr. Seuss's trademark claims are thus not amenable to dismissal on this basis, and Plaintiffs' cases are inapposite.  *See Warner Bros.*, 720 F.2d at 246 (affirming dismissal of Plaintiffs' unfair competition claim because it was too weak to survive

summary judgment – not because it was precluded by the Copyright Act); *Durham Indus. v. Tomy Corp.*, 630 F.2d 905, 918-19 (2d Cir. 1980) (dismissing plaintiff's unfair competition claim because it merely sought protection against copying); *Fioranelli v. CBS Broadcasting Inc.*, 15 Civ. 952, 2017 WL 1400119, at \*5-7 (S.D.N.Y. Jan. 19, 2017) (dismissing Lanham Act claim under *Dastar* reasoning that is inapplicable here).[14]  Plaintiffs' first attack thus fails.[15]

### 2.    Plaintiffs' First Amendment Arguments Fail

Next, Plaintiffs argue that the public interest in free expression outweighs the risk of consumer confusion between *Grinch* and the Play.  (Dkt. No. 46 at 23-24.)   The First Amendment, however, does not provide a license to trammel on legally recognized intellectual property rights.  *Dallas Cowboys Cheerleaders*, 600 F.2d at 1188.

Relying on *Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Grp., Inc.*, 886 F.2d 490 (2d Cir. 1989), Plaintiffs contend the Play cannot infringe Dr. Seuss's trademarks because it is a parody.  (Dkt. No. 46 at 23.)  As discussed above, however, the Play is not a parody, and *Cliffs Notes* does not preclude trademark infringement as a matter of law, it applies a balancing test. *Cliffs Notes*, 886 F.2d at 494 ("[In any case where an expressive work is alleged to infringe a trademark, it is appropriate to weigh the public interest in free expression against the public interest in avoiding consumer confusion.").[16]  Applying that balancing test here, public interest in

---

[14] Plaintiffs reach outside the pleadings to claim that a "simple Google search" shows that there are available fonts similar to Dr. Seuss's stylized one.  (Dkt. No. 46 at 22 n.9.)  It is unclear why Plaintiffs make this argument, but there is no question that a distinctive font can qualify for trademark protection. *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 382 (2d Cir. 2005) ("[S]tylized shapes or letters may qualify [as inherently distinctive], provided the design is not commonplace but rather unique or unusual in the relevant market."); 2 MCCARTHY § 12:59 (4th ed.) ("Federal trademark protection for a distinctive typeface or lettering design would not be preempted, pursuant to Copyright Act.").  Dr. Seuss has alleged that its font is distinctive.  (Dkt. No. 33 at ¶¶ 29, 60.)
[15] Plaintiffs make passing reference to *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989) (Dkt. No. 46 at 23), the forerunner to the balancing test discussed in *Cliffs Notes*.  Dr. Seuss has alleged that Plaintiffs have intentionally confused consumers by using an image of Cindy-Lou Who in advertising, and Plaintiffs admit that the ad was used to draw investors to the Play.  (Dkt. No. 33 at ¶¶ 29-30; Dkt. No. 36 at ¶ 29.)  Dr. Seuss submits that at this stage, these facts are sufficient for *Grimaldi's* requirement that an infringer explicitly mislead consumers in connection with an expressive work.
[16] Plaintiffs cite many additional cases—*Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F. Supp. 2d 410

avoiding consumer confusion weighs in Dr. Seuss's favor, particularly because the Play is not a parody and took too many source-identifying elements, including in advertisements.  Plaintiffs' First Amendment defense is thus unavailing.

### 3.    Plaintiffs Infringe Dr. Seuss's Trademarks

Plaintiffs assert that the Court should find that no likelihood of confusion exists between *Grinch* and the Play.  (Dkt. No. 46 at 24-25.)  Such a "fact-intensive analysis," however, is generally inappropriate on a motion to dismiss.  *World Trade Centers Association, Inc. v. Port Authority of N.Y. & N.J.*, No. 15 Civ. 7411, 2016 WL 8292208, at *2 (S.D.N.Y. Dec. 12, 2016) (quoting *Merck & Co., Inc. v. Mediplan Health Consulting, Inc.*, 425 F. Supp. 2d 402, 412 (S.D.N.Y. 2006)).  In addition, it is "well settled that, when applying the *Polaroid* factors to determine likelihood of confusion at a motion to dismiss stage, courts have not required all factors to be addressed in order to find adequate pleading of a likelihood of confusion."  *Id*. (citing *Ritani, LLC v. Aghjayan*, 880 F. Supp. 2d 425, 446 (S.D.N.Y. 2012) & *The Name LLC v. Arias*, No. 10 Civ. 3212, 2010 WL 4642456, at *5 (S.D.N.Y. Nov. 16, 2010)).

