# EXHIBIT 1

**OPINION & ORDER**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x
                                 :

MATTHEW LOMBARDO AND WHO'S     :  **OPINION AND ORDER**
HOLIDAY LLC,                            :  **GRANTING DECLARATORY**
                                   :  **JUDGMENT FOR PLAINTIFFS**
             Plaintiffs,        :  **AND DISMISSING**
                                   :  **DEFENDANT'S**
     v.                            :  **COUNTERCLAIMS**
                                   :

DR. SEUSS ENTERPRISES, L.P.,       :
                                   :

            Defendants.      :  16 Civ. 9974 (AKH)
                                   :

---------------------------------------------------------------- x

ALVIN K. HELLERSTEIN, U.S.D.J.:

           Plaintiff Matthew Lombardo is the author of *Who's Holiday!* (the "Play"), a

comedic play that makes use of the characters, plot, and setting of the Dr. Seuss book, *How the*

*Grinch Stole Christmas!* ("*Grinch*"), to make fun of it and to criticize its qualities, i.e., to parody

it. Plaintiffs Lombardo and Who's Holiday LLC seek a declaration that the Play is fair use and

therefore does not infringe upon defendant Dr. Seuss Enterprises, L.P.'s copyright in *Grinch*.

Defendant asserts counterclaims alleging copyright and trademark infringement. Plaintiffs move

for judgment on the pleadings pursuant to Rule 12(c), arguing that the Play constitutes fair use of

defendant's copyright. Plaintiffs also move to dismiss defendant's counterclaims for failure to

state a legally sufficient claim for relief. For the reasons stated herein, plaintiffs' motion is

granted. The Play constitutes fair use and therefore does not infringe defendant's copyright in

*Grinch* or related trademarks. Defendant's counterclaims are dismissed.

## BACKGROUND

### I.    The Original Work: *How The Grinch Stole Christmas!*

           *Grinch*, originally published in 1957, is a well-known children's book written by

the author known as Dr. Seuss. First Amended Compl. ("FAC") ¶ 7. Defendant owns a

copyright in *Grinch*, and alleges ownership of trademarks in (i) the characters of the Grinch and Cindy-Lou Who; (ii) the stylized hand-lettering used consistently throughout Dr. Seuss books; and (iii) certain drawn images of Cindy-Lou Who. FAC ¶ 8; Counterclaims ¶ 20.

      *Grinch* tells the story of the Grinch, a green creature that lives in a cave on Mount Crumpit above the town of Who-Ville, home of the merry and cheerful Whos, who positively love Christmas. The Grinch, who despises Christmas, decides to ruin Christmas for Who-Ville by disguising himself as Santa Claus and stealing all of Who-Ville's Christmas trees and presents. While executing his plan, the Grinch encounters Cindy-Lou Who, an adorable two-year old girl. When Cindy-Lou asks the Grinch why he is taking her family's tree, the Grinch lies to Cindy-Lou, telling her that he needs to repair a light on the tree but will return it soon. Cindy-Lou believes the Grinch and returns to bed. The next day, the Grinch listens from Mount Crumpit for the sound of crying Whos, but instead hears the sounds of merry singing. The Grinch, upon learning that the Whos could remain joyous during Christmas even without presents or Christmas trees, realizes that Christmas means more than presents. The Grinch, his heart having "grown three sizes that day," returns to Who-Ville with all of the presents and joins the Whos for a scrumptious feast, featuring a dish called roast beast. *See generally*, Greenberger Decl. Ex. 2.

## II. The Allegedly Infringing Work: *Who's Holiday*

      Plaintiff Lombardo is the author of the play, *Who's Holiday*. Lombardo formed plaintiff Who's Holiday LLC to produce the Play. *Who's Holiday* is a one-actress 75-minute comedic play featuring a rather down-and-out 45 year-old version of Cindy-Lou Who. The Play takes place at Cindy-Lou's 1970s era trailer in the hills of Mount Crumpit. Cindy-Lou speaks to the audience only in rhyming couplets that are clearly intended to evoke the work of Dr. Seuss. While waiting for guests to arrive for her Christmas party, Cindy-Lou tells the audience the story

2

of her life, beginning with her first encounter with the Grinch at the age of two. Throughout the Play, as she shares her history, Cindy-Lou drinks hard alcohol, abuses prescription pills, and smokes a substance she identifies as "Who Hash," which she describes as just "like a prescription" which keeps her in check to avoid a "conniption." She engages in this self-medication following her realization that none of the guests she invited to her party is likely to attend, as they keep calling throughout the Play to cancel.

As Cindy-Lou recounts her initial encounter with the Grinch and his subsequent change of heart, paralleling the plot of the original *Grinch*, she incorporates age-inappropriate language and details that do not appear in the original work. ("I watched for a while as he was stealin' our shit / Then I cooed by mistake and he saw me. That twit."); ("How would I know he was evil or crass? / He gave me some water. Then patted my ass."). After recounting the plot of the original *Grinch*, Cindy-Lou goes on to tell the audience – using rhymes involving bawdy, ribald innuendo – that she became friends with the Grinch during her school-age years, and that she engaged in sexual intercourse with the Grinch upon turning eighteen. Cindy-Lou refers to the size of the Grinch's genitalia growing "three sizes that day." After learning that she is pregnant, Cindy-Lou informs the Grinch, who asks her to marry him. Over her parents' protestation ("When I told my parents they weren't pleased in the least / I mean, who wants their baby girl deflowered by a beast."), Cindy-Lou marries the Grinch, moves into his cave at the top of Mount Crumpit, and gives birth to their child ("With the fur and the paws it looked just like its Daddy / With no who dilly attached, I named the kid Patti.").