Dr. Seuss has "sufficiently alleged facts supporting an inference of a likelihood of consumer confusion sufficient for the motion to dismiss stage pursuant to the *Polaroid* factors," *World Trade Centers Association, Inc.*, 2016 WL 8292208, at *2, as it has alleged that (1) the Dr. Seuss Marks are strong (Dkt. No. 33 at ¶ 75); (2) Plaintiffs used the same GRINCH and CINDY-LOU WHO marks, drawings of Cindy-Lou Who, and characteristic Dr. Seuss font from

---

(S.D.N.Y. 2002); *Charles Atlas, Ltd. v. DC Comics, Inc.*, 112 F. Supp. 2d 330 (S.D.N.Y. 2000); *Yankee Pub. Inc. v. News Am. Pub. Inc.*, 809 F. Supp. 267, 275 (S.D.N.Y. 1992); *Tetley, Inc. v. Topps Chewing Gum, Inc.*, 556 F. Supp. 785 (E.D.N.Y. 1983).  But none change the fact that the proper approach calls for a balancing test, as set forth in *Cliffs Notes*—not a presumption of free expression over trademark infringement.  Furthermore, nothing in Plaintiffs' cases changes the rule that the balancing test requires an examination of facts that are simply not available at this stage of litigation.  *See, e.g. New York Stock Exch., Inc. v. Gahary*, 196 F. Supp. 2d 401, 413 (S.D.N.Y. 2002) ("Once again, the key question in the parody context is whether the speaker has created confusion by identifying the famous party as the actual source of the message, as opposed to simply the target of the parody. And on that issue, defendants have raised enough questions to justify denying the [the Plaintiff's] motion for summary judgment.").

the original *Grinch* in the Play and advertisements (*id.* at ¶¶ 20, 29); (3) Plaintiffs' use of the Dr. Seuss Marks targets the same consumers of *Grinch* derivative works, and largely around the same time of year – Christmas – and in New York, where derivative *Grinch* theatrical works play[17] (*id.* at ¶¶ 2, 28-34); (4) Dr. Seuss has already "bridged the gap" by licensing the use of the Dr. Seuss Marks for *Grinch* theatrical works, including ones that expand the Grinch and Cindy-Lou Who characters (*id.* at ¶ 18); and (5) Plaintiffs intended to confuse consumers (*id.* at ¶ 31).

Plaintiffs make a conclusory leap that "[i]t is unlikely that an ordinary prudent purchaser would think that the Play is actually a work written by [Dr. Seuss], as opposed to a parody of *Grinch*." (Dkt. No. 46 at 24.)  Once again relying on the assumption that their Play is a parody, Plaintiffs cite *Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*, 156 F. Supp. 3d 425 (S.D.N.Y. 2016), a case in which "it [wa]s self-evident that [defendant] MOB did mean to say something about Louis Vuitton specifically," and where "MOB's gimmick would be obvious to even its most unsophisticated customers." *Id.* at 435-36, 443.  The court noted that a parody, in addition to differentiating itself from the original, must "clearly indicate[] to the ordinary observer that the defendant is not connected in any way with the owner of the target trademark." *Id.* at 435. That is not the case here, where Plaintiffs are alleged to have used Dr. Seuss imagery to advertise the Play and have created a work that very well could confuse theatre goers as to whether Dr. Seuss approved of and/or sponsored the Play in light of its non-parodic uses of *Grinch's* storyline and main characters. *Harley Davidson, Inc. v. Grottanelli*, 164 F.3d 806, 813 (2d Cir. 1999) (the trademark parody exception does not apply when the purported parody "makes no comment" on the original mark, and "simply uses it somewhat humorously to promote [its] own products and services . . . .").