As the years go by, Cindy-Lou and the Grinch's relationship begins to sour as they struggle with issues such as unemployment, access to health care, lack of heat, and hunger. One day, Cindy-Lou discovers that the family dog Max has frozen to death, and she decides to

3

cook his carcass in order to feed her family. When the Grinch discovers what his dinner is made of, he attempts to physically abuse Cindy-Lou. During the ensuing scuffle, the Grinch falls off the edge of a cliff and dies. Following the Grinch's death, Cindy-Lou is arrested, convicted and incarcerated, and her daughter is put into foster care. After describing how her time in prison ultimately made her stronger and wiser, Cindy-Lou eventually finds out that all of her guests have declined to attend her party and begins to cry. It then dawns on her that she can celebrate Christmas with the audience instead. After singing a few Christmas songs, the door bells rings. Cindy-Lou expects it to be a local prankster, but it turns out to be her daughter, Patti. *See generally*, FAC Ex. 1.

### III. Procedural History

In July 2016, defendant sent plaintiffs and related entities numerous cease-and-desist letters requesting that plaintiffs refrain from any conduct that infringed defendant's intellectual property. After receipt of these letters, plaintiffs elected not to move forward with their planned production of the Play, and instead filed this lawsuit. In addition to seeking a declaration that the Play constitutes fair use, plaintiffs also filed several tort claims seeking recovery of funds lost as a result of the cancelled production. In an earlier opinion, I granted defendant's motion to dismiss plaintiff's tort claims. *See Lombardo v. Dr. Seuss Enterprises, L.P.*, 2017 WL 1378413 (S.D.N.Y. Apr. 7, 2017). In response to plaintiffs' first amended complaint, defendant filed counterclaims alleging copyright and trademark infringement. Over defendant's objection that discovery was necessary before the fair use issue could be resolved, I invited plaintiffs to file a motion for judgment on the pleadings pursuant to Rule 12(c) to test the issue. *See* Scheduling Order, Dkt. No. 40 (June 7, 2017).

4

## DISCUSSION

### I.     The Question of Whether the Play Constitutes Fair Use Is Properly Resolved on a Rule 12(c) Motion

The parties dispute whether the question of fair use can be resolved on a motion for judgment on the pleadings. Plaintiffs argue that discovery is unnecessary because the only task for the Court is to conduct a side-by-side comparison of the Play and *Grinch* and apply the law of fair use. Defendant counters that the following discovery is necessary to resolve the fair use question: (i) all versions of the Play's website and potential advertisements (as opposed to just those attached as exhibits to plaintiffs' pleadings); (ii) all drafts of the Play itself; (iii) all set and costume designs; and (iv) deposition testimony from the Play's author, director, set designer and costume designer.

No such discovery is necessary in this case. Numerous courts in this district have resolved the issue of fair use on a motion for judgment on the pleadings by conducting a side-by-side comparison of the works at issue. In *Arrow Prods., LTD. v. Weinstein Co. LLC*, 44 F. Supp. 3d 359 (S.D.N.Y. 2014), for example, the court held that "discovery would not provide any additional relevant information in this inquiry" because "[a]ll that is necessary for the court to make a determination as to fair use are the two films at issue." 44 F. Supp. 3d at 368. Similarly, in *Adjmi v. DLT Entm't Ltd.*, 97 F. Supp. 3d 512 (S.D.N.Y. 2015), which concerned a play that parodied the television show *Three's Company*, the court addressed fair use on a motion for judgment on the pleadings, reasoning that "[c]ourts in this Circuit have resolved motions to dismiss on fair use grounds in this way: comparing the original work to an alleged parody, in light of applicable law." 97 F. Supp. 3d at 527; *see also Effie Film, LLC v. Murphy*, 932 F. Supp. 2d 538 (S.D.N.Y. 2013) (resolving copyright infringement claim on motion for judgment on the pleadings by comparing screenplays side-by-side); *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg*

5

*L.P.*, 756 F.3d 73, 86 (2d Cir. 2014) (affirming district court's pre-discovery fair use ruling and noting that the "discovery [plaintiff] seeks would not alter our analysis").

Even in cases where fair use is addressed on a motion for summary judgment, following discovery, courts often resolve the issue of fair use by comparing the two works at issue. In *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013), for example, the Second Circuit chose to disregard the alleged infringer's deposition testimony, and instead endorsed the Seventh Circuit's approach of resolving fair use by "looking at the artworks and the photographs side-by-side." 714 F.3d at 707; *see Brownmark Films, LLC v. Comedy Partners,* 682 F.3d 687, 690 (7th Cir. 2012) ("[T]he only two pieces of evidence needed to decide the question of fair use in this case are the original version of WWITB and the episode at issue."). The Second Circuit adopted this approach because "[w]hat is critical is how the work in question appears to the reasonable observer, not simply what an artist might say about a particular piece or body of work." *Cariou*, 714 F.3d at 707.

Thus, although discovery might yield additional information about plaintiffs' intent, such information is unnecessary to resolve the fair use issue; all that is needed is the parties' pleadings, copies of *Grinch* and the Play, and the relevant case law. Defendant objects that plaintiffs have cherry-picked documents (such as promotional materials) that refer to the Play as a parody, and attached those documents to their complaint. I have not relied on such documents. The "threshold question when fair use is raised in defense of parody is whether a parodic character may reasonably be perceived," not whether the author of the secondary work labels it as such. *Campbell v. Acuff–Rose Music, Inc.,* 510 U.S. 569, 582 (1994).

To prevail on a Rule 12(c) motion in this context, plaintiffs' must "establish that there can be no set of facts to support an action for copyright infringement" brought against

them. *Adjmi*, 97 F. Supp. 3d at 526–27. In this sense, "[b]ecause this is an action for a declaratory judgment of *non*-infringement, [plaintiffs'] burden on this motion is turned on its head." In deciding this motion, all pleadings – including defendant's counterclaims – are taken to be true, subject to the same plausibility standard that applies on a Rule 12(b)(6) motion. *See Effie Film, LLC*, 932 F. Supp. 2d at 552 ("In deciding a Fed. R. Civ. P. 12(c) motion the court applies the same standard as it would in deciding a Rule 12(b) motion—a plaintiff must plead sufficient facts to state a claim for relief that is plausible on its face.").

## II. Fair Use

"The ultimate goal of copyright is to expand public knowledge and understanding, which copyright seeks to achieve by giving potential creators exclusive control over copying of their works, thus giving them a financial incentive to create informative, intellectually enriching works for public consumption." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 212 (2d Cir. 2015). "For nearly three hundred years, since shortly after the birth of copyright in England in 1710, courts have recognized that, in certain circumstances, giving authors *absolute* control over all copying from their works would tend in some circumstances to limit, rather than expand, public knowledge." *Id.* "Courts thus developed the doctrine, eventually named fair use, which permits unauthorized copying in some circumstances, so as to further 'copyright's very purpose, '[t]o promote the Progress of Science and useful Arts.'" *Id.* (quoting *Campbell,* 510 U.S. at 575) (quoting U.S. Const., Art. I, § 8, cl. 8).

The fair use doctrine is codified in the Copyright Act of 1976. *See* 17 U.S.C. § 107. "That codification does not so much define 'fair use' as provide a non-exhaustive list of factors to guide courts' fair use determinations." *TCA Television Corp. v. McCollum*, 839 F.3d 168, 178 (2d Cir. 2016). The preamble to Section 107 provides that "the fair use of a copyrighted work … for purposes such as criticism, comment, news reporting, teaching

7

(including multiple copies for classroom use), scholarship, or research is not an infringement of copyright." 17 U.S.C. § 107. "When the copied work is being used for one of the purposes identified in the preamble, there is a strong presumption in favor of fair use[.]" *Fox News Network, LLC v. TVEyes, Inc.*, 43 F. Supp. 3d 379, 389 (S.D.N.Y. 2014) (citing *NXIVM Corp. v. Ross Institute,* 364 F.3d 471, 477 (2d Cir. 2004)).

Although fair use requires a "case-by-case analysis," *Campbell*, 510 U.S. at 577, and "is an open-ended and context-sensitive inquiry," *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006), most courts approach the issue by applying the four nonexclusive factors set out in the Copyright Act itself: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107. These four factors are not to be "treated in isolation, one from another." *Campbell*, 510 U.S. at 578. Instead, "[a]ll are to be explored, and the results weighed together, in light of the purposes of copyright." *Id.* "A proponent of the fair use doctrine need not establish that each factor weighs in its favor to prevail." *TVEyes*, 43 F. Supp. 3d at 389.

### a. First Fair Use Factor: Purpose and Character of the Use

"The first factor, which addresses the manner in which the copied work is used, is the 'heart of the fair use inquiry.'" *N. Jersey Media Grp. Inc. v. Pirro*, 74 F. Supp. 3d 605, 614 (S.D.N.Y. 2015) (quoting *Blanch,* 467 F.3d at 251). "The central question is 'whether and to what extent the new work is 'transformative,''" *Estate of Smith v. Cash Money Records, Inc.*, 2017 WL 2333770, at *7 (S.D.N.Y. May 30, 2017) (quoting *Campbell*, 510 U.S. at 579), for the "goal of copyright ... is generally furthered by the creation of transformative works." *Campbell*, 510 U.S. at 579. To resolve whether a work is transformative, *Campbell* instructs courts to

8

consider "whether the new work merely supersedes the objects of the original creation, or instead
adds something new, with a further purpose or different character, altering the first with new
expression, meaning, or message." *Id.*

           I begin my analysis of the first fair use factor by considering whether the Play is a
parody of *Grinch*, for parody "'has an obvious claim to transformative value,' and thus deciding
that the new work is a parody necessarily entails finding that the new work is transformative."
*Abilene Music, Inc. v. Sony Music Entm't, Inc.*, 320 F. Supp. 2d 84, 89 (S.D.N.Y. 2003) (quoting
*Campbell*, 510 U.S. at 579); *see also MasterCard Int'l Inc. v. Nader 2000 Primary Comm., Inc.*,
2004 WL 434404, at *12 (S.D.N.Y. Mar. 8, 2004) ("One such transformative use that is typically
found to be fair use is a parody."); *Adjmi*, 97 F. Supp. 3d at 534 (finding fair use and describing
secondary work as a "transformative parody" of original work). Treating parodies as
transformative works is logical, for if defendant could control who was permitted to parody the
*Grinch* and in what manner, the purpose of copyright law would be stifled, not promoted.

           For the reasons discussed below, I hold that the Play is a parody of *Grinch*, and
thus transformative.

### i. Parody

           "One type of protected creativity is parody, a recognized category of criticism or
comment authorized by Section 107." *Adjmi*, 97 F. Supp. 3d at 530. "Where the [alleged
infringer's] use is for the purposes of 'criticism, comment ... scholarship, or research,' 17 U.S.C.
§ 107," the first factor "will normally tilt in the [alleged infringer's] favor." *NXIVM Corp. v.
Ross Inst.*, 364 F.3d 471, 477 (2d Cir. 2004); *see also Wright v. Warner Books, Inc.*, 953 F.2d
731, 736 (2d Cir. 1991) ("[T]here is a strong presumption that factor one favors the [alleged
infringer] if the allegedly infringing work fits the description of uses described in section 107.").
This does not end the inquiry, however, for the Supreme Court has rejected the notion that "any

parodic use is presumptively fair." *Campbell*, 510 U.S. at 581. "Accordingly, parody, like any other use, has to work its way through the relevant factors, and be judged case by case, in light of the ends of the copyright law." *Id.* That said, "once a work is determined to be a parody, the second, third, and fourth factors are unlikely to militate against a finding of fair use." *Abilene Music*, 320 F. Supp. 2d at 89.

"The threshold question when fair use is raised in defense of parody is whether a parodic character may reasonably be perceived." *Campbell*, 510 U.S. at 582. Adopting dictionary definitions, the Supreme Court has referred to parody as a "literary or artistic work that imitates the characteristic style of an author or a work for comic effect or ridicule," or a "composition in prose or verse in which the characteristic turns of thought and phrase in an author or class of authors are imitated in such a way as to make them appear ridiculous." *Id.* at 580. The "heart of any parodist's claim to quote from existing material, is the use of some elements of a prior author's composition to create a new one that, at least in part, comments on that author's works." *Id.* Thus, "the copied work must be, at least in part, an object of the parody, otherwise there would be no need to conjure up the original work." *Rogers v. Koons*, 960 F.2d 301, 310 (2d Cir. 1992). "If, on the contrary, the commentary has no critical bearing on the substance or style of the original composition, which the alleged infringer merely uses to get attention or to avoid the drudgery in working up something fresh, the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish), and other factors, like the extent of its commerciality, loom larger. *Campbell*, 580 U.S. at 580.

The key question I must therefore resolve, is whether the Play comments on *Grinch* by imitating and ridiculing its characteristic style for comic effect, or, as defendant contends, merely exploits the characters, style and themes of *Grinch* in order "to avoid the

10

drudgery in working up something fresh." *Id.* Defendant argues that the Play "does not poke fun of the Seussian rhyming style," but instead usurps that style in order to sell a commercial work. Nor, according to defendant, does the Play comment on or ridicule the characters and themes of *Grinch*; it merely "uses *Grinch*, Cindy-Lou, the Grinch character, and the dog Max as building blocks for a sequential work, featuring those same characters in the Suess-created settings of Mount Crumpit and Who-Ville."

Defendant's assessment misses the mark. The Play recontextualizes *Grinch's* easily-recognizable plot and rhyming style by placing Cindy-Lou Who – a symbol of childhood innocence and naiveté – in outlandish, profanity-laden, adult-themed scenarios involving topics such as poverty, teen-age pregnancy, drug and alcohol abuse, prison culture, and murder. In so doing, the Play subverts the expectations of the Seussian genre, and lampoons the *Grinch* by making Cindy-Lou's naiveté, Who-Ville's endlessly-smiling, problem-free citizens, and Dr. Seuss' rhyming innocence, all appear ridiculous.

In *Grinch*, Cindy-Lou's childhood innocence serves as a counterpoint to the Grinch's deceitful nature and his disdain for joy and happiness. Cindy-Lou is a "small *Who*" who was "not more than two," and made a "small sound like the coo of a dove." She asks the Grinch, "Santy Claus, why, why are you taking our Christmas tree? WHY?" The Grinch tells her that he is taking the tree to his workshop to repair a broken light, and Cindy-Lou believes his lie. In the Play, by contrast, Cindy-Lou is depicted as a grown woman. She lives alone in a poorly maintained trailer, struggles with alcohol and substance abuse, and uses profanity freely (as long as it still rhymes). She mothered a child with the Grinch, knocked the Grinch off a cliff after he tried to attack her, and served time in prison as a result. At one point, Cindy-Lou

11

suggests to the audience that she used to put razor blades in apples on Halloween to keep the children of Who-Ville away from her house.

The Play's version of Who-Ville likewise pokes fun of *Grinch's* utopic depiction of Who-Ville. In *Grinch*, Who-Ville is filled with cheery citizens who love Christmas, have grand communal feasts, dream "sweet dreams without a care," and sing joyous songs together as they "stand hand-in-hand." No problems trouble the residents, who have been blessed with an indomitably optimistic spirit that not even the Grinch can defeat. In the Play, by contrast, Who-Ville is plagued by problems and real-world challenges. The Grinch struggles with unemployment. Who-Ville's criminal justice system metes out a harsh punishment upon Cindy-Lou following the Grinch's death, from what appears to be lawful self-defense, and Cindy-Lou's child is placed into foster care. In the Play, Who-Ville is no longer a place where people can overcome adversity by smiling and singing together. Who-Ville is now a place where young women are impregnated by green beasts, families struggle to put food on the table, paparazzi run rabid, and citizens get high on "Who Hash" to escape problems of daily life.

In creating these juxtapositions, the Play, rather than trading on the character of Cindy-Lou Who and the setting of Who-Ville for commercial gain, turns these Seussian staples upside down and makes their saccharin qualities objects of ridicule. Defendant argues that the Play's references to the Dr. Seuss song "Fahoo Fores Dahoo Dores" and *Grinch's* fictional "goo-goo-gums" and "foo-foo-fluffs" are evidence of improper copying. Not so, for immediately after she refers to "goo-goo-gums" and "foo-foo-fluffs," Cindy-Lou turns to the audience to comment, "Whatever the fuck those were."

The Play parodies *Grinch* also by recontextualizing and subverting the Seussian rhyming style. For example, during a scene in which Cindy-Lou recounts her time in prison, her

12

cell mate confronts her: "STOP SPEAKING IN RHYME," the cell mate says. "But that's how all the Whos talk," Cindy-Lou tries to explain. The cell mate shoots back, "You ain't no Who here! It's time you speak plain!" The cell mate's response makes clear that rhyming is unsuitable for the real world and invites the audience to contemplate the juxtaposition of speaking in rhyme and doing prison time. The Play also uses the audience's familiarity with the Suessian rhyming style to imply vulgar, un-Suessian conclusions to rhymes. Take, for example, Cindy-Lou's description of a night with the Grinch:

> But things started to change when I turned eighteen.
> I was becoming a woman. And he? Was still green.
> The night of my birthday, he took me alone to the dock.
> Where he gave me my present. His big, thick, long –

*The telephone rings.*

(Excuse me.)

"The heart of any parody is its evocation of the message or style of the original work in order to alter that message or style in a way that humorously expresses the author's opinion of the original work." *Abilene Music*, 320 F. Supp. 2d at 90. The Play's coarseness and vulgarity lampoons *Grinch* by highlighting the ridiculousness of the utopian society depicted in the original work: society is not good and sweet, but coarse, vulgar and disappointing. Through clever re-arrangement of the original material, the Play attempts to depict the realities of the modern world in which we live. The Play would not make sense without evoking the style and message of *Grinch*, for there would be no object of the parody. Whether the Play's parody of *Grinch* is effective, or in good taste, is irrelevant. *See Campbell*, 510 U.S. at 569 ("Whether … parody is in good taste or bad does not and should not matter to fair use."); *Yankee Pub. Inc. v. News Am. Pub. Inc.*, 809 F. Supp. 267, 280 (S.D.N.Y. 1992) (Leval, J.) ("First Amendment

protections do not apply only to those who speak clearly, whose jokes are funny, and whose parodies succeed.").

Both the Supreme Court and the Second Circuit have recognized that secondary works that poke fun at the original work's hokeyness, blandness or seriousness can constitute parody. In *Campbell*, for example, the Supreme Court held that a 2 Live Crew song that copied the Roy Orbison song "Pretty Woman" was parody because it "was clearly intended to ridicule the white-bread original" by "substituting predictable lyrics with shocking ones ... [that] derisively demonstrat[e] how bland and banal the Orbison song seems to them." *Campbell*, 510 U.S. at 582. Similarly, in *Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109 (2d Cir. 1998), the Second Circuit found that an advertisement for the movie *Naked Gun 33 1/3: The Final Insult*, which featured the head of Leslie Nielsen superimposed over an iconic photograph of a pregnant Demi Moore, qualified as parody. "Because the smirking face of Nielsen contrasts so strikingly with the serious expression on the face of Moore, the ad may reasonably be perceived as commenting on the seriousness, even the pretentiousness, of the original. The contrast achieves the effect of ridicule that the Court recognized in *Campbell* would serve as a sufficient 'comment' to tip the first factor in a parodist's favor." 137 F.3d at 114.

### ii. Transformative Use

In assessing whether a secondary work is transformative, the "critical inquiry is whether the new work uses the copyrighted material itself for a purpose, or imbues it with a character, different from that for which it was created." *McCollum*, 839 F.3d at 180. Defendant argues that the Play is not transformative because it involves the same characters from *Grinch*, takes place in the same setting, and incorporates the plot of the original work. That may be true, but the Play does much more than just insert the characters from *Grinch* into a dark, updated setting. By parodying those characters and setting, the Play "adds something new" and "alters

14

the [original] with new expression, meaning, [and] message." *Campbell*, 510 U.S. at 579. The Play, as a parody, qualifies as a transformative work. *See Abilene Music*, 320 F. Supp. 2d at 89 ("[D]eciding that the new work is a parody necessarily entails finding that the new work is transformative.").

> *TCA Television Corp. v. McCollum*, 839 F.3d 168 (2d Cir. 2016), in which the Second Circuit recently rejected a fair use claim, is distinguishable. *McCollum* concerned a play in which a character uses a sock puppet to perform, nearly verbatim, a minute-long segment of the Abbott and Costello routine, *Who's on First*. The Second Circuit held that this use was not transformative because there was no explanation why such "extensive copying of a famous comedy routine was necessary" to the purpose the use served: character development and plot advancement. *Id.* at 179. This unaltered use of an original work, inserted into a new work for a purpose entirely disconnected from the original work itself, does not qualify as fair use and is readily distinguishable from the Play's use of *Grinch*. Unlike in *McCollum*, where it was irrelevant whether the alleged infringer used *Who's on First* or some other original work, the Play's use of *Grinch* is necessary to the purpose and meaning of the Play; absent that use, much of the Play's comedy and commentary evaporates.

### iii. Commercial Nature of the Allegedly Infringing Work

> The first statutory factor also asks "whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107. Although a finding that the secondary work is of a commercial nature generally weighs against a finding of fair use, the Supreme Court has made clear that where the work is transformative – that is, the first factor otherwise favors a finding of fair use – the fact that the work is also commercial is of less importance. Transformative works "lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright, and the more transformative the new work, the less will be the

15

significance of other factors, like commercialism, that may weigh against a finding of fair use."
*Campbell*, 510 U.S. at 579. As the Second Circuit has held, "Congress could not have intended a
rule that commercial uses are presumptively unfair." *Cariou*, 714 F.3d at 708; *see also Blanch*,
467 F.3d at 254 (discounting the "secondary commercial nature of the use" since "the new work
is substantially transformative."). Given that the Play's use of *Grinch* is transformative, it is of
little significance that the use is also of a commercial nature.

### b. Second Fair Use Factor: Nature of the Copyrighted Work

The second fair use factor, the "nature of the copyrighted work," recognizes that
"some works are closer to the core of intended copyright protection than others, with the
consequence that fair use is more difficult to establish when the former works are copied."
*Campbell*, 510 U.S. at 586. For example, where the original work is fictional rather than factual,
a finding of fair use might be less likely, for the "law generally recognizes a greater need to
disseminate factual works than works of fiction or fantasy." *Harper & Row Publishers, Inc. v.
Nation Enterprises*, 471 U.S. 539, 563 (1985).

However, the "second factor has rarely played a significant role in the
determination of a fair use dispute." *Authors Guild v. Google, Inc.*, 804 F.3d at 220. Moreover,
"the second factor ... is not heavily weighted in cases involving parodies," as is the case here,
"since any work meriting parody is likely to be both well-known and creative enough to be close
to the core of intended copyright protection." *Abilene Music*, 320 F. Supp. 2d at 89 (internal
quotation marks omitted). "To quote the Supreme Court, the second factor is not 'ever likely to
help much in separating the fair use sheep from the infringing goats in a parody case, since
parodies almost invariably copy publicly known, expressive works.'" *Adjmi*, 97 F. Supp. 3d at
532 (quoting *Campbell*, 510 U.S. at 586). Accordingly, although this factor favors defendant
because *Grinch* is a creative work, I decline to give much weight to this factor in light of the

16

Play's parodic nature.

### c. Third Fair Use Factor: Amount and Substantiality of Use

"The third statutory factor asks whether 'the amount and substantiality of the portion used in relation to the copyrighted work as a whole ... are reasonable in relation to the purpose of the copying.'" *McCollum*, 839 F.3d at 185 (quoting *Campbell*, 510 U.S. at 586). A court is to consider "not only 'the quantity of the materials used' but also 'their quality and importance.'" *McCollum*, 839 F.3d at 185 (quoting *Campbell* 510 U.S. at 587). "There are no absolute rules as to how much of a copyrighted work may be copied and still be considered a fair use," *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 98 (2d Cir. 2014) (internal quotation marks and citation omitted), for the "extent of permissible copying varies with the purpose and character of the use." *Id.* (quoting *Campbell*, 510 U.S. at 586-87). An "important inquiry is whether the selection and quantity of the material taken are reasonable in relation to the purported justification." *McCollum*, 839 F.3d at 185. The Second Circuit has not been consistent in explaining whether a secondary user may copy more than is necessary to achieve his or her objective. *Compare Cariou v. Prince*, 714 F.3d 694, 710 (2d Cir. 2013) ("[T]he law does not require that the secondary artist may take no more than is necessary." (citing *Campbell*, 510 U.S. at 588)), *with Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 98 (2d Cir. 2014) ("The crux of the inquiry is whether 'no more was taken than necessary.'" (quoting *Campbell*, 510 U.S. at 589)). It is clear, however, that "the larger volume (or the greater importance) of the original taken, the less likely the taking will qualify as a fair use." *Adjmi*, 97 F. Supp. 3d at 533.

Courts have recognized that in the context of parody, a secondary user is entitled to more extensive use of the original than might otherwise be permissible, given that "the parody must be able to 'conjure up' at least enough of that original to make the object of its critical wit recognizable." *Campbell*, 510 U.S. at 588 (citation omitted). Thus, the "Court of Appeals has

17

consistently held that a parody under the fair use doctrine is entitled to more extensive use of the original work than is ordinarily allowed under the substantial similarity test." *Adjmi*, 97 F. Supp. 3d at 533 (citing *Rogers v. Koons*, 960 F.2d 301, 310 (2d Cir. 1992)).

Applied here, the Play's use of *Grinch* is not excessive in relation to the parodic purpose of the copying. The Play does incorporate substantial elements of *Grinch's* characters, setting, plot, and style but, as plaintiffs have articulated, the Play engages in this "distorted imitation" in order to mock the original. In the Play, the character of Cindy-Lou serves an entirely different function than in the original. The Grinch, although referred to throughout the Play, does not appear as an on-stage character at all. With respect to setting, the Play takes place in a "silver bullet trailer in the snowy hills of Mount Crumpit," a specific setting absent from the original *Grinch.* And, as discussed above, the Who-Ville described in the Play is considerably different from the Who-Ville depicted in *Grinch.* Nor does the Play copy or quote *any* language from *Grinch* verbatim. The Play does recount the plot of *Grinch*, but does so for the purpose of "conjuring up" the original.

For these reasons, I find that the amount taken from *Grinch* was "reasonable in proportion to the needs of the intended transformative use." *Estate of Smith*, 2017 WL 2333770, at *10.

### d. Fourth Fair Use Factor: The Effect On the Potential Market For the Copyrighted Work

The fourth factor considers "the effect of the use upon the potential market for or value of the copyrighted work," 17 U.S.C. § 107, and focuses on "whether the secondary use usurps demand for the protected work by serving as a market substitute." *McCollum*, 839 F.3d at 186. "The enquiry must take account not only of harm to the original but also of harm to the market for derivative works." *Campbell*, 510 U.S. at 590 (internal quotation marks and citation

18

omitted). The question is "whether the copy brings to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights holder of significant revenues because of the likelihood that potential purchasers may opt to acquire the copy in preference to the original." *Authors Guild v. Google, Inc.*, 804 F.3d at 223.

Beyond market substitution of the original work, analysis of the fourth factor also "properly identifies and weighs relevant harm to the derivative market for a copyrighted work, which market includes uses that creators of original works might license others to develop." *McCollum*, 839 F.3d at 186 (internal quotation marks and citation omitted). Although "a court's focus is not on possible lost licensing fees from defendants' challenged use," a court "properly considers the challenged use's 'impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets.'" *Id.* (quoting *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 930 (2d Cir. 1994)).

Here, there is virtually no possibility that consumers will go see the Play in lieu of reading *Grinch* or watching an authorized derivative work, such as the 2000 film *Dr. Seuss' How the Grinch Stole Christmas*. *Grinch* is a children's book intended for an all-ages audience, whereas the Play is a bawdy, off-color parody of *Grinch* that is clearly intended for adult audiences. "As to parody pure and simple, it is unlikely that the work will act as a substitute for the original, since the two works usually serve different market functions." *Campbell*, 510 U.S. at 570-71. The Play is not an unauthorized sequel of *Grinch*, and given the clear differences in tone and content, it is unreasonable to assume that audiences might confuse the Play for a theatrical version of *Grinch*, or that the Play would usurp the market for *Grinch*.

In *Mattel, Inc. v. Pitt*, 229 F. Supp. 2d 315 (S.D.N.Y. 2002), for example, the court found that a website featuring images of Barbie dolls wearing sadomasochistic costumes

19

and engaging in sexually explicit acts would not "pose any danger of usurping demand for

Barbie dolls in the children's toys market" because the "sale or display of 'adult' dolls does not

appear to be a use Mattel would likely develop or license others to develop." 229 F. Supp. 2d at

318; *see also CCA & B, LLC v. F + W Media Inc.*, 819 F. Supp. 2d 1310, 1323 (N.D. Ga. 2011)

(finding fair use in part because "it is highly unlikely that consumers will choose an

inappropriate-for-children parody in lieu of the wholesome" original work). It is true, as

defendant argues, that some fans of *Grinch* may be drawn to the Play because of its content.

However, given the Play's clear parodic qualities, it is far more likely that this potential

crossover will increase interest in *Grinch*, as opposed to usurp the market for it. Conversely, to

the extent the Play causes fans of Dr. Seuss to abandon the original work altogether, such a

concern is irrelevant, for the court's "concern is not whether the secondary use suppresses or

even destroys the market for the original work or its potential derivatives, but whether the

secondary use usurps the market of the original work." *NXIVM Corp.*, 364 F.3d at 482.

Nor is it likely that the Play will have any impact on potential licensing

opportunities for derivative works in defendant's "traditional, reasonable, or likely to be

developed markets," *McCollum*, 839 F.3d at 186 (citation omitted), for the "market for potential

derivative uses includes only those that creators of original works would in general develop or

license others to develop." *Campbell*, 510 U.S. at 592. Defendant alleges that the Play will

cause harm to its licensing market for derivative works and that it has previously authorized a

number of *Grinch* derivative works that expanded on the character of Cindy-Lou Who and

included "themes and jokes aimed at adult audiences." Counterclaims ¶¶ 18, 33. But even

accepting these allegations as true, as I must on a motion for judgment on the pleadings,

defendant makes no allegations that it intends to authorize a parody containing references to

20

bestiality, drug use, and other distinctly "un-Seussian" topics. *See Campbell*, 510 U.S. at 592

("[T]he unlikelihood that creators of imaginative works will license critical reviews or lampoons

of their own productions removes such uses from the very notion of a potential licensing

market.").

     Thus, the fourth factor weighs strongly in favor of a finding of fair use, and in

considering all of the four factors together, I hold that the Play constitutes fair use.

## III. Counterclaims

     In addition to copyright infringement claims, which are dismissed in light of my

fair use finding, defendant also asserts three claims sounding in trademark: (i) false association

and unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (ii)

unfair competition under New York common law; and (iii) trademark dilution under New York

General Business Law Section 360-L. N.Y. Gen. Bus. Law § 360-l. As relevant to this

litigation, defendant alleges trademarks in (i) the characters of the Grinch and Cindy-Lou Who;

(ii) the stylized hand-lettering used consistently throughout Dr. Seuss books; and (iii) certain

drawn images of Cindy-Lou Who. Counterclaims ¶ 20.

     Conflict between the First Amendment and the law of trademark "is inevitable in

the context of parody, because the keystone of parody is imitation." *Cliffs Notes, Inc. v. Bantam

Doubleday Dell Pub. Grp., Inc.*, 886 F.2d 490, 494 (2d Cir. 1989). In this Circuit, courts are to

apply a balancing test to resolve the conflict between these interests: the Lanham Act "should be

construed to apply to artistic works only where the public interest in avoiding consumer

confusion outweighs the public interest in free expression." *Rogers v. Grimaldi*, 875 F.2d 994,

999 (2d Cir. 1989). In *Cliffs Notes*, the Second Circuit elaborated on the *Rogers* balancing test in

the context of parody, noting that the test "allows greater latitude for works such as parodies, in

which expression, and not commercial exploitation of another's trademark, is the primary intent,

21

and in which there is a need to evoke the original work being parodied." 866 F.2d at 495.
"Thus, where the unauthorized use of a trademark is for expressive purposes of comedy, parody,
allusion, criticism, news reporting, and commentary, the law requires a balancing of the rights of
the trademark owner against the interests of free speech." *Yankee Pub. Inc. v. News Am. Pub.
Inc.*, 809 F. Supp. 267, 276 (S.D.N.Y. 1992).

With respect to plaintiffs' use of the characters of the Grinch and Cindy-Lou
Who, which are integral to the Play, I hold that the public interest in free expression clearly
outweighs any interest in avoiding consumer confusion, the likelihood of which is extremely
minimal given the parodic nature of the Play. *See Louis Vuitton Malletier, S.A. v. My Other Bag,
Inc.*, 156 F. Supp. 3d 425, 443 (S.D.N.Y. 2016) (hand bag that was an "obvious parody" of the
original Louis Vuitton luxury bag presented no likelihood of confusion).

Plaintiffs' alleged use of Dr. Seuss-style hand-lettering and the drawn images of
Cindy-Lou Who presents a closer question, for these trademarks do not appear in the Play, but
are instead alleged to have been used in connection with advertising for the Play and other
promotional materials. Counterclaims ¶ 29. Nevertheless, they serve plaintiffs' parodic purpose,
for as the Second Circuit recognized in *Cliffs Notes*, a parodic work must necessarily evoke
elements of the original work, including trademarked elements, in order to communicate the
object of the parody. "It is hard to imagine, for example, a successful parody of Time magazine
that did not reproduce Time's trademarked red border." *Cliffs Notes*, 886 F.2d at 494. So too
here, it is hard to imagine a parody of a Dr. Seuss book that did not deploy the characteristic
typeface associated with Dr. Seuss' most well-known books, or a parody of Cindy-Lou Who that
omitted images of that character. The public's interest in free speech outweighs defendant's
interest in protecting these trademarks.

22

Normally, the strength of defendant's marks would point to a likelihood of confusion. However, "[w]here the plaintiff's mark is being used as part of a jest or commentary, the opposite can be true." *Yankee Pub. Inc.*, 809 F. Supp. at 273. This is because the "strength and recognizability of the mark may make it easier for the audience to realize that the use is a parody and a joke on the qualities embodied in trademarked word or image." *Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F. Supp. 2d 410, 416 (S.D.N.Y. 2002) (internal quotation marks and citation omitted). Thus, "taking into account that somewhat more risk of confusion is to be tolerated when a trademark holder seeks to enjoin artistic expression such as a parody," I hold that the risk of confusion in this context "does not outweigh the well-established public interest in parody." *Cliffs Notes*, 886 F.2d at 495.[1]

Defendant's state law unfair competition and trademark dilution claims are dismissed for the same reasons. *See Kregos v. Associated Press*, 795 F. Supp. 1325, 1336 (S.D.N.Y. 1992) ("[T]he standards for § 43(a) claims under the Lanham Act and unfair competition claims under New York law are virtually the same."); *Charles Atlas, Ltd. v. DC Comics, Inc.*, 112 F. Supp. 2d 330, 341 (S.D.N.Y. 2000) (finding risk of confusion "clearly outweighed by the public interest in parodic expression" and dismissing state law trademark dilution and unfair competition claims "because they are based on the same permissible conduct."); *Yankee Publishing,* 809 F.Supp. at 282 (finding that the "same First Amendment considerations that limit a cause of action under the Lanham Act apply also to a cause of action under New York law.").

---

[1] In light of this holding, I need not work through the "likelihood of confusion" factors established in *Polaroid v Polared Elecs. Corp* , 287 F.2d 492 (2d Cir. 1961). As articulated in *Cliffs Notes*, "the *Polaroid* test is at best awkward in the context of parody, which must evoke the original and constitutes artistic expression." 886 F.2d at 497 n.3

**CONCLUSION**

For these reasons, plaintiffs' motion for judgment on the pleadings and dismissal of defendant's counterclaims is granted. The Clerk shall terminate the motion, and all related motions (Dkt. Nos. 44, 48). The Play constitutes fair use and does not infringe defendant's copyright in *Grinch*. The Clerk shall enter judgment granting judgment to plaintiffs and dismissing the counterclaims, and shall tax costs in favor of plaintiffs. The Clerk shall mark the case closed.

SO ORDERED.

Dated:   September / 2017
New York, New York

ALVIN K. HELLERSTEIN
United States District Judge