---

[17] While the parties dispute whether the Play and derivative *Grinch* works occupy the same market (compare Dkt. No. 30 at ¶ 53 to Dkt. No. 33 at ¶ 33), this inference should be drawn in Dr. Seuss's favor.  *See Arrow Prods.*, 44 F. Supp. 3d at 367.

Plaintiffs make a number of additional (although somewhat duplicative) arguments to support dismissal of Dr. Seuss's trademark claims.  First, Plaintiffs argue that Dr. Seuss's trademark claims are pre-empted by 17 U.S.C. § 301, citing *Urbont v. Sony Music Entm't*, 831 F.3d 80, 93 (2d Cir. 2016) and *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 305 (2d Cir. 2004), (Dkt. No. 46 at 25-26), but these cases concern preemption of state law claims, not trademark claims.  Second, Plaintiffs argue that Dr. Seuss's trademark claims are barred by *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003).  (Dkt. No. 46 at 26.) *Dastar* is inapposite, however, because, as discussed above, Dr. Seuss's Lanham Act claims are distinct from its claims of copyright infringement; Dr. Seuss does not allege, as in *Dastar*, that Plaintiffs falsely took authorship credit.  5 MᴄCᴀʀᴛʜʏ ᴏɴ Tʀᴀᴅᴇᴍᴀʀᴋs ᴀɴᴅ Uɴꜰᴀɪʀ Cᴏᴍᴘᴇᴛɪᴛɪᴏɴ § 27:78 (4th ed.)  ("[I]t is clear that *Dastar* does not impact traditional claims of trademark and trade dress infringement.")  Third, Plaintiffs argue without any legal support that Dr. Seuss's trademark claims should be dismissed because "Plaintiffs did not use the alleged marks in commerce . . . because Defendant's cease and desist letters halted performances of the Play before they even began."  (Dkt. No. 46 at 26.)  This argument is nonsense.  *See, e.g., Essie Cosmetics, Ltd. v. Dae Do Int'l, Ltd.*, 808 F .Supp. 952, 957 (E.D.N.Y. 1992) ("In a trademark infringement action, a court may grant injunctive relief 'even before defendant actually opens the business,' so long as the threatened act of defendant is 'imminent and impending.'") (quoting J. Tʜᴏᴍᴀs MᴄCᴀʀᴛʜʏ, Tʀᴀᴅᴇᴍᴀʀᴋs ᴀɴᴅ Uɴꜰᴀɪʀ Cᴏᴍᴘᴇᴛɪᴛɪᴏɴ, § 30.5 at 470 (2d ed. 1984)); *Bertolli USA, Inc. v. Filippo Bertolli Fine Foods, Ltd.*, 662 F. Supp. 203 (S.D.N.Y. 1987) (trademark infringement action was not premature when defendant's product had not yet entered marketplace but defendant had sent product samples to two distributors and had printed product labels).

Finally, in asserting all of their arguments, Plaintiffs completely ignore Dr. Seuss's allegations relating to Plaintiffs' use of imagery of Cindy-Lou Who on advertisements for the Play. (Dkt. No. 33 at ¶ 29.) As alleged by Dr. Seuss, that use is likely to confuse consumers as to the source, sponsorship, or approval by Dr. Seuss of the infringing Play.

## V. CONCLUSION

The Court should deny Plaintiffs' copyright fair use Motion as premature and allow the parties to engage in discovery, and deny Plaintiffs' Motion on Dr. Seuss's trademark claims. Alternatively, if the Court is inclined to decide Plaintiffs' copyright fair use Motion without discovery, it should be denied because the Play is not a fair use.

Dated: New York, New York

July 28, 2017

DLA PIPER LLP (US)

By: /s/ *Tamar Duvdevani*
    Tamar Y. Duvdevani
    1251 Avenue of the Americas
    New York, New York 10020
    Tel: (212) 335-4500
    Fax: (212) 884-8580

    Ryan C. Compton (admitted *pro hac vice*)
    Ashley H. Joyce
    DLA PIPER LLP (US)
    500 Eighth Street, NW
    Washington, D.C. 20004
    Tel: 202.799.4000
    Fax: 202.799.5000

    *Attorneys for Defendant*
    *Dr. Seuss Enterprises, L.P.